JAMES M. WAGSTAFFE (95535)
wagstaffe@kerrwagstaffe.com
MICHAEL NG (237915)
mng@kerrwagstaffe.com
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105–1528
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Defendant
COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH
ORGANISATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| CISCO-LINKSYS LLC, CISCO SYSTEMS, INC. AND CISCO SYSTEMS WIRELESS NETWORKING (AUSTRALIA) PTY, LTD.<br><br>                Plaintiffs,<br><br>        v.<br><br>COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,<br><br>                Defendant. | Case No. SACV0900178-DOC (MLG)<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT CSIRO'S MOTION TO DISMISS**<br><br>DATE: August 10, 2009<br>TIME: 8:30 a.m.<br>COURTROOM: 9D<br><br>TRIAL: [None]<br><br>**Hon. David O. Carter** |

KERR
&
WAGSTAFFE
LLP

# <u>TABLE OF CONTENTS</u>

*Page*

I.      Introduction ........................................................................................... 1

II.     Factual Background ............................................................................... 2

  A. CSIRO's Wireless Networking Invention ......................................... 2

  B. The Spin-Off of Radiata ................................................................ 3

  C. Radiata's Purchase by Cisco ......................................................... 4

  D. The Current Dispute ..................................................................... 5

  E. The United States and Australian Litigation ..................................... 6

III.    Argument ............................................................................................. 7

  A. This Court Lacks Subject Matter Jurisdiction Over This Dispute Under the Foreign Sovereign Immunities Act .................................... 7

    1. Legal Standard ................................................................ 7

    2. CSIRO Is a Foreign Governmental Entity Subject to FSIA Protection ............................................................... 8

    3. The Radiata Dispute Does Not Trigger the Commercial Activity Exception of the FSIA ............................................ 9

  B. In the Alternative, the Court Should Dismiss on Grounds of *Forum Non Conveniens* .............................................................. 13

    1. Legal Standard ............................................................. 13

  C. Australia Provides an Adequate Alternative Forum ......................... 14

  D. The Threshold for Dismissal Is Lowered for Foreign Plaintiffs ...... 15

  E. The Private Factors Overwhelmingly Favor Dismissal ................... 16

    1. Residence of the Parties and the Witnesses ......................... 16

    2. The Forum's Convenience to the Litigants ........................... 19

    3. Access to Physical Evidence and Other Sources of Proof ..... 20

    4. Whether Unwilling Witnesses Can Be Compelled to Testify ........................................................................ 20

1             5.     Cost of Bringing Witnesses to Trial ........................................ 21

2             6.     Enforceability of the Judgment................................................ 21

3      F.     The Public Factors Also Weigh in Favor of Dismissal ................... 22

4             1.     Local Interest of Lawsuit ........................................................ 22

5             2.     Court's Familiarity with Governing Law ............................... 22

6             3.     Burden on Local Courts and Juries, Congestion in the Court, and the Costs of Resolving a Dispute Unrelated to

7                       this Forum .............................................................................. 23

8      G.     Courts Have Dismissed Similar Foreign Licensing Actions ............ 23

9      H.     The Court Should Exercise Its Discretion Not to Hear This

10            Declaratory Judgment Action ............................................................ 24

11 IV.     Conclusion ................................................................................................. 25

KERR
&
WAGSTAFFE
LLP

# TABLE OF AUTHORITIES

*Page*

## *Cases*

Action Indus., Inc. v. U.S. Fid. & Guar. Co.,
  358 F.3d 337 (5th Cir. 2004)........................................................................ 14

Adler v. Federal Republic of Nigeria,
  107 F.3d 720 (9th Cir. 1997).................................................................. 8, 11

Altmann v. Republic of Austria,
  317 F.3d 954 (9th Cir. 2002)........................................................................ 14

Australian Government Aircraft Factories v. Lynne,
  743 F.2d 672 (9th Cir. 1984)........................................................................ 12

Bonzel v. Pfizer, Inc.,
  439 F.3d 1358 (Fed. Cir. 2006).............................................................. 23, 24

Brillhart v. Excess Ins. Co. of America,
  316 U.S. 491 (1942) .................................................................................... 25

Corzo v. Banco Cent. de Reserva del Peru,
  243 F.3d 519 (9th Cir. 2001)........................................................................ 12

Coyle v. P.T. Garuda Indonesia,
  363 F.3d 979 (9th Cir. 2004)........................................................................ 8

Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,
  212 F. Supp. 2d 30 (D.D.C. 2002) .............................................................. 13

Doe v. Unocal Corp.,
  248 F.3d 915 (9th Cir. 2001)........................................................................ 14

Finova Cap. Corp. v. Ryan Helicopters U.S.A. Inc.,
  180 F.3d 896 (7th Cir. 1999)........................................................................ 25

Great Prize, S.A. v. Mariner Shipping Party, Ltd.,
  967 F.2d 157 (5th Cir. 1992)........................................................................ 15

Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.,
  179 F.R.D. 264 (C.D. Cal. 1998) ................................................................ 23

Hilton v. Guyot,
  159 U.S. 113 (1895) .................................................................................... 21

Intel Corp v. Commonwealth Scientific and Indus. Research Organisation,
  2005 WL 1656903 (N.D. Cal. July 8, 2005)................................................ 9

Intel Corp. v. Commonwealth Scientific and Industrial Research Organisation,
  455 F.3d 1364 (Fed. Cir. 2006)................................................................... 13

<u>Interpane Coatings, Inc. v. Australia & New Zealand Banking Group Ltd.,</u>
   732 F. Supp. 909 (N.D. Ill. 1990) .................................................................. 15

<u>Lockman Found. v. Evangelical Alliance Mission,</u>
   930 F.2d 764 (9th Cir. 1991).......................................................... 14, 15, 21

<u>Lueck v. Sundstrand Corp.,</u>
   236 F.3d 1137 (9th Cir. 2001).............................................................. 14, 15

<u>Ministry of Health, Province of Ontario, Canada v. Shiley Inc.,</u>
   858 F. Supp. 1426 (C.D. Cal. 1994)............................................................. 23

<u>Mizokami Bros. of Ariz., Inc. v. Baychem Corp.,</u>
   556 F.2d 975 (9th Cir. 1977).......................................................................... 14

<u>Palmco Corp. v. JSC Techsnabexport,</u>
   448 F. Supp. 2d 1194 (C.D. Cal. 2006)......................................................... 22

<u>Paper Operations Consultants Intern., Ltd. v. S.S. Hong Kong Amber,</u>
   513 F.2d 667 (9th Cir. 1975).......................................................................... 18

<u>Piper Aircraft Co. v. Reyno,</u>
   454 U.S. 235 (1981)............................................................................ 14, 15, 22

<u>Republic of Argentina v. Weltover, Inc.,</u>
   504 U.S. 607 (1992).................................................................................... 8, 11

<u>Rong v. Liaoning Province Government,</u>
   452 F.3d 883 (D.C. Cir. 2006) ........................................................................ 8

<u>Samco Global Arms, Inc. v. Arita,</u>
   395 F.3d 1212 (11th Cir. 2005)............................................................... 11, 12

<u>Saudi Arabia v. Nelson,</u>
   507 U.S. 349 (1993) ......................................................................................... 8

<u>Siderman de Blake v. Republic of Argentina,</u>
   965 F.2d 699 (9th Cir. 1992) ........................................................................ 11

<u>Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.,</u>
   549 U.S. 422, 429-30 (2007)........................................................................... 7

<u>Standard Bank PLC v. Vero Ins. Ltd.,</u>
   2009 WL 458680 (D. Colo. Feb. 24, 2009) ................................................. 15

<u>United World Trade, Inc. v. Mangushlakneft Oil Production Ass'n,</u>
   33 F.3d 1232 (10th Cir. 1994)....................................................................... 11

<u>Warren v. Fox Family Worldwide, Inc.,</u>
   328 F.3d 1136 (9th Cir. 2003)......................................................................... 7

<u>Wilton v. Seven Falls Co.,</u>
   515 U.S. 277 (1995) ...................................................................................... 25

<u>Yousuf v. Samantar,</u>
   2009 WL 40942 (4th Cir. Jan. 08, 2009) ....................................................... 9

iv

KERR
&
WAGSTAFFE
LLP

Zedan v. Kingdom of Saudi Arabia,
    849 F.2d 1511 (D.C. Cir. 1988) .................................................................. 13

### *Statutes*

28 U.S.C. § 1602 ........................................................................................... 8

28 U.S.C. § 1603 ........................................................................................ 8, 9

28 USC § 2201 ............................................................................................. 24

### *Rules*

Fed. R. Civ. P. 12 ........................................................................................... 7

KERR
&
WAGSTAFFE
LLP

## I.    INTRODUCTION

Plaintiffs' complaint asks this Court to issue a declaration setting forth the respective rights of the parties under Australian law, as it applies to a contract between the Australian government's national science agency (the Commonwealth Scientific and Industrial Research Organisation, or "CSIRO") and an Australian start-up company, formerly known as Radiata Communications Pty Ltd. ("Radiata").  At the time the contract was formed, Radiata was closely affiliated with CSIRO, having been formed by former researchers for a joint project between CSIRO and Macquarie University (located in Sydney) for the purpose of developing wireless networking technology originally invented by CSIRO. Radiata was subsequently purchased by Cisco Systems, Inc. ("Cisco") who now claims that it is a party to the underlying contract, and that it has sublicensed rights under the contract to another of its subsidiaries, Cisco-Linksys LLC ("Linksys").

Because it is a foreign government agency, under the Foreign Sovereign Immunity Act, CSIRO is subject to jurisdiction of this Court only if it engaged in defined "commercial activities" with a "direct effect" in the United States. CSIRO, however, contracted with an Australian entity, and the effects here are at best indirect, and a result of Plaintiffs' separate commercial transactions.  CSIRO is thus immune from suit and respectfully requests dismissal on that basis.

Even if this Court determines that it has jurisdiction, adjudication here is inappropriate.  The only reason the parties are here is because after CSIRO gave notice that it intended to terminate the contract (as was its right), Plaintiffs asked for and were granted an extension of the cure period.  During the pendency of that cure period, on Christmas Eve, Plaintiffs filed this suit.  CSIRO was forced to wait until after the end of the cure period to finalize termination and file its own suit in the Australian courts.  Moreover, the underlying contract was negotiated and formed in Australia, and the governing law requires that it be construed in light of the circumstances surrounding its formation, which can be ascertained only

KERR
&
WAGSTAFFE
LLP

through Australian witnesses and evidence. The majority of the material witnesses and relevant evidence is located in Australia, and that country's courts are perfectly competent to adjudicate this dispute under its own domestic law. CSIRO therefore respectfully requests in the alternative that the Court dismiss on *forum non conveniens* grounds, or that it exercise its discretion to decline jurisdiction over this declaratory judgment action.

## II.    FACTUAL BACKGROUND

### A.    CSIRO'S WIRELESS NETWORKING INVENTION

CSIRO is Australia's national science agency, and one of the world's leading scientific research organizations. (Declaration of Denis Redfern ("Redfern Decl.") at ¶ 6.) It was created in 1926 by the Australian Parliament's passage of the Science and Industry Research Act, and operates pursuant to a 1949 amendment to the Act as an Australian government authority under government control and direction, with ultimate reporting to the Minister for Innovation, Industry, Science and Research. (Id., Ex. A.) CSIRO is largely funded by the Australian government. (Id. ¶ 6.) Though its mission is wide-ranging, CSIRO has long nurtured a particular expertise in radio technology, drawn from an Australian legacy developed when that country served as the front line for Allied radar defenses during the Second World War, and from its research in radio astronomy. (Id. ¶ 7.) In the early 1990s, as the world's leading computer companies struggled to develop a workable technology for indoor wireless data communications, CSIRO scientists worked out a solution to the myriad problems still befuddling the competing teams of researchers, and created the technology behind what is now the standard for wireless local area networks, or "WLANs." (Id. ¶ 8.)

Even after CSIRO's invention, however, much work remained to create the devices, circuits and systems necessary for a functional WLAN. (Id. ¶ 10.) For assistance with that effort, CSIRO turned to Macquarie University in Sydney. (Id.) Pursuant to a 1993 agreement, CSIRO agreed to fund Macquarie to undertake

1  simulation, testing, and microchip development aimed at further developing

2  CSIRO's WLAN technology.  (Id.)  Working through significant technical

3  challenges, the joint project continued to refine the technology, and by 1997 was

4  working on a functional prototype system, including a microchip known as the

5  DMT50.  (Id.)

6      **B.    THE SPIN-OFF OF RADIATA**

7      In late 1997, three members of the Macquarie and CSIRO joint research

8  team spun off to create a separate company aimed at developing commercial

9  applications for CSIRO's WLAN technology.  (Id. ¶ 12.)  The three, one of the

10 original CSIRO researchers (Terry Percival) along with two others who worked on

11 the Macquarie joint venture (Neil Weste and David Skellern), formed Radiata

12 Communications Pty Ltd.  Radiata—now one of the plaintiffs in this litigation—

13 was and remains an Australian corporation.  (First Amended Complaint ("FAC") ¶

14 5.)  CSIRO and Radiata worked together closely.  (Redfern Decl. ¶ 13.)  CSIRO

15 seconded staff to Radiata, which rented laboratory and office space from CSIRO

16 through July 2000.  (Id.)  In the early days, in fact, Radiata was housed in a shed in

17 the back of a CSIRO facility in Marsfield, located in suburban Sydney, and Radiata

18 borrowed equipment and workshop facilities from CSIRO.  (Id.)

19     To enable Radiata's efforts to prove the functionality of and develop

20 commercial applications for CSIRO's technology, the two entered a non-exclusive

21 technology license agreement (the "TLA") dated February 23, 1998, which granted

22 Radiata a license to certain "Technology," defined as: "Circuit descriptions, HDL

23 code and test suites; CSIRO patent 'A wireless LAN' contained in: - Australian

24 Patent Number 666411; - Japanese Patent Number 6-296176; - USA Patent

25 Number 5,487,069; - Europe Patent Application Number 93309371.8 (patent

26 pending); - PARROT MAC – Australian Provisional Patent Application no:

27 PO9322 'Medium Access Control Protocol for Data Communications' dated 19

28 September 1997."  (Id. ¶ 13-17, Ex. B ("TLA") at p. 12.)  "Circuit descriptions,

HDL code and test suites" refers to such technology developed by CSIRO and Macquarie University in the late 1990s, including through their joint project. (Id. ¶ 14.) The scope of that license, including the identity of the technology actually transferred from CSIRO to Radiata and used in Radiata's subsequent work, is a key factual issue in the dispute between the parties here.

The TLA also imposed affirmative obligations on Radiata for the benefit of CSIRO. For example, the TLA granted CSIRO a permanent, free license in any improvements to the technology for research purposes, and a complete assignment of any such improvements upon termination of the agreement. (TLA § 10.) The TLA also required Radiata to make best efforts to commercialize the technology and bring it to market, for example, mandating that it sell 10,000 products by the end of 2001. (TLA § 4 and p. 12.) The TLA, and all of its subsequent amendments, have included an explicit choice of law provision selecting the law of New South Wales to govern the contract. (TLA § 19.18.)

### C. RADIATA'S PURCHASE BY CISCO

In 1999, the Institute of Electrical and Electronics Engineers ("IEEE") ratified 802.11a wireless LAN standard, which relies on CSIRO's technology for wireless data transmission. (Redfern Decl. ¶ 18.) The subsequent IEEE 802.11g standard, released in 2003, and draft IEEE 802.11n standard also rely on CSIRO's technology. (Id.) Though Radiata continued to develop potential applications for CSIRO's technology, it has never itself marketed a product. (Id. ¶ 19.) Nevertheless, the IEEE approval piqued interest in the company, and it was approached by a number of potential suitors. (Id.) Eventually, Radiata agreed to be purchased by Cisco, and approached CSIRO to request that the TLA be amended to reflect the sale and to grant Radiata the right to transfer the TLA to a Cisco subsidiary. (Id. ¶ 20.)

CSIRO eventually agreed, and it and Radiata entered a short amendment to the TLA dated February 1, 2001 (Cisco was not a party to the amendment). (Id.,

KERR
&
WAGSTAFFE
LLP

Ex. C.)  The amendment included the right to novate the TLA to one of the "Cisco Group of Companies," defined as Cisco Systems (Bermuda) limited or another wholly owned subsidiary of Cisco.  (Id. at § 4.)  The novation agreement was to follow a form attached to the amendment, but the draft novation was never completed.  (Id. ¶ 22.)  The amendment also allowed Radiata or another licensee to grant a sublicense of the technology for the purpose of manufacturing products for the licensee.  (Id. ¶ 23, Ex. C at § 3.)  Notice to and consent by CSIRO of the sublicense was required, and transfer of the technology in a form that would enable the sublicensee to redesign or make improvements to it was forbidden.  (Id.)

Radiata, which was subsequently renamed Cisco Systems Wireless Networking (Australia) Pty, Ltd., continued its active operations in Australia until at least 2003, including the development of chips for Cisco, and continues its separate corporate existence today.  (Id. ¶ 25.)  Beginning in 2002, Cisco began paying royalties under the TLA for certain chips that utilize WLAN technology. (Id. ¶ 25.)  In August 2002, CSIRO and Cisco entered into a second amendment that retroactively permitted a sublicense to MarvellTechnology Group, Ltd. and Marvell International Ltd. (both Bermuda corporations and collectively referred to herein as "Marvell"), which had been manufacturing chips for Cisco, and a few other small clean-up matters not at issue here.  (Id. ¶ 26, Ex. D.)

### D.    THE CURRENT DISPUTE

Starting in approximately 2003, a disagreement between the parties arose concerning the amount of royalties paid under the TLA.  (Id. ¶ 28.)  At its origin, the parties' disagreement centered on the scope of the TLA and the breadth of any right Cisco might have to a license under that agreement.  (Id.)  Over the course of negotiations concerning those rights, however, CSIRO learned of a number of other breaches of the TLA.  (Id. ¶ 29.)  Those include: (1) the failure to mark products with CSIRO's patent numbers, a clear requirement under the TLA and necessary to put any subsequent purchasers on notice of CSIRO's intellectual

property rights; (2) the granting of certain sublicenses without CSIRO's required consent; (3) the granting of sublicenses purporting to allow sublicensees to grant additional sublicenses; and (4) the failure to notify CSIRO of improvements to the licensed technology. (Id.) At various points during the parties' negotiations, CSIRO gave clear written notice of said breaches. (Id.) In addition, one of Cisco's sublicensees has participated in litigation against CSIRO asserting the invalidity of CSIRO's patent rights related to the technology, also a violation of the TLA. (Id.)

In 2003, Cisco purchased Linksys (now Cisco-Linksys LLC, a plaintiff here), one of the leading manufacturers of WLAN networking products. (FAC ¶ 27.) The purchase significantly expanded Cisco's wireless product offerings. (Redfern Decl. ¶ 27.) Cisco now claims that Linksys obtained a license under the TLA, a fact that CSIRO disputes. (FAC ¶ 71.) The parties also disagree as to whether Linksys' products, which use chips that were separately developed and did not evolve from Radiata chips, fall within the scope of the TLA. (Redfern Decl. ¶ 28.) Though settlement negotiations have been ongoing since approximately 2003 in Australia and the United States, this dispute does not arise out of those negotiations but out of the original meaning of the TLA itself. (Id.)

### E.    THE UNITED STATES AND AUSTRALIAN LITIGATION

At the end of 2008, those negotiations broke down, and on October 24, 2008, CSIRO informed Radiata and Cisco of its intent to terminate the TLA, as was its clear right under sections 16 and 17 of the TLA, if Cisco did not cure its breaches within the contractually specified period. (Id. ¶ 30.) Cisco subsequently asked CSIRO to extend the cure period to December 31, 2008, to which CSIRO agreed. (Id.) Before that deadline was reached, however, Cisco filed this suit on Christmas Eve, December 24, 2009. (Id. ¶ 31.) Once the cure period ended, CSIRO sent notice of termination of the TLA, as noted in Cisco's amended complaint. (Id.)

As all of the parties anticipated, CSIRO filed suit (the "Australian action") a

few days after the termination became effective in trial court in New South Wales, the Australian state whose law governs the TLA. (Declaration of Michael Pryse ("Pryse Decl.") ¶ 6, Ex. A.) As Cisco does here, CSIRO seeks a declaratory judgment in the Australian action concerning the rights of the parties under the agreement and the validity of CSIRO's termination. (Id. ¶ 7.) CSIRO, Cisco and Radiata are all parties to that litigation. (Id.) By agreement of the parties, service was made in both cases effective the same date, January 19, 2009. (Id. ¶ 8.) Cisco and Radiata have both generally appeared in the Australian action, thus consenting to jurisdiction. (Id.) The Australian action, like this one, was the subject of two standstill agreements between the parties, pursuant to which pending deadlines were extended to July 15, 2009. (Id.)

Document discovery in the Australian case is expected to last four to six months, with an additional four months for written witness statements and two to three months for expert discovery. (Id. ¶ 16.) Trial is expected to begin another three months after that, and last approximately four weeks. (Id. ¶ 16.)

## III.  ARGUMENT

### A.  THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS DISPUTE UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT[1]

#### 1.  Legal Standard

Federal Rule of Civil Procedure 12(b)(1) provides that a party may seek the dismissal of a complaint for lack of subject matter jurisdiction. "A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence." Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

---

[1]    The Court may grant dismissal on *forum non conveniens* or any other threshold grounds without addressing these jurisdictional issues. Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 549 U.S. 422 (2007).

CASE NO. SACV0900178-DOC (MLG)                    DEFENDANT'S MOTION TO DISMISS

### 2. CSIRO Is a Foreign Governmental Entity Subject to FSIA Protection

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. section 1602 *et seq.*, is the exclusive basis for jurisdiction over a foreign government in any United States court, either state or federal.  Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992) (the FSIA "provides the 'sole basis' for obtaining jurisdiction over a foreign sovereign in the United States.").  Under the FSIA, a foreign sovereign is presumptively immune from the jurisdiction of the courts of the United States unless a specified exception to immunity applies.  See Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); Weltover, 504 U.S. at 610–11.  The exceptions to FSIA are "discrete and limited."  Rong v. Liaoning Province Government, 452 F.3d 883, 890 (D.C. Cir. 2006) (citations omitted).  Once a defendant shows it is a foreign state, the plaintiff has the burden of proving that a FSIA exception applies.  Adler v. Federal Republic of Nigeria, 107 F.3d 720, 728 (9th Cir. 1997).  The existence of FSIA jurisdiction or immunity is a question of law.  Coyle v. P.T. Garuda Indonesia, 363 F.3d 979, 984 n.7 (9th Cir. 2004).

The definition of "foreign state" within the parameters of the FSIA includes foreign states themselves, their political subdivisions, and any "agency or instrumentality of a foreign state," which is further defined as an entity: "(1) which is a separate legal person, corporate or otherwise, and (2)  which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3)  which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country."  28 U.S.C. § 1603(b).  According to the legislative history of the FSIA, "separate legal person" was "intended to include a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name, contract in its own name or hold property in its own name."  Yousuf v. Samantar, 2009 WL 40942, at *9 (4th Cir.

Jan. 08, 2009) (quoting H.R. Rep. No. 94-1487, at 15 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6614).

CSIRO meets the standard of section 1603(b) and thus is entitled to the protections of the FSIA. As discussed above, CSIRO is an agency of the Australian government, created by statute, operating under government control and direction, and largely funded by the Australian Parliament. (Redfern Decl. ¶ 6.) Indeed, Cisco implicitly has acknowledged the applicability of FSIA by following the service provisions of the FSIA when attempting to effect service on CSIRO in this matter, including service of a summons specifying the extended sixty-day deadline for answering under the FSIA. (Declaration of Michael Ng ("Ng Decl.") ¶ 3, Ex. A.) In a separate action involving CSIRO's patent licensing activity in the United States, both the Northern District of California and the Federal Circuit correctly treated CSIRO as an agency or instrumentality of the government of Australia. Intel Corp v. Commonwealth Scientific and Indus. Research Organisation, 2005 WL 1656903, at *2 (N.D. Cal. July 8, 2005); aff'd 455 F.3d 1364 (Fed. Cir. 2006).

### 3. The Radiata Dispute Does Not Trigger the Commercial Activity Exception of the FSIA

The only potentially applicable exception to FSIA immunity here is the so-called "commercial activities" exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States ....

9

28 U.S.C. §1605(a)(2). Cisco's declaratory relief action is not based on any commercial activity occurring in the United States. Cisco's First Amended Complaint seeks declaratory relief on what Cisco identifies as nine issues. Seven of those nine issues solely concern interpretation of the TLA and its first amendment.[2] Both the TLA and the first amendment thereto were negotiated entirely in Australia, between an Australian company and an agency of the Australian government, and are expressly governed by Australian law. (Redfern Decl. ¶¶ 16, 21.) CSIRO engaged in no commercial activity in the United States in connection with the TLA or its first amendment. (Id. ¶ 24.)

Two of Cisco's claims for declaratory relief bear some tangential relationship to the second amendment to the TLA which was negotiated in California, but which has no relevance or meaning without the more important underlying Australian agreements. Specifically, the parties dispute whether Plaintiffs followed the sublicensing requirements set forth in the original TLA and first amendment when granting a sublicense to Marvell, which was summarily authorized in the second amendment as a "clean-up" provision to reflect the fact that Marvell was already manufacturing chips for Plaintiffs but had not been given a sublicense. It was not until later that CSIRO discovered that Cisco had violated the terms of the original TLA by, among other things, allowing Marvell itself to grant further sublicenses. In other words, the substance of the violation and the legal dispute between the parties involves the original Australian-only contract. Like the TLA, the second amendment to the TLA is expressly governed by Australian law. Negotiation of this one amendment under Australian law does not transmogrify the prior commercial acts in Australia into acts in the United States or otherwise alter the Australian character of this contractual relationship.

Nor can Cisco legitimately show that CSIRO engaged in any activity

---

[2]    The first, second, third, fourth, fifth, eighth, and ninth causes of action appear to rest solely on interpretation and analysis of the TLA and its first amendment; i.e., analysis of the agreements reached in Australia between Australian entities under Australian law.

KERR
&
WAGSTAFFE
LLP

1    relating to the TLA outside the United States that had a "direct effect" here.

2    "Under the direct effect requirement, the 'foreign sovereign's activities must cause

3    an effect in the United States that is substantial and foreseeable in order to abrogate

4    sovereign immunity.'" Siderman de Blake v. Republic of Argentina, 965 F.2d 699,

5    710 (9th Cir. 1992). "An effect is 'direct' for purposes of the commercial activity

6    exception if it follows as an 'immediate consequence' of the defendant's activity."

7    Adler, 107 F.3d at 726 (quoting Weltover, 504 U.S. at 618). "[M]ere financial loss

8    by a person – individual or corporate – in the U.S. is not, in itself, sufficient to

9    constitute a 'direct effect.'" Id. at 726-27. Instead, the Court should "look to the

10   place where legally significant acts giving rise to the claim occurred in determining

11   the place where a direct effect may be said to be located." Id. at 727 (internal

12   quotations omitted).

13          Here, there is at best only an indirect and coincidental connection between

14   the TLA and the United States. As discussed above, the TLA was negotiated

15   between two Australian entities, and is governed by Australian law. (Redfern

16   Decl. ¶¶ 16, 21, Ex. B.) None of its terms require any performance by CSIRO in

17   the United States. (Id. ¶ 24.) See United World Trade, Inc. v. Mangushlakneft Oil

18   Production Ass'n, 33 F.3d 1232, 1237 (10th Cir. 1994) (finding no direct effect in

19   the United States where the defendants' contractual performance took place wholly

20   outside the U.S.). Indeed, the only connection to the United States is Cisco's post-

21   TLA role as Radiata's parent corporation, including the second amendment based

22   on Cisco's contracts with Marvell. (Redfern Decl. ¶ 26.) CSIRO had no

23   involvement in that acquisition or in Cisco's decision to contract with Marvell, and

24   its acquiescence in those circumstances does not waive CSIRO's sovereign

25   immunity.

26          An analogous situation was presented in Samco Global Arms, Inc. v. Arita,

27   395 F.3d 1212 (11th Cir. 2005), which involved an arms-sale contract between the

28   government of Honduras and a Panamanian corporation. The Panamanian

11

corporation's contractual rights were later purchased by a United States corporation which attempted to sue the government of Honduras for breach of contract in Miami.  The Eleventh Circuit held that the commercial activity exception to FSIA did not apply because the underlying contract was made entirely outside of the United States by non-United States parties:

> The only tie this case has to the United States is the plaintiff, a
> non-contracting party, who purchased the rights to the contract
> some 15 years after its execution, in a transaction in which the
> defendants played no part.  Given the total absence of any other
> contacts with the United States aside from the corporate
> personality of the assignee to the contract, we cannot find any
> act of the Honduran government that "caused a direct effect in
> the United States."

Id. at 1218 (citations omitted).  The same logic applies here.  Cisco's complaint seeks declaratory relief as to whether it is a party to the TLA and the meaning of several TLA provisions.  Cisco is only involved in this case because it acquired Radiata.  The original contracting parties, Radiata and CSIRO, were in Australia and their contract had no tie to the United States.

Moreover, even if Cisco's post-contracting acquisition of Radiata and subsequent involvement in the contract was an "effect" on the United States, such effect was *not* an immediate consequence of any conduct by CSIRO but instead, at most, an indirect and incidental effect.  See Corzo v. Banco Cent. de Reserva del Peru, 243 F.3d 519, 525 (9th Cir. 2001) (consequences of breach of contract resulting from foreign activities were "at best secondary or incidental results of the [foreign government]'s actions."); Australian Government Aircraft Factories v. Lynne, 743 F.2d 672, 675 (9th Cir. 1984) (financial loss sustained within the United States is insufficient to establish a direct effect); Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil, 212 F. Supp. 2d 30, 35-36 (D.D.C.

2002) (no direct effect where it was unclear that a contractual payment was to be made in the United States). The determination of the nature and scope of Cisco's rights under the TLA, including the extent of its royalty payment obligations, simply does not have a direct impact in the United States sufficient to invoke the exception under the FSIA. See also Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1514-15 (D.C. Cir. 1988) (breach of contract with U.S. resident engineer working in Saudi Arabia did not cause a direct effect in the United States and was insufficient to eliminate FSIA immunity).

CSIRO is not claiming that it can never be sued in the United States, only that its TLA contract with Radiata does not subject it to such a suit. Cisco will likely misdirect the Court to the Federal Circuit's decision in Intel Corp. v. Commonwealth Scientific and Industrial Research Organisation, 455 F.3d 1364 (Fed. Cir. 2006), which found that CSIRO negotiations conducted with an American company in the United States to license technology under its United States patent were sufficient to invoke the commercial activity exception to the FSIA. Id. at 1370. The critical distinction, of course, is that the negotiations with Intel were directly with a U.S. company and involved licensing under a U.S. patent. Id. In this case, the dispute arises from an agreement originally executed between public and private Australian entities (i.e., CSIRO and Radiata), in Australia, and governed by Australian law. The technology licensed under the TLA was protected by patents issued in Australia, Japan and Europe, as well as the United States. (TLA at p. 12.) Cisco became involved after the fact when it acquired Radiata. Under these circumstances, CSIRO's sovereign immunity under FSIA is intact and the Court lacks jurisdiction over this dispute.

## B. IN THE ALTERNATIVE, THE COURT SHOULD DISMISS ON GROUNDS OF *FORUM NON CONVENIENS*

### 1. Legal Standard

"A district court may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the

1  parties and the court and the interests of justice indicate that the action should be

2  tried in another forum." Altmann v. Republic of Austria, 317 F.3d 954, 972 (9th

3  Cir. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249-50 (1981)).  "A

4  party moving to dismiss on grounds of forum non conveniens must show two

5  things: (1) the existence of an adequate alternative forum, and (2) that the balance

6  of private and public interest factors favors dismissal." Lockman Found. v.

7  Evangelical Alliance Mission, 930 F.2d 764, 767 (9th Cir. 1991) (citation omitted).

8      Dismissal under the doctrine is a matter committed to the district court's

9  sound discretion.  Mizokami Bros. of Ariz., Inc. v. Baychem Corp., 556 F.2d 975,

10  977 (9th Cir. 1977).  In exercising such discretion, the court balances various

11  public and private factors.  "Courts consider the following private interest factors:

12  (1) the residence of the parties and the witnesses; (2) the forum's convenience to

13  the litigants; (3) access to physical evidence and other sources of proof; (4)

14  whether unwilling witnesses can be compelled to testify; (5) the cost of bringing

15  witnesses to trial; (6) the enforceability of the judgment; and (7) 'all other practical

16  problems that make trial of a case easy, expeditious and inexpensive.'" Lueck v.

17  Sundstrand Corp., 236 F.3d 1137, 1145 (9th Cir. 2001) (citations omitted).  The

18  public interest factors consist of:  "(1) local interest of lawsuit; (2) the court's

19  familiarity with governing law; (3) burden on local courts and juries; (4)

20  congestion in the court; and (5) the costs of resolving a dispute unrelated to this

21  forum." Id. at 1147 (citations omitted).  These factors are not necessarily

22  exhaustive or exclusive and no single factor is dispositive.  Action Indus., Inc. v.

23  U.S. Fid. & Guar. Co., 358 F.3d 337, 340 (5th Cir. 2004).

24      C.    **AUSTRALIA PROVIDES AN ADEQUATE ALTERNATIVE FORUM**

25      An adequate alternative forum exists when defendants are amenable to

26  service in the foreign forum and it provides the plaintiff with some remedy for the

27  defendant's wrong.  Doe v. Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001).  The

28  standard is low; to be adequate, an alternative forum need only provide "some

remedy" for the wrong at issue.  Lueck, 236 F.3d at 1144; Lockman Found., 930 F.2d at 768.  A forum will be inadequate only where the remedy provided is "so clearly inadequate or unsatisfactory, that it is no remedy at all."  Piper Aircraft, 454 U.S. at 254.

There can be no legitimate dispute here that Australia is an adequate alternative forum to hear Plaintiffs' claims.  As a general matter, federal courts have repeatedly and consistently found that Australian courts provide an adequate alternate forum for common law claims such as those at issue here.  See, e.g., Great Prize, S.A. v. Mariner Shipping Party, Ltd., 967 F.2d 157, 160 (5th Cir. 1992) ("The adequacy of Australia as an alternative forum is undisputed."); Standard Bank PLC v. Vero Ins. Ltd., 2009 WL 458680, at *4 (D. Colo. Feb. 24, 2009); Interpane Coatings, Inc. v. Australia & New Zealand Banking Group Ltd., 732 F. Supp. 909 (N.D. Ill. 1990).  CSIRO is an agency of the Australian government and amenable to process there.  (Pryse Decl. ¶ 8.)  The contract at issue in this case is governed by New South Wales law, and the courts of that state certainly are competent to decide the issues that arise under their state's own law.

Any theoretical quibble that might be raised about the adequacy of the Australian courts disappears when confronted with the reality that Cisco, Radiata and CSIRO are currently litigating a declaratory judgment action in the Supreme Court of New South Wales concerning many of these identical issues.  (Id. ¶¶ 6-7.) Any non-overlapping claims present in this suit but not the Australian action may be added to the latter by way of counterclaim.  (Id. ¶ 7.)

### D.    THE THRESHOLD FOR DISMISSAL IS LOWERED FOR FOREIGN PLAINTIFFS

"[I]f the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper."  Piper Aircraft, 454 U.S. at 256 n. 23.  The threshold is lowered for disputes between two foreign parties, in which the plaintiffs' choice of forum is entitled to little deference.  Lockman Found. 930 F.2d at 767.  At its core, this is an

Australian dispute between Australian parties, the signatories to the contract at issue. Cisco claims it is a party to the TLA, but cannot point to an actual written assignment of rights from Radiata, the Australian plaintiff, to Cisco, the American one. At best, Cisco asserts that CSIRO agreed that Radiata *could have* novated the agreement (FAC ¶ 54) and that "CSIRO gave *apparent* consent for Cisco to step into the shoes of Cisco Australia" (id. ¶ 54, emphasis added), but its hazy allegations do not convert the gravamen of the action into a dispute involving a domestic plaintiff. Cisco should not be allowed to seek a declaration (on an estoppel theory, id. ¶ 60) that it is a party and therefore bootstrap this into an American dispute. Because the real dispute here is between two Australian companies, Plaintiffs' choice of an American forum should be given little, if any, weight.

### E.    THE PRIVATE FACTORS OVERWHELMINGLY FAVOR DISMISSAL

Even if analyzed under the standards governing American plaintiffs, the private factors here overwhelmingly favor dismissal.

#### 1.    Residence of the Parties and the Witnesses

The real dispute between these parties lies (a) in the interpretation of the TLA and the first amendment thereto, and (b) in factual issues surrounding what actually transpired during the early days of the contract, when the "Technology" at issue was being transferred from CSIRO and Macquarie to Radiata. *All* of the relevant witnesses with any material information concerning those issues are Australians who reside in Australia.[3]

Australian law directs that the meaning of the contractual terms be interpreted in light of the "factual matrix," that is, the "surrounding circumstances and the purpose and object of the transaction, and the market in which the parties

---

[3]    With respect to the "residence" of these parties, CSIRO is Australian, as is Radiata. Cisco and Linksys, though American, are both international corporations who do significant business in Australia. Cisco maintains offices in Australia—in fact, its Australian headquarters are located in North Sydney, in New South Wales. (Redfern Decl. ¶ 38.)

were operating." (Declaration of Professor John Carter ("Carter Decl.") ¶¶ 14-17, quoting Australian authority.) The TLA and the first amendment thereto were both negotiated and entered into entirely in Australia, by Australian attorneys, CSIRO and Radiata personnel who continue to reside in Australia. (Redfern Decl. ¶¶ 16, 21.) Approval for the agreements was given by senior CSIRO staff, all of whom are Australian residents. (Id.) The market in which the parties were operating at the time the agreements were made (the relevant time period under Australian law, see Carter Decl. ¶ 17) was the Australian market, or at a minimum, an international market viewed from the perspective of an Australian company seeking to do business there. Thus, the only witnesses with any relevant knowledge of the relevant "factual matrix" are all Australian residents.[4]

Australian law also mandates that the language of the contract be interpreted from the perspective of a reasonable person in the position of the parties. (Carter Decl. ¶ 19.) The relevant perspective here is of an Australian in the position of the parties, and to the extent custom or usage might also be considered, the relevant custom and usage would be that of Australia. (Id. ¶ 19.) The witnesses best able to shed light on the broader context are therefore also Australian.

If interpretation cannot be settled by reference to the language of the contract itself considered in light of the Australian factual matrix, any reference to parol evidence will also feature an all-Australian cast. In limited circumstances, Australian law permits consideration of the actual intention of the parties and evidence of their prior negotiations. (Id. ¶ 24.) The witnesses with knowledge of CSIRO's and Radiata's intentions were the participants in the decision-making process at the time, and all reside in Australia. (Redfern Decl. ¶¶ 16, 21.) None of

---

[4]    Cisco may argue that some of its employees who were involved with Cisco's purchase of Radiata have knowledge relevant to the factual matrix surrounding the first amendment. A desire to be purchased by Cisco may have been Radiata's motivation for negotiating the amendment, but Cisco neither was a party to nor participated in its negotiation of the amendment. Even if Cisco's overtures to Radiata provided the impetus for the request to amend, only Radiata personnel can say what influence Cisco's presence in the background may or may not have had on the company's circumstances as it entered that agreement—Cisco's subjective intentions are irrelevant.

1   the negotiations to the relevant contracts took place in the United States.  (Id.)

2   Notably, Australian law generally forbids consideration of the parties' *subsequent*

3   conduct, even in circumstances when parol evidence may be taken into account.

4   (Carter Decl. ¶ 21.)  Thus, even if some of the conduct related to the contract that

5   took place after Cisco's purchase of Radiata might have occurred in the United

6   States, that information is simply immaterial here.[5]

7       Another component of the dispute between the parties is the identity and

8   scope of the "Technology" for which the TLA grants a license.  CSIRO interprets

9   the term narrowly; Cisco unsurprisingly interprets the term broadly.  Resolution of

10  that part of the dispute involves the contractual interpretation described above, but

11  also an analysis of the actual technology transferred between CSIRO, Macquarie

12  and Radiata in the early days of the contract.  For example, the parties disagree as

13  to whether a certain computer code used in the design of Cisco products originated

14  in the code written by the CSIRO/Macquarie joint venture, or was generated

15  independently—including by the very same people involved in the joint venture

16  once they were part of Radiata.  That analysis requires the close and detailed

17  testimony of the Australian witnesses who were present at the creation and can

18  identify the transferred technology.[6]  All of the relevant witnesses with knowledge

19  of those relevant facts reside in Australia.

20      CSIRO anticipates that Cisco will attempt to focus the Court's attention on

21  the parties' dispute over the subsequent breach of the TLA, and argue that

22  questions involving performance or non-performance largely involve conduct that

23  occurred in the United States—and thus, American witnesses.  The parties are

24  largely in agreement about Plaintiffs' subsequent conduct, however.  What is still

25

26  ---

    [5]     Cisco may point to the protracted discussions aimed at resolving this dispute, some of which took place in

27  this country.  The Ninth Circuit has held that pre-litigation negotiations are not relevant to a *forum non conveniens*
    analysis.  Paper Operations Consultants Intern., Ltd. v. S.S. Hong Kong Amber, 513 F.2d 667, 672 (9th Cir. 1975).

28  [6]     Once the relevant original code is identified, it is a relatively easy matter to determine whether it is
    contained in current Cisco products.  An expert can conduct the needed analysis by reference to the code itself
    without any need for additional factual input from other witnesses.

KERR
&
WAGSTAFFE
LLP

CASE NO. SACV0900178-DOC (MLG)                    DEFENDANT'S MOTION TO DISMISS

disputed is the meaning of the contract as it applies to such conduct, and as explained above, it is the Australian witnesses who have the knowledge material to those contractual interpretation issues.  For example, Cisco largely concedes that it did not mark chips with CSIRO's patent numbers, but the parties disagree as to whether that breach is significantly material to warrant termination.  Any disputed factual issues surrounding performance are susceptible to rather straightforward proof.  For example, CSIRO contends that Radiata granted sublicenses without CSIRO's consent, or without terms required by the TLA.  Proof of those issues is largely documentary—either the required written consent exists, or it does not, and the written document either does or does not include the required terms.  Similarly, the dispute over what technology was provided to sublicensees, or the existence of unauthorized improvement made to that technology, can be determined largely by an expert's examination of the relevant computer code, which is easily produced and highly transportable.  In short, resolution of the issues underlying Cisco's breach does not require a great degree of testimony from American witnesses.

Because the vast majority of material witnesses reside in Australia, the first private factor weighs heavily in favor of dismissal.

### 2.    The Forum's Convenience to the Litigants

As referenced above, Cisco and Linksys are global companies, with offices in Australia.  Because most of the relevant witnesses are in Australia, the marginal burden for Plaintiffs to litigate in Australia will be minimal—in fact, litigation in Australia may well prove cheaper for Cisco and Radiata as they may avoid travel costs for their own Australian witnesses to the United States.

In contrast, litigating this case in the United States would place a significant burden on CSIRO, a governmental agency.  CSIRO's witnesses are all located in Australia, and the cost of bringing them to the United States for trial would necessarily impact the funding available for the agency's core scientific research mission.  (Redfern Decl. ¶¶ 34-37.)  Furthermore, a number of CSIRO's

19

witnesses—including those with the key knowledge about the interactions between CSIRO and Radiata—are elderly, and some are in poor health.  (Id.)  Assuming their ability to make the trip, the fifteen hour flight from Australia to southern California alone will impose a significant burden on those witnesses.

### 3.    Access to Physical Evidence and Other Sources of Proof

The documentary evidence relevant to the factual matrix surrounding the formation of the TLA exists entirely in Australia, in the records of parties like CSIRO and Radiata, but also in the possession of third parties like Macquarie University, individuals involved in the projects, or others involved in the negotiations.  All of the code and other information reflecting the actual transfer of technology to Radiata exists (or did exist) in the records of Macquarie University, and CSIRO has neither access to nor control over those documents.  (Redfern Decl. ¶ 33.)  Though production of such custodians may be compelled in connection with United States litigation, the process is relatively cumbersome, and production is more efficiently achieved in domestic Australian litigation.  (Pryse Decl. ¶ 14.)

In contrast, while compelling documents from American third parties in connection with an Australian case also involves some extra steps, the relevant documentary evidence in the United States is all or largely within Plaintiffs' possession.  They have custody of the documents and code describing their products, and can obtain from their subcontractors all such documents relevant to the products at issue.  As a result, there should be little need for third-party discovery in the United States, meaning that, on balance, the parties will have better access to the relevant documents if this dispute is litigated in the Australian courts.

### 4.    Whether Unwilling Witnesses Can Be Compelled to Testify

The process for compelling deposition testimony and the production of evidence from third parties in Australia remains relatively cumbersome despite Australia's adoption of procedures enabling the Hague Convention on the Taking

KERR
&
WAGSTAFFE
LLP

of Evidence Abroad in Civil and Commercial Matters.[7]  Unless the third party voluntarily submits to a deposition or document subpoena, the requesting party must obtain a letter of request from this Court and submit it along with an application to the Supreme Court of the relevant Australian state.  (Pryse Decl. ¶ 14.)  The Australian court may (but is not required to) then issue an order compelling the witness to appear and/or produce documents, to which it may attach limitations.  (Id.)  Even for straightforward requests, the initial process of obtaining an order may take several months.  (Id.)  Though the United States follows a similar procedure with respect to discovery sought in connection with foreign actions, the lower number of non-party witnesses here means litigation in Australia would decrease the volume of international discovery requests required.

### 5.    Cost of Bringing Witnesses to Trial

Travel between Australia and the United States is obviously costly, but because the majority of witnesses reside in Australia, the overall cost of bringing witnesses to trial will be less if the dispute is litigated in Australia.  To at least some degree, it will be easier for Cisco to bear those costs, because it maintains offices in Australia and can utilize that existing infrastructure for out-of-town witnesses during trial.  CSIRO, on the other hand, maintains no presence in southern California, and thus will incur greater costs if the action is litigated here.

### 6.    Enforceability of the Judgment

An Australian judgment would be enforceable in Australian courts, and under the principles established long ago in Hilton v. Guyot, 159 U.S. 113, 202–03 (1895), generally enforceable in United States courts as well.

The private factors thus overwhelmingly support dismissal of this case in favor of adjudication in the alternate forum, namely, the Supreme Court of New South Wales, in which the parties have already begun litigation.

---

[7]      Both American and Australian courts provide procedures for compelling testimony from domestic witnesses, but third-parties cannot be compelled to travel to the other country to testify live at trial.  See Lockman Found., 930 F.2d at 770; Pryse Decl. ¶ 12.

### F.    THE PUBLIC FACTORS ALSO WEIGH IN FAVOR OF DISMISSAL

#### 1.    Local Interest of Lawsuit

The Australian courts have a clear and indisputable interest in adjudicating the respective rights of parties under a contract between an Australian government entity and an Australian company.  Cisco and Linksys, in contrast, are global companies, which sell the products they claim are licensed under the TLA internationally, undermining any particular local interest.  The mere fact that Linksys, one of Radiata's alleged licensees, is headquartered in southern California gives no particular local significance to these proceedings.  After all, the second amendment envisioned that the TLA might be novated to a Bermuda entity, and Cisco purports to have given sublicenses to STMicroelectronics, Inc. (FAC ¶ 25), a Delaware company headquartered in Texas, and Marvell International, Ltd., a Bermuda company.  (Ng Decl. ¶ 4, Exs. B and C.)  There is, therefore, no particular local interest in this suit justifying its retention here.

#### 2.    Court's Familiarity with Governing Law

The Supreme Court of New South Wales is, of course, most familiar with its own law.[8]  Though this Court clearly has the capacity to apply foreign law when necessary, the *forum non conveniens* doctrine is "designed in part to help courts avoid conducting complex exercises in comparative law."  Piper Aircraft, 454 U.S. at 251.  As explained in the accompanying declaration of John Carter of the University of Sydney Law School, one of Australia's leading contract law experts, at least some of the law governing the issues in this case remains in a state of flux, and adjudication here would require this Court to dive actively into the debate—without the potential for appeal to higher Australian courts whose function it is to synthesize and guide the progression of the country's case law.  The more

---

[8]    Cisco may point to similarities between New South Wales and California law, but as this Court has recognized, nothing in the relevant law requires a party moving for dismissal on *forum non conveniens* grounds to establish distinctions between the governing law and law of the forum.  See Palmco Corp. v. JSC Techsnabexport, 448 F. Supp. 2d 1194, 1201 (C.D. Cal. 2006).

CASE NO. SACV0900178-DOC (MLG)                    DEFENDANT'S MOTION TO DISMISS

appropriate arrangement would be to litigate this dispute in the courts of New South Wales, which are attuned to the subtleties of their own common law.

### 3.    Burden on Local Courts and Juries, Congestion in the Court, and the Costs of Resolving a Dispute Unrelated to this Forum

Though this declaratory judgment action is not subject to trial by jury, litigation would nevertheless be burdensome and costly, imposing additional congestion on this Court.[9]  Moreover, allowing proceedings to proceed here would carry with it the risk that the Australian court will reach judgment first, undermining the value of any prior proceedings here.  There is simply no reason to impose *any* burden on this Court when an entirely competent and more appropriate forum has already begun parallel proceedings.[10]

Therefore, the public factors here also favor dismissal.[11]

### G.    Courts Have Dismissed Similar Foreign Licensing Actions

The facts of this case are strikingly similar to those in <u>Bonzel v. Pfizer, Inc.</u>, 439 F.3d 1358 (Fed. Cir. 2006), in which the district court granted, and the Federal Circuit approved, a motion to dismiss on *forum non conveniens* grounds.  Plaintiff Bonzel, a German citizen and resident, invented an angioplasty catheter on which he obtained a United States patent.  <u>Id.</u> at 1360.  He granted a worldwide license of his patented technology to Schneider AG, a Swiss corporation, at that time a subsidiary of Pfizer, Inc., a United States company.  <u>Id.</u> at 1360, 1364.  The license agreement was negotiated in Germany and was to be construed under German law. <u>Id.</u> at 1360.  Later, Pfizer sold Schneider to Boston Scientific Corp., which

---

[9]    CSIRO is not aware of any particular backlog of cases in this Court, but to the extent any exists, requests judicial notice of the Court's own administrative records evidencing such congestion.

[10]    Cisco may argue that its suit here is entitled to preference under the "first-to-file" rule.  The rule does not apply to *forum non conveniens* motions, but in any event Cisco's action here was an anticipatory action not subject to that rule.  <u>See, e.g.</u>, <u>Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.</u>, 179 F.R.D. 264, 271 (C.D. Cal. 1998).  Equitable considerations strongly favor disregarding any preference to which Cisco might otherwise be entitled, because Cisco asked for and received an extension of the cure period, then filed this suit on Christmas Eve during that extended period, while CSIRO was forced to wait out the cure period before bringing suit.

[11]    In the alternative, CSIRO requests that the Court stay all proceedings here, retaining jurisdiction to enter further orders after the conclusion of the Australian litigation as may be necessary, as it has the authority to do. <u>Ministry of Health, Province of Ontario, Canada v. Shiley Inc.</u>, 858 F. Supp. 1426, 1442 (C.D. Cal. 1994).

designated two American subsidiaries as successors to Schneider's license.  Id.

Plaintiff then sued Pfizer, Schneider and Boston Scientific for breach of the licensing agreement.  Id.  After several rounds of back-and-forth between state and federal court, the court dismissed the action on several grounds, including *forum non conveniens,* and the Federal Circuit affirmed.  Id. at 1362, 1365.  Recognizing that the significant events were "the contract negotiation between Dr. Bonzel and Schneider AG in Germany," and "Pfizer's sale of the Schneider companies to Boston Scientific, including Bonzel's patent rights," though noting that "Schneider AG was a subsidiary of Pfizer, a U.S. company," the court nevertheless agreed that "although there may be some Minnesota witnesses, the threshold question of Bonzel's entitlement under the governing contract requires contract interpretation and application under German law," and that therefore "a German court is a more appropriate forum, for the counts in Bonzel's complaint require interpretation and enforcement of a contract governed by German law."  Id. at 1364.

Similarly here, this Court is called on to interpret Australian law as it applies to a contract entered into between Australian parties in Australia.  As with Bonzel, it matters little that one corporate party to the contract may be owned by an American company, or that the licensing rights at issue were allegedly transferred to an American companies which, as here, were parties to the case.  The threshold issue in these actions involving licensing is interpretation of the contract conferring the license, and therefore the best forum is the court with expertise in the governing law and with proximate access to the relevant witnesses and evidence.

## H.   THE COURT SHOULD EXERCISE ITS DISCRETION NOT TO HEAR THIS DECLARATORY JUDGMENT ACTION

Pursuant to the Declaratory Judgment Act, 28 U.S.C. section 2201, this Court *may* declare rights, but is under no obligation to do so, and may exercise its discretion to decline a declaratory judgment action such as this.  "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial

24

KERR
&
WAGSTAFFE
LLP

administration." <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 288 (1995) (holding that no "exceptional circumstances" are required to decline jurisdiction over a declaratory judgment).[12]

Maintenance of this case would result in the oddity of the Court dictating to an Australian government entity and an Australian corporation their rights and obligations under Australian law.  As the Supreme Court held with respect to analogous deference to state court proceedings: "Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties." <u>Brillhart v. Excess Ins. Co. of America</u>, 316 U.S. 491, 494 (1942).  Here, it is wasteful and unnecessary to maintain this suit when the Australian action will more economically and efficiently resolve the dispute.  CSIRO requests that the Court exercise its discretion to decline jurisdiction over this declaratory judgment action.

## IV.    CONCLUSION

For the reasons stated above, CSIRO respectfully requests that the Court dismiss Plaintiffs' complaint for lack of subject matter jurisdiction under the FSIA, or, in the alternative, on the grounds of *forum non conveniens* or pursuant to its discretion to decline jurisdiction over this declaratory judgment action.

DATED: July 15, 2009                    **KERR & WAGSTAFFE LLP**


By: /s/ James M. Wagstaffe
JAMES M. WAGSTAFFE

Attorneys for Defendant
COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH
ORGANISATION

---

[12]    Even outside the declaratory judgment context, other courts have recognized the discretion of federal courts to abstain from actions in favor of parallel foreign litigation to preserve judicial resources and avoid piecemeal litigation.  <u>See, e.g.</u>, <u>Finova Cap. Corp. v. Ryan Helicopters U.S.A., Inc.</u>, 180 F.3d 896, 898 (7th Cir. 1999).



KERR
&
WAGSTAFFE
LLP