JAMES M. WAGSTAFFE (95535)
wagstaffe@kerrwagstaffe.com
MICHAEL NG (237915)
mng@kerrwagstaffe.com
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105–1528
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Defendant
COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH
ORGANISATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| CISCO-LINKSYS LLC, CISCO SYSTEMS, INC. AND CISCO SYSTEMS WIRELESS NETWORKING (AUSTRALIA) PTY, LTD.<br><br>        Plaintiffs,<br><br>    v.<br><br>COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,<br><br>        Defendant. | Case No. SACV0900178-DOC(MLG)<br><br>**DECLARATION OF DANIEL J. FURNISS IN SUPPORT OF DEFENDANT CSIRO'S MOTION TO TRANSFER VENUE**<br><br>DATE: August 10, 2009<br>TIME: 8:30 a.m.<br>COURTROOM: 9D<br><br>TRIAL: [None]<br><br>**Hon. David O. Carter** |

KERR
&
WAGSTAFFE
LLP

I, Daniel J. Furniss, do hereby declare as follows:

1.     I am a partner in the law firm of Townsend and Townsend and Crew, LLP.  I make this declaration of my own personal knowledge in to support Commonwealth Scientific and Industrial Research Organisation's ("CSIRO") motion to transfer venue in the above-captioned action.

2.     I am lead counsel in the following case currently pending before Judge Leonard Davis in the United States District Court for the Eastern District of Texas:  Marvell Semiconductor, Inc. et al. v. CSIRO, E.D. Tex. No. 6:07 CV 204 LED (the "Marvell Action").  I was lead counsel for CSIRO in the following recently concluded cases, also before Judge Davis in the United States District Court in the Eastern District of Texas: Commonwealth Scientific and Industrial Research Organisation v. Buffalo Technology (USA), Inc., Case No. 06-CV-324-LED (the "Buffalo Action"), Microsoft Corporation v. Commonwealth Scientific and Industrial Research Organisation, Case No. 06-CV-00549-LED (the "Microsoft Action"), Commonwealth Scientific and Industrial Research Organisation v. Toshiba America Information Systems, Inc., Case No. 06-CV-00550-LED (the "Toshiba Action"), and Intel Corporation v. Commonwealth Scientific and Industrial Research Organisation, Case No. 06-CV-00551-LED (the "Intel Action", collectively with the other Eastern District of Texas cases described above, the "Texas Actions").

3.     All of those Texas Actions involve enforcement of CSIRO's United States patent number 5,487,069 (the "'069 patent"), awarded for CSIRO's wireless networking technology, commonly known as "Wi-Fi."  A true and correct copy of the '069 patent is attached hereto as Exhibit A.

4.     I have represented CSIRO in connection with the '069 patent litigation since the middle of 2003 when my partner Rob Colwell asked me to meet with Denis Redfern of CSIRO.  I have represented CSIRO continuously since 2003 and have represented CSIRO in essentially all of the '069 litigation.

5.    Following the selection of its technology as the IEEE standard, CSIRO attempted to license its technology to manufacturers of products that use 802.11a/g/n, but was met with an apparent industry-wide refusal to negotiate reasonable license terms.

*The Buffalo Action*

6.    After years of frustration, CSIRO initiated litigation to enforce its patent rights, beginning with its suit in the Eastern District of Texas against Buffalo Technology (USA), Inc. filed February 2, 2005. (<u>CSIRO v. Buffalo Tech. (USA), Inc.</u>, E.D. Tex. No. 6:06 CV 324 LED.)  The litigation with Buffalo proceeded at the Eastern District of Texas's customary brisk pace, helped along by the court's appointment of Michael T. McLemore ("McLemore") as a technical consultant.  A true and correct copy of the court's order appointing McLemore as technical consultant is attached hereto as Exhibit B.

7.    Based on McLemore's analysis of the patent claims and the submissions of the parties, the court conducted a <u>Markman</u> hearing and issued its findings on claim construction on May 8, 2006.  A true and correct copy of the court's claim construction order is attached hereto as Exhibit C.

8.    CSIRO filed and prevailed on summary judgment in an order issued November 13, 2006, again relying in large part on McLemore's analysis.  A true and correct copy of the court's summary judgment order is attached hereto as Exhibit D.

9.    Buffalo took an appeal to the Federal Circuit (No. 2007-1449), which partially affirmed and partially remanded for additional findings of fact.  A true and correct copy of the Federal Circuit's decision is attached hereto as Exhibit E.

10.    The case was then coordinated with the cases described immediately below, and came before the court for trial on April 13, 2009.

*The Intel, Microsoft and Toshiba Actions*

11.    Shortly after the initiation of the Buffalo Action, a compendium of

KERR
&
WAGSTAFFE
LLP

computer hardware manufacturers, including Intel Corporation, Dell, Inc., Hewlett-Packard Company and Netgear, Inc. filed twin declaratory judgment actions against CSIRO in the Northern District of California on May 9, 2005.  (The Microsoft and Intel Actions mentioned above.)  After initial jurisdictional motions and an interlocutory appeal to the Federal Circuit, Judge Martin J. Jenkins of the Northern District of California transferred both the Microsoft Action and the Intel Action to the Eastern District of Texas, where the Buffalo Action was then pending.  A true and correct copy of the court's order granting CSIRO's motion to transfer venue is attached hereto as Exhibit F.

12.    On December 22, 2006, CSIRO filed suit against several additional hardware manufacturers, also in the Eastern District of Texas.  (The Toshiba Action mentioned above.)  The Eastern District of Texas, Judge Leonard Davis presiding, coordinated proceedings in the Intel, Microsoft and Toshiba Actions, and significant discovery was taken by all sides.  McLemore was again appointed technical consultant for that case, and reviewed and analyzed large volumes of background information related to CSIRO's technology.  A true and correct copy of the order appointing McLemore in the Microsoft, Intel and Toshiba cases is attached hereto as Exhibits G.

13.    The fees for McLemore's work were again split between the parties. A true and correct copy of a sample of the orders directing the parties to pay McLemore's bills are attached hereto as Exhibit H.  To date CSIRO alone has paid approximately $68,500 for his time.

14.    The court conducted another <u>Markman</u> hearing, and issued its claim construction order in those three coordinated cases and the Marvell Action on August 14, 2008.  Following additional discovery, the three actions proceeded to trial, with the <u>Buffalo</u> action, on April 13, 2009.  (As described below, the Marvell Action trails behind the other three, and is not set for trial until May 10, 2010.)

– 3 –

KERR
&
WAGSTAFFE
LLP

*Resolution of The Buffalo, Intel, Microsoft and Toshiba Actions*

15.    Approximately one week after the start of the coordinated April 13, 2009 trial, CSIRO reached a settlement with all of the adverse parties to the Buffalo, Intel, Microsoft and Toshiba Actions.

*The Marvell Action*

16.    On May 4, 2007, Marvell Semiconductor, Inc. and its related entities filed a declaratory judgment action in the Eastern District of Texas, seeking an order that Marvell's component parts do not infringe the '069 patent.  (The Marvell Action mentioned above.)  The case is similar in substance to the other Texas actions, and CSIRO has counterclaimed for infringement of the '069 Patent by Marvell.  Shortly after filing its case, Marvell also sought to intervene in the then-pending Intel, Microsoft and Toshiba Actions for the purpose of moving to disqualify CSIRO's long-time trial counsel in those actions.  The court denied Marvell's motion to disqualify, and after Marvell appealed, the Federal Circuit affirmed that decision.  A true and correct copy of the order of the Eastern District of Texas and the decision of the Federal Circuit on appeal is attached hereto as Exhibits I and J, respectively.

17.    Marvell's case is still pending before the Eastern District of Texas.  A true and correct copy of the docket from that case, downloaded from Pacer on July 13, 2009, is attached hereto as Exhibit K.  The court previously consolidated proceedings through the Markman hearing with the Intel, Microsoft and Toshiba Actions, and so has already issued a claim construction order in that case, again, with the assistance of McLemore.  The Marvell action is scheduled for trial on May 10, 2010, and discovery in that matter continues apace.   The parties have taken extensive discovery of documents and other evidence, including the hardware description language ("HDL") code underlying the circuit design Marvell's microchips, have taken dozens of depositions, and have both engaged numerous expert witnesses.

1

*Cisco's Participation in the Texas Actions*

2    18.    Though Cisco Systems, Inc. ("Cisco") is not a party to the Texas

3    Actions, it has been an active participant in those proceedings. The parties sought

4    significant discovery from Cisco concerning the TLA and the licensing fees paid

5    pursuant to the agreement. Cisco objected to that discovery, and on August 5,

6    2008 filed a motion for a protective order in the Northern District of California

7    (from which the subpoena to Cisco issued). That court denied the motion as

8    premature and directed that any further request for a protective order be taken up

9    with the Eastern District of Texas.

10    19.    On October 24, 2008 Cisco refiled its motion in substantially similar

11    form with the Texas court, moving for additional protections for its confidential

12    information on the basis that the Texas litigation was closely related to its ongoing

13    licensing dispute with CSIRO under the TLA (the subject of this case) and that

14    information produced in discovery in the Texas actions might be used against

15    Cisco in that licensing dispute. A true and correct copy of Cisco's motion for a

16    protective order filed in the Eastern District of Texas is attached hereto as Exhibit

17    L.

18    20.    Cisco is also a participant in what CSIRO's opposing parties in the

19    Texas Actions have called a "Common Interest Group," pursuant to which they

20    have claimed that the communications between them are privileged. Cisco was a

21    signatory to those parties' Common Interest and Information Sharing Agreement

22    dating back to September 15, 2004, and Cisco maintained that it remained a

23    member of the Common Interest Group throughout the proceedings there. A true

24    and correct copy of a letter dated November 2, 2007 from Daniel T. Conrad,

25    counsel for Dell, Inc. in the Intel Action, listing Cisco as a member of the Common

26    Interest Group, is attached hereto as Exhibit M. Attached hereto as Exhibit N is a

27    true and correct copy of an email dated August 29, 2008 from Matthew S.

28

KERR
&
WAGSTAFFE
LLP

1  Yungwirth, counsel for Cisco, to me, stating that Cisco is a member of the
2  Common Interest Group.

3      21.    I have reviewed the pleadings in this case and am personally familiar
4  with the details of the dispute between the parties.  My firm has long represented
5  CSIRO in the negotiations with Cisco concerning the dispute at issue, and
6  continues to represent them in connection therewith.  As stated above, I am lead
7  counsel for CSIRO in the ongoing Marvell Action.  On that basis, I am aware that
8  this case and the Marvell Action involve substantial factual and legal overlap.

9      22.    For example, factual issues concerning Cisco's purchase of Radiata,
10 the alleged transfer of contractual rights to other Cisco entities, the transfer of
11 technology to manufacturing sublicensees, and the development of technology
12 received from CSIRO through Radiata are already live issues in the Marvell
13 Action.  CSIRO is presently seeking discovery from Marvell regarding the Radiata
14 sublicense to Marvell of the '069 patent in breach of the TLA.

15     23.    Both this case and the Marvell Action (as well as the other now-
16 settled Texas Actions) involve the same underlying technology, CSIRO's wireless
17 LAN invention.  As with the patent enforcement actions, this case involves
18 significant factual questions about the scope of that technology and construction of
19 the '069 patent.  For example, Plaintiffs in this case claim that the Technology
20 License Agreement (or "TLA") grants them a full license to exploit the '069
21 patent, and ask the Court to issue a declaratory judgment to that effect.  Disposition
22 of the issue will require careful evaluation of the contents and boundaries of the
23 technology at issue, including the deciding court's evaluation of the boundaries of
24 the '069 Patent itself.  The scope of the '069 Patent is also at issue in the Marvell
25 Action, in which CSIRO's counterclaim allege infringement of patent.

26     24.    I am also aware that Plaintiffs in this case seek a declaration that they
27 did not breach the TLA's prohibition on granting sublicenses except in the form
28 provided in the TLA and its amendments and its prohibition on transferring the

licensed technology in a manner that would allow the sublicenses to redesign or make improvements to it.  One of the two sublicensees at issue is Marvell.  From my prior litigation of the '069 Patent cases, I know that to ascertain whether Cisco improperly transferred the technology to Marvell, the deciding court will need to review the design of Marvell's chips (that is, their HDL code), discover whether they contain CSIRO's technology, and then carefully evaluate any changes made to that technology before concluding whether or not such changes evidence a violation of the TLA.  That task is largely redundant with the analysis already underway in the Marvell Action, where the HDL code for Marvell's chips must be evaluated to determine if it infringes on the '069 Patent—including whether it contains CSIRO's original code.

25.    McLemore continues to be retained by the Eastern District of Texas for additional analysis and support in the Marvell Action.  It is our understanding that his assignments will include providing the court with an analysis of the contents and boundaries of CSIRO's '069 Patent.

26.    Based on my litigation of the Texas Actions, including the ongoing Marvell Action, and my familiarity with this action and the underlying suit between the parties, I believe that litigation in the Eastern District of Texas will be more efficient for both the courts and parties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of July, 2009 at Palo Alto, California.

/s/ Daniel J. Furniss
Daniel J. Furniss

# EXHIBIT A

US005487069A

# United States Patent [19]

## O'Sullivan et al.

[11] Patent Number: 5,487,069

[45] Date of Patent: Jan. 23, 1996

[54] **WIRELESS LAN**

[75] Inventors: **John D. O'Sullivan**, Ermington; **Graham R. Daniels**, Willoughby; **Terence M. P. Percival**, Lane Cove; **Diethelm I. Ostry**, Petersham; **John F. Deane**, Eastwood, all of Australia

[73] Assignee: **Commonwealth Scientific and Industrial Research Organisation**, Australia

[21] Appl. No.: **157,375**

[22] Filed: **Nov. 23, 1993**

[30]        **Foreign Application Priority Data**

Nov. 27, 1992 [AU]    Australia .................................... PL6069

[51] Int. Cl.[6] .................................................... H04B 7/01
[52] U.S. Cl. ......................... 370/94.3; 375/284; 375/348; 455/52.3; 455/65
[58] Field of Search ................................. 375/34, 39, 51, 375/57, 58, 99, 101, 254, 261, 279, 284, 285, 346, 348; 370/95.3; 455/56.1, 54.1, 63, 65, 52.3

[56]            **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,605,019 | 9/1971 | Cutter et al. | 375/58 |
| 4,630,314 | 12/1986 | Smith | 375/58 |
| 4,679,227 | 7/1987 | Hartogs | 375/58 |
| 4,888,767 | 12/1989 | Furuya et al. | 375/58 |
| 5,095,535 | 3/1992 | Freeburg | 455/55 |
| 5,191,576 | 3/1993 | Pommier et al. | 370/50 |
| 5,283,780 | 2/1994 | Schuchman et al. | 455/65 |

**OTHER PUBLICATIONS**

Supercomm/ICC'92 vol. 2, Jun. 1992, Chicago US pp. 1025–1031 D. Buchholz et al. 'Wireless In–Building Network Architecture and Protocols' p. 1029, left col., line

26–line 35.

IEEE Transactions on Communications, vol. 39, No. 5, May 1991, New York US pp. 783–793 E. F. Casas et al. 'OFDM for Data Communication over Mobile Radio FM Channels—Part I: Analysis and Experimental Results' p. 784, left col., line 1—right col., line 2; FIG. 1 p. 790, right col., line 18–line 22.

42nd VTS Conference vol. 2, May 1992, Denver US pp. 819–822 T. Le–Ngoc 'A CSMA/CD Portable Data System Using Adaptive Reed–Solomon Coding' p. 820, left col., line 2–line 9.

IEEE Transactions on Communications, vol. 33, No. 7, Jul. 1985, New York US pp. 665–675 L. J. Cimini Jr. 'Analysis and Simulation of a Digital Mobile Channel Using Orthogonal Frequency Division Multiplexing' par. I–par. II. Par IV.

*Primary Examiner*—Benedict V. Safourek
*Attorney, Agent, or Firm*—William S. Frommer

[57]            **ABSTRACT**

The present invention discloses a wireless LAN, a peer-to-peer wireless LAN, a wireless transceiver and a method of transmitting data, all of which are capable of operating at frequencies in excess of 10 GHz and in multipath transmission environments. This is achieved by a combination of techniques which enable adequate performance in the presence of multipath transmission paths where the reciprocal of the information bit rate of the transmission is short relative to the time delay differences between significant ones of the multipath transmission paths. In the LANs the mobile transceivers are each connected to, and powered by, a corresponding portable electronic device with computational ability.

**72 Claims, 8 Drawing Sheets**





*FIG.1*



*FIG.2*



FIG.3



FIG. 4



FIG.5



*FIG. 6*



*FIG. 7*



*FIG. 8*



FIG. 9

5,487,069

**1**

## WIRELESS LAN

### BACKGROUND OF THE INVENTION

The present invention relates to local area networks (LANs) which enable devices with computational ability to communicate with each other and, in particular, to a wireless LAN in which the devices communicate by means of radio transmissions.

In recent years the personal computer has become an increasingly important tool in business and commerce and many workers now spend a good portion of their working day operating such computers. Similarly, business organisations are increasingly structuring their businesses to not only enable, but to oblige, their workers to access information by means of a personal computer or equivalent terminal, which is connected to a local area network which extends around or through the office environment.

Hitherto such local area networks have been provided either by electrical conductor or optical fibre and this requires the office premises to be extensively cabled. This cabling must be adjusted if, for example, partitions within an office are to be adjusted. In addition, the cabling required for a classroom or tutorial arrangement where a large number of personal computers are intended to be operated within a small area, can be quite substantial.

Furthermore, an increasing trend in recent times has been the sale of mobile or portable devices with computational ability. These include both laptop/notebook and handheld computers. Whilst the primary impetus for the purchase of such a computer is the ability to use its computational power outside of the normal office environment, once a portable computer has been purchased, the desire arises to use the portability within the office premises so as to allow the user of the portable computer to take the computer with him and use it in the closely adjacent offices of colleagues, for example, and yet still be able to access the LAN of the business organisation, which may be spread over several adjacent buildings in "campus" style.

While this is possible by means of plug-in connectors which enable the portable computer of one operator to be plugged into the office LAN at any particular location, it is generally inconvenient since the LAN may not provide for two or more points of connection within a single office, the portable computer loses its portability, and so on.

Accordingly, the need arises for a LAN to which such portable devices can be connected by means of a wireless or radio link.

Such wireless LANs are known, however, hitherto they have been substantially restricted to low data transmission rates. In order to achieve widespread commercial acceptability, it is necessary to have a relatively high transmission rate and therefore transmit on a relatively high frequency, of the order of 1 GHz or higher. As will be explained hereafter, radio transmission at such high frequencies encounters a collection of unique problems.

One wireless LAN which is commercially available is that sold by Motorola under the trade name ALTAIR. This system operates at approximately 18 GHz, however, the maximum data transmission rate is limited to approximately 3–6 Mbit/s. A useful review of this system and the problems of wireless reception at these frequencies and in "office" environments is contained in "Radio Propagation and Antimultipath Techniques in the WIN Environment", James E. Mitzlaff IEEE Network Magazine November 1991 pp. 21–26.

**2**

This engineering designer concludes that the inadequate performance, and the large size, expense and power consumption of the hardware needed to adaptively equalize even a 10 Mbit/s data signal are such that the problems of multipath propagation cannot thereby be overcome in Wireless In-Building Network (WIN) systems. Similarly, spread spectrum techniques which might also be used to combat multipath problems consume too much bandwidth (300 MHz for 10 Mbits/s) to be effective. A data rate of 100 Mbit/s utilizing this technology would therefore consume 3 GHz of bandwidth.

Instead, the solution adopted by Motorola and Mitzlaff is a directional antenna system with 6 beams for each antenna resulting in 36 possible transmission paths to be periodically checked by the system processor in order to locate the "best quality" path and "switch" the antennae accordingly. This procedure adds substantial bulk and cost to the system. This procedure is essentially the conversion of a multipath transmission problem into a single path transmission environment by the use of directional antennae.

### OBJECTS AND SUMMARY OF THE INVENTION

The object of the present invention is to provide a wireless LAN in a confined multipath transmission environment having a high bit rate even through the reciprocal of the data or information bit rate (the data "period") is short relative to the time delay differences between significant transmission paths.

According to one aspect of the invention there is disclosed a transmitter for operation in a confined multipath transmission environment, said transmitter comprising antenna means coupled to transmission signal processing means in turn coupled to an input data channel, said transmitter being operable to transmit data at radio frequencies in excess of 10 GHz, and said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths.

According to another aspect, there is disclosed a transmitter for operation in a confined multipath transmission environment, said transmitter comprising antenna means coupled to transmission signal processing means in turn coupled to an input data channel, said transmitter being operable to transmit data at radio frequencies, said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement to said data passed to said modulation means and means, interposed between said data reliability enhancement means and said modulation means, for interleaving blocks of said data.

A transmitter can further be incorporated into a transceiver for operation in a confined multipath transmission environment. The transceiver also comprises reception signal processing means coupled to the antenna means and an output data channel to receive data at radio frequencies. A transceiver can be incorporated in a peer-to-peer wireless LAN, in that a plurality of mobile such transceivers for data

5,487,069

**3**

transceiving operation by radio transmissions between ones thereof in a confined multipath environment. Furthermore, transceivers can be included in a wireless LAN, in that a plurality of such mobile transceivers have data transceiving operation by radio transmissions to one of a plurality of hub transceivers, the hub transceivers being coupled together to constitute a plurality of data sources and destinations.

According to another aspect, the invention discloses a method for transmitting data in a confined multipath transmission environment at radio frequencies in excess of 10 GHz, said data being provided by an input data channel coupled to transmission signal processing means in turn coupled to antenna means, said method comprising the steps of:

    modulating said data, by modulation means of said transmission signal processing means, into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant one of non-direct transmission paths; and

    transmitting, by said antenna means, said sub-channel symbols at said radio frequencies in excess of 10 GHz.

According to a yet further aspect of the invention, there is disclosed a method for transmitting data in a confined multipath transmission environment of radio frequencies, said data being provided by an input data channel coupled to transmission signal processing means in turn coupled to antenna means, said method comprising the steps of:

    applying data reliability enhancement to said data;

    interleaving blocks of said enhanced data;

    modulating said data, by modulation means of said transmission signal processing means, into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of significant ones of non-direct transmission paths; and

    transmitting, by said antenna means, said sub-channel symbols.

Preferably, transmission is enhanced by the use of one or more of the following techniques, namely interactive channel sounding, forward error correction with redundancy sufficient for non-interactive correction, modulation with redundancy sufficient for interactive error correction by re-transmission of at least selected data, and the choice of allocation of data between sub-channels.

The radio transmission is also preferably divided into small packets of data each of which is transmitted over a time period in which the transmission characteristics over the predetermined range are relatively constant.

The encoding of the data is preferably carried out on an ensemble of carriers each costituting a sub-channel and having a different frequency with the modulation of each individual carrier preferably being multi-level modulation of carrier amplitude and/or phase (mQAM). The modulation family mQAM includes amplitude shift keying (ASK), multi-level ASK (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK), amplitude phase keying (APK), multi-level APK (mAPK) and the like.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic plan view of an office illustrating multipath transmissions of radio frequencies of at least 10 GHz caused by reflections;

**4**

FIG. 2 is a graph of received power as a function of time, for an impulse transmission, illustrating the received signals of reduced magnitude which are delayed owing to the possibility of multiple path transmission;

FIG. 3 is a graph of the received amplitude of steady state signals as a function of the transmitted frequency, this characteristic itself being time dependent;

FIG. 4 is a schematic diagram illustrating a local area network including a plurality of hubs each of which is able to communicate with mobile transceiver(s) within a corresponding cell;

FIG. 5 is a schematic block diagram of the circuit arrangements within each hub and mobile transceiver;

FIG. 6 is a more detailed block diagram illustrating part of the mobile transceiver of FIG. 5.

FIG. 7 is a more detailed block diagram of the framing, FEC and modulator section 32 of the transmit path of the mobile transceiver of FIG. 6;

FIG. 8 is more detailed block diagram of the framing, FEC and demodulator section 32 of the mobile transceiver of FIG. 6; and

FIG. 9 is a more detailed block diagram of the mm-wave transmitter 36 and receiver 35 of the mobile transceiver of FIG. 6.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Embodiments of the present invention will now be described with reference to the drawings.

In schematic form, FIG. 1 illustrates a room 1 in a typical office environment which includes items of furniture 2 and a transmitter 3 and receiver 4. For radio transmissions at a frequency in excess of 10 GHz, a multipath mode of transmission from the transmitter 3 to the receiver 4 occurs. Reflections from the walls (and floor and ceiling) of the room 1, items of furniture 2, and the like, within the room 1 cause the multiple path transmissions.

As illustrated in FIG. 2, the effect of the multiple path transmissions is that the receiver 4 receives an undelayed signal 5 which has travelled directly from the transmitter 3 to the receiver 4, and a number of delayed signals 6 which are received at a time after receipt of the undelayed signal 5. The magnitude of the delayed signals 6 is usually somewhat attenuated. Under some conditions, the magnitude of the undelayed signal 5 can be attenuated also, sometimes by more than some delayed signals 6.

As a consequence of the delayed signals 6, it is necessary for the length of time during which a single symbol is transmitted (the symbol period) to be substantially longer than the delay time in order that the received echoes of a first symbol not mask the receipt of a subsequent symbol. This requirement has provided a severe upper limit to the rate at which data can be transmitted in such an environment.

Furthermore, as illustrated in FIG. 3, the office environment is by no means a good one for radio transmission. FIG. 3 illustrates a typical channel characteristic over a short time period illustrating the magnitude of the received signal as a function of frequency in the 1 GHz band between 60 and 51 GHz. It will be seen that the received amplitude is by no means constant and, in particular, at various frequencies fading occurs. Furthermore, as indicated by dotted lines in FIG. 3, the frequency at which fading occurs varies as a function of time because of movements within the room.

5,487,069

<table>
<tr><td>5</td><td>6</td></tr>
</table>

Such a communication channel is called a time varying frequency selective fading channel.

Similar, but different, communications channels are known in both telephone and long distance radio communications and various strategems, generally known as equalisation, are used to overcome the problems such channels present. However, in these fields since such fading is due to changes in temperature, or atmospheric conditions, once such telephone and long distance radio communication channels are established, the fading characteristic changes relatively slowly. Also in telephone applications advantage of the fact that channel degradation is generally low near the centre of the channel, can be taken when arranging the equalisation. This is not the case in an office or indoor environment.

Rather, in the above described office environment, the change in the transmission characteristic indicated by dotted lines in FIG. 3 can, for example, be caused by the simple act of someone opening a briefcase positioned on a desk. The raised lid of the briefcase results in a change in the characteristic. Similar extremely short term changes can be caused by the receiver 4 itself moving, or other objects moving such as doors opening, people moving, and the like. Clearly the transmitter 3 can also move. The foregoing establishes a very hostile environment within which the desired radio transmissions are to take place. In particular, there is no preferred channel or even a guaranteed channel within the 1 GHz band.

It would be possible to overcome the abovementioned difficulties by the use of highly directional antennae so as to eliminate all paths of transmission but the direct path. However, attempting to mechanically align such an antenna which was in turn affixed to a portable computer is commercially unattractive.

FIG. 4 illustrates in schematic form the general layout of a wireless LAN in accordance with a preferred embodiment of the present invention. A plurality of hubs 8 and mobile transceivers 9 are provided. The hubs 8 are interconnected by means of a backbone 10 which can take the form of either electrical conductors or optical fibre cable. As indicated by a dotted line in FIG. 4 the backbone 10 can constitute a loop. If desired, the backbone 10 can be connected to other computers 7 and, if desired, via a gateway 11 to the public switched telephone network 12. In a typical arrangement, each office (or each office in each building of a campus) would be provided with a single hub 8 which would communicate with the, or each of the, mobile transceivers 9 in that room. Either the backbone 10 can extend over the entire area to be covered, or the area can be covered by the use of multiple gateways and multiple backbones. The effective range of the transceiver within the hub 8 is arranged to essentially cover only that room. The limited transmission range for the hub 8 creates a corresponding cell 13 as indicated by broken lines in FIG. 4. For a large room such as a lecture room in an educational institution, the length of the room can require that the room be provided with two hubs 8 in which case two partially overlapping cells 13 would be present within the one room.

As seen in FIG. 5, for the hub transceiver 8, a number of component blocks are provided. These take the form of a network interface 20, a buffer memory 21, a framing, forward error correction (FEC) and modulating section 22, a framing, forward error correction and demodulation section 23, an IF (intermediate frequency) system section 24, a mm-wave receiver 25, a mm-wave transmitter 26, and an antenna 27 which is sufficiently broad in its radiation pattern

to illuminate the entire cell. The antenna 27 can achieve this result statically or dynamically (with electronic or mechanical beam steering). All these items are connected to, and are operable by, a control and timing section 28. In addition, all are powered by an AC mains operable power supply 29.

Equivalent portions of the mobile transceiver 9 are indicated by a designator having a magnitude higher by 10 in FIG. 5 and also in FIGS. 6–9. The mobile transceiver 9 has a battery powered power supply 39. This is possible because of the use of low power gallium arsenide devices in the receiver 35 and transmitter 36, in particular.

It will be noted that the antenna 37 is preferably a steerable antenna which is electronically steerable by the control and timing section 38 so as to at least partially direct the transmissions to and from the mobile transceivers 9 towards the corresponding hub 8. A suitable antenna for this purpose is that disclosed in Applicant's Australian Patent Application No. 66100/94 entitled "A PLANAR ANTENNA", the contents of which are hereby incorporated by cross-reference. This antenna improves the signal to noise ratio on the wireless link and attenuates delayed signals thereby improving multipath performance.

A more detailed block diagram of a portion of the transceiver 9 is illustrated in FIGS. 6–9. In FIG. 6 the general arrangement of the transceiver 9 (excepting the terminal interface 30 and buffer memory 31) is illustrated. An intermediate stage of detail is given for the receiver 35 and transmitter 36, the receive intermediate frequency system 34 and receive demodulator 33 and the transmit intermediate frequency system 34 and transmit modulator 32. Full details of the modulation are given in FIG. 7 and of the demodulation in FIG. 8.

In FIG. 7, the transmit path framing, FEC and modulating section 32 of FIGS. 5 and 6, is illustrated in detail. From the buffer memory 31 of FIG. 5 a binary data stream is applied to a CRC (cyclic redundancy check) Generate and Append block 40. The output of this block 40 or that of an End of Packet Pattern Generator 41 is selectively input to a rate ½ TCM (trellis coded modulation) Encoder 42. The output of encoder 42 is in turn input to a Di-bit Interleaver 43, the output of which is in turn input to a QPSK Encoder 44 which carries out differential encoding on a frame-by-frame basis. The output of QPSK Encoder 44 and a synchronising header generator 45 are combined in frame assembly and zero pad insertion block 46 so that the frames are assembled and four zero pads inserted so that six carriers are generated to each side of, but not coincident with, the centre frequency.

The assembled frames are then passed through an Inverse Fast Fourier Transform device 47 which uses a 16 point complex IFFT. The resultant signal is passed through Frame Serializer and Cyclic Extender block 48 to correctly sequence with 4 point cyclic extension the serial frames. The result is then passed via digital to analogue converters 49,50 to the intermediate frequency stage 34 of FIGS. 5 and 6.

In the receive path in the Framing, FEC and Demodulating section 33 of FIGS. 5 and 6, essentially the reverse procedures are carried out as illustrated in detail in FIG. 8. The received signal from the intermediate frequency stage 34 is passed through the analogue to digital converters 60,61 and thence to the cyclic extractor and frame assembler 62. The resultant signal is passed through the Fast Fourier Transform device 63 to provide the essentially decoded signal. This signal is then simultaneously passed to a frame dis-assembler and zero pad remover 64 and to a synchronising calculator and detector 65 which provides start of message, end of message and symbol timing signals. These are passed to the control and timing unit 38 of FIGS. 5 and 6.

5,487,069

7

The output of the frame dis-assembler and zero pad remover 64 is passed to a demodulator/detector 66 which carries out the necessary soft decision frame-by-frame differential demodulation and detection. The resulting output is passed to de-interleaver 67 and then to TCM decoder which is again a soft decision decoder. The decoder output is passed both to the buffer memory 31 of FIG. 5 and to CRC Accumulator and Checker 69. This latter device produces an error signal for the control and timing unit 38 of FIGS. 5 and 6 if the demodulating/decoding has not correctly recovered the transmission data.

Turning now to FIG. 9, from the antenna 37 a schematically indicated bi-directional amplifier 71 leads via a filter 72 to an image rejection mixer 73. The preferred form of bi-directional amplifier 71 is that disclosed in Applicant's co-pending International Patent Application No. PCT/AU94/00704 entitled "A Bi-Directional Amplifier", the contents of which are hereby incorporated by cross-reference. Alternatively the bi-directional amplifier 71 can be realised by use of a separate transmit amplifier and a separate receive amplifier as illustrated connected between the antenna 37 and filter 72 by appropriate switches under the control of the control and timing unit 38 of FIGS. 5 and 6.

The image rejection mixer 73 receives a 58 GHz signal from a local oscillator (LO) unit 74. In the preferred form the first local oscillator (LO) is at a frequency of 58 GHz, resulting in an intermediate frequency band of 2–3 GHz. In the preferred embodiment illustrated in FIG. 9, this signal is obtained by doubling the output signal of a 29 GHz oscillator. It is also preferable to perform some form of frequency stabilization on this oscillator, either by using an external frequency discriminator as illustrated in FIG. 9, a stable internal resonator or some form of frequency/phase locked-loop.

The image rejection mixer 73 is connected to both the receive IF system 34 and the transmit IF system 34 and can be shared between them by the use of an appropriate switch again under the control of the control and timing unit 38 of FIGS. 5 and 6. The use of the filter 72 provides additional rejection of the image frequency.

From FIGS. 6–9, It will be seen that the preferred form of modulation includes not only encoding but also fast fourier transforming, and its inverse. The transceiver 35,36 is preferably realised by means of one or more monolithic Integrated circuits. Furthermore, in order to reduce power consumption in the mobile transceiver 9, the control and timing section 38 can power down each mobile transceiver 9 except when it is transmitting or receiving. This is determined by a polling scheme initiated by the hub transceivers 8. For example, the hub 8 can communicate with each mobile transceiver 9 in turn inquiring if any data is required to be transmitted or access to other parts of the LAN is required. This polling of the various stations can comprise one of a number of standard techniques such as time division multiple access, ALOHA or slotted ALOHA, timed token passing, grant request schemes or other applicable techniques.

The transmissions from the various transceivers 8 and 9 which comprise the network need not necessarily be at the same bit rate since some portions of the network need only a low speed of transmission (eg. printers) while others require a very high speed of transmission. This embodiment enables a variety of rates of transmission to be accommodated in a compatible network. This enables lower cost and/or low power consumption transceivers 9 to be used for printers or low data rate computing devices.

In order to provide a high speed but transmission rate in the hostile radio environment as described above, at least

8

two (and preferably three) techniques are used simultaneously. The first technique is to transmit over a relatively large number of parallel sub-channels within the available bandwidth so that each channel has a low bit rate but the total, or overall bit rate, is high. This spread, by increasing the symbol length, overcomes the problem of delay time and hence decreases the problems caused by inter-symbol interference.

The second technique involves the transmission of the data in small packets having some form of data reliability monitoring and/or enhancement such as Forward Error Correction (FEC). The length of the packet depends upon the method of data reliability enhancement and the hostility of the environment. Sufficiently small packets overcome the problem of the rapid time change of the channel characteristics.

The third technique is interleaving (to be described hereafter) which is essentially a further data reliability enhancement. This technique improves the performance or many FEC schemes in overcoming the problems caused by nulls in the channel's frequency response.

In the most favourable environment, use of only ensemble modulation (the first technique) can be sufficient to produce an adequate result. However, such environments are rarely encountered and therefore, in practice, the second technique should be employed in combination with the first technique.

The initial form of the second technique is data reliability enhancement by automatic repeat request (ARQ). The maximum permissible packet length able to be chosen is that which will ensure a practical probability of error free transmission. As the hostility of the environment increases, either channel sounding or a redundancy arrangement such as forward error correction (FEC), and/or data redundancy, and/or permutation modulation should be also used. If necessary, both channel sounding and redundancy technique(s) can be used.

In relation to the first of these techniques, typical time delays due to multipath transmission are of the order of 50 ns because of the dimensions of typical rooms. At a desired bit rate of the order of 100 Mbit/s, this indicates that the bit period is 10 ns which is only 20% of the delay time. However, if the transmission is divided into, say, twelve sub-channels, then in order to achieve a bit rate of 100 Mbit/s overall, this implies that each channel must have a bit rate of approximately 8.3 Mbit/s. If 12 bits are encoded and sent as a symbol, then the symbol time is of the order of 120 ns which is greater than the delay time. The choice of the optimum number of sub-channels depends on the environment.

In relation to the second technique, because of the fading channel, not all the sub-channels can be expected to transmit successfully. For this reason data error correction is provided. This takes a number of forms. The first is redundancy sufficient for the detection of errors so that there may be subsequent re-transmission of at least selected data in which those passages of information not correctly received are re-sent. The re-transmission is not necessarily over the same sub-channel or channel. The second is forward error correction which has a redundancy sufficient for non-interactive correction. A third is permutation modulation such as multi-tone amplitude shift keying which has built-in redundancy. Any of these techniques allow the demodulator to correct for a relatively small percentage of errors in the received bits.

The preferred type of modulation in each sub-channel is multi-level modulation of carrier amplitude and/or phase (mQAM). The modulation family mQAM includes ampli-

5,487,069

9

tude shift keying (ASK), multi-level ASK (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK), amplitude phase keying (APK), multi-level APK (mAPK) and the like.

Transceivers 9 for devices such as printers which require a lower bit rate transmission can use the techniques which give a lower spectral efficiency such as amplitude shift keying (ASK).

A variant of ASK over an ensemble of carriers is called permutation modulation. In this scheme, the transmission is m-ary where a transmitted symbol can encode $\log_2$ m binary digits. There is an alphabet of m symbols allocated to the channel. Each symbol transmitted has a built in redundancy so that if several of the symbols are received in error due to the poor nature of the corresponding part of the channel, a correct decision can still be made as to which of the allowed symbols was transmitted.

A choice of the symbols with the appropriate orthogonality can be made using a number of well known information theory techniques or by a computer search for the appropriate codes. Due to the high redundancy and limited bandwidth efficiency of permutation modulation, this system does not yield a high spectral efficiency (expressed as bits/Hz). For the system of the illustrated embodiment this can be lower than 0.25 bit/Hz. It is, however, relatively simple to implement and so is desirably used in a lower cost, lower bit rate transceiver 9 for printers, for example, which are compatible with the higher performance embodiments described below.

Another embodiment of the multi-carrier scheme is to phase modulate each carrier using a phase shift keying (PSK). In simple embodiments this is binary phase shift keying (BPSK) where two phase options are transmitted or quadrature phase shift keying (QPSK) where four phase options are transmitted. Any higher number can be transmitted as required.

In the BPSK embodiment, incorporating forward error correction, the incoming binary data stream at a bit rate "b" is encoded using a conventional forward error correction scheme such as, but not restricted to Reed-Solomon or convolutional coding. Such coding increases the number of bits to be transmitted by a factor "r" which is the reciprocal of the code rate. The encoded stream, at a bit rate b.r, is then split into "pi" parallel paths, and each path used to BPSK modulate a separate carrier in the ensemble, giving an effective symbol duration, on the radio link, of p/(b.r.) seconds.

The resulting signal is then transmitted over the channel and received by the other unit with some sub-channels error free and others with a potentially substantial error rate, due to the frequency selective nature of the channel.

The received carriers are demodulated and the individual bit streams combined (or aggregated) to form an encoded data stream with possible errors (mainly from the bad sub-channels) which is then decoded by a device (such as a Reed-Solomon or Viterbi decoder). Any errors in the received signal are normally completely corrected by this decoding process.

Additionally, a weighting can be given as to the confidence of the accuracy of the output of each BPSK demodulator based upon the amplitude of the received carrier. This weighting can be used as an additional input to the decoding device to determine which bits are more likely to be in error and to increase the performance of this device in correcting as many errors as possible in the transmission.

It is also possible to use combined coding and modulation schemes such as trellis-coded-modulation (TCM) to give

10

improved bandwidth efficiency and improved error correction capability.

It is also possible to use multiple level phase shift keying modulation on each of the carriers transmitted and a corresponding demodulator on the receiver. This will give improved bandwidth efficiency and therefore allow much higher data rates to be transmitted through the channel for the same compatible bandwidth. This option allows higher bit rate units to occupy the same spectrum as the lower bit rate transceivers but in a compatible manner. The increased spectral efficiency is acquired at the cost of increased complexity in the modulators and demodulators, together with some degradation of error performance.

As referred to above, link data interleaving schemes can be used, in this system, to further improve the error correcting performance of FEC codes which distribute the contribution of individual data elements over fewer carriers than the total number in the ensemble. Link data interleaving schemes do this by distributing the encoded data between the carriers in such a way that the correlation in error probability of those carriers associated with any given element of uncoded input data is minimised. On average, this corresponds to maximising the minimum frequency spacing between those carriers.

For example, with a 5-bit constraint length, half rate trellis coded QPSK modulation on the carriers of a 12 carrier ensemble, a suitable interleaving scheme is

Carrier number (1–12) modulated by successive encoder output di-bits:

1, 3, 5, 7, 9, 11, 2, 4, 6, 8, 10, 12, 1, 3, . . . etc.

Such an interleaving scheme is typically implemented by means of demultiplexers, shift registers and multiplexers in substantially conventional fashion.

The above will improve the error rate performance of the system, however, it will not eliminate all errors in all cases. To overcome any residual errors in the system an additional error correction layer, such as cyclic redundancy checked (CRC) automatic repeat request (ARQ),can be used. This error correction layer requests the re-transmission of those symbols which are believed to be in error. This re-transmission can occur over the same frequency channel, or a request can be made to the control and timing section to shift the entire frequency channel by some predetermined amount, or to change antenna characteristics such as polarisation, to increase the probability of error free transmission.

Because of the highly time variable nature of the transmission channel, the transmitted data is divided into packets of short duration (typically 100 microseconds). During this short time period it is satisfactory to assume that the transmission characteristics are essentially stationary. Before transmission of a packet of data, it is possible to use a channel selection technique to reduce error rates. One channel selection technique is to channel sound prior to transmission of the packet. If necessary, this allows the data rate to be reduced if a particular sub-channel or channel is found to be degraded.

As illustrated in FIGS. 7 and 8 the preferred method of generating and demodulating multi-carrier modulation schemes uses a device capable of performing Fast Fourier Transforms (FFTs) and Inverse Fast Fourier Transforms (IFFTs) on complex data at high speeds. Such a device is described in Australian Patent No. 610,934 entitled "A Transform Processing Circuit" granted to the present applicants, the disclosure of which is hereby incorporated by cross-reference. In the example shown in FIGS. 7 and 8, 16 point fast Fourier transformation is used.

5,487,069

11

Improved performance can be obtained by using cyclic extension by means of circuit 48 and cyclic extraction by means of circuit 62 in conjunction with the fast Fourier transformation. Cyclic extension is a technique for enhancing the multi-path tolerance of FFT-based ensemble modulation schemes by reducing the degradation of sub-channel orthogonality produced by channel delay spread effects and demodulator timing errors. It consists, at the modulator, of extending the time duration of individual multicarrier symbols by appending, to the FFT output frame, a copy of that frame, then truncating the combination to the desired length. The length of the extension is a compromise between tolerance to multipath induced intra-symbol interference and the reduction of channel spectral efficiency. It preferably corresponds to the time interval over which the channel impulse response has substantial energy.

At the extractor and frame assembler 62, an essentially uncorrupted multicarrier symbol is excised (by cyclic extraction) from the potentially distorted incoming extended symbol, whose ends may be corrupted by the extended impulse response of a multipath channel. This excised symbol is then used in the FFT based demodulation process. For example, when using a 16 point FFT, a cyclic extension length of 4 points can be used.

These processes can be effectively Implemented by a slight extension of the frame assembly/disassembly mechanism required for the FFT interface. A related (but more computationally intensive) process is that of "tapering" or "windowing", whereby the amplitude of the multicarrier symbol is varied over part of the symbol time in order to reduce the mutual cross-talk of sub-channels more than a few carrier spacings apart in frequency.

When using multi-carrier schemes it is not always desirable to occupy the full band and some carriers need not be transmitted. For example, when using an FFT device 63 the analogue (reconstruction/anti-aliasing) filter selectivity requirements, for given adjacent channel suppression/rejection, can be relaxed by using a larger transform whose higher frequency bins are zero-filled in the modulator and ignored in the demodulator. This corresponds to not generating the higher frequency (out-of-band) carriers at the transmitter and ignoring any received energy at those frequencies, so the FFT provides (subject to dynamic range considerations) a significant part of the band edge selectivity. Zero insertion can also be used to remove the band-centre carrier (DC at baseband) to reduce susceptibility to DC offset drifts in the system. For example, when using a 16 point FFT device 63 only 12 carriers are preferably used.

As shown in FIG. 6, a device 65 is required to synchronize the receiver to the incoming data. This device can, for example, compare this incoming data to the receiver's timing signals, calculate the difference in symbol and bit times and pass this information to the control and timing unit which would then perform the appropriate corrections to achieve synchronization or zero difference.

A preferred synchronisation scheme, having multipath tolerance commensurate with ensemble modulation and sharing of the FFT hardware, determines multicarrier symbol timing and gross local oscillator frequency difference by measurement of the relative phases of several carriers present in the message header generated by generator 45 and comparision of these with the known phase relationship of the transmitted carriers at the beginning of the header transmission.

The IF systems 34 are shown in FIG. 6 and consists of an I,Q up converter for the transmitter and I,Q down converter for the receiver. The second LO units of the IF systems 34

12

are tuned over the band 2–3 GHz and this allows the conversion of the signals to and from baseband. In some embodiments It is preferable to provide tuning of the carrier frequency by varying the frequency of the first local oscillator 74 (FIG. 9) and in others by varying the frequency of the second local oscillator in the IF system. It is possible to share some of the components in the transmit and receive IF systems.

The foregoing describes only some embodiments of the present invention and modifications can be made thereto without departing from the scope of the present invention. For example, interleaving and bit reversal of the transmitted data to decrease the received error rate can be accomplished by utilizing the bit reversal inherent in the FFT conversion. Also the antenna 37 can utilize polarisation diversity to improve reception.

One arrangement for the simultaneous operation of low bit rate transceivers and high bit rate transceivers is to allocate, say, half the available (high bit) channel to the low bit rate transceivers. Thus, the low bit rate transceivers utilize only half of the available bandwidth and a hub can transmit data at the low rate to two low bit rate transceivers at the same time. Thus the same hub hardware is used for both high bit and low bit rate transmissions.

It will be clear to those skilled in the art that the LAN need not incorporate hubs 8 since the mobile transceivers 9 can transmit to, and from, each other directly within the predetermined cell range. Such a LAN is termed a peer-to-peer LAN.

Similarly, the hubs 8 although described as being interconnected by electric cable and/or optical fibre, can also be inter-connected by a radio or infra-red link. The link can form a part or the backbone 10 or constitute the inter-huh communication link.

What we claim is:

1. A wireless LAN comprising:

a plurality of hub transceivers coupled together to constitute a plurality of data sources and destinations; and

a plurality of mobile transceivers each coupled to data processing means and between each said data processing means and a corresponding said transceiver data passes to be transmitted or received, said transceivers being for data transceiving operation by radio transmissions to one of said hub receivers in a confined multipath environment, and each transceiver comprising: antenna means coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to an input data channel, and said reception signal processing means in turn coupled to an output data channel, each said transceiver being operable to transmit and receive data at radio frequencies in excess of 10 GHz, and said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths.

2. A wireless LAN as claimed in claim 1, wherein said transmission signal processing means further comprises means to provide data reliability enhancement to said input data passed to said modulation means.

3. A wireless LAN as claimed in claim 2, wherein said data reliability enhancement is Forward Error Correction.

4. A wireless LAN as claimed in claim 3, wherein said transmission signal processing means further comprises

5,487,069

13

means, interposed between said data reliability enhancement means and said modulation means, for interleaving blocks of said input data.

5. A wireless LAN as claimed in claims 4, wherein said blocks of said input data are bits.

6. A wireless LAN as claimed in claim 1, wherein said modulation means performs, for each said sub-channel, multi-level amplitude and/or phase modulation (mQAM).

7. A wireless LAN as claimed in claim 6, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

8. A wireless LAN as claimed in claim 1, wherein said reception signal processing means comprises demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel.

9. A wireless LAN as claimed in claim 1, further comprising switching means for selectively coupling said antenna means to said transmission signal processing means for transmission of data and to said reception signal processing means for reception of data.

10. A wireless LAN comprising:

a plurality of hub transceivers coupled together to constitute a plurality of data sources and destinations; and

a plurality of mobile transceivers each coupled to data processing means and between each said data processing means and a corresponding said transceiver data passes to be transmitted or received, said transceivers being for data transceiving operation by radio transmissions to one of said hub receivers in a confined multipath environment, and each transceiver comprising: antenna means coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to a input data channel, and said reception signal processing means in turn coupled to a output data channel, each said transceiver being operable to transmit and receive data at radio frequencies, said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply a data reliability enhancement to said data passed to said modulation means and means, interposed between said data reliability enhancement means and said ensemble modulation means, for interleaving blocks of said data.

11. A wireless LAN as claimed in claim 10, wherein said data reliability enhancement is Forward Error Correction.

12. A wireless LAN as claimed in claim 11, wherein said blocks of said input data are bits.

13. A wireless LAN as claimed in claim 10, wherein said modulation means performs, for each said sub-channel, multi-level amplitude and/or phase modulation (mQAM).

14. A wireless LAN as claimed in claim 13, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

15. A wireless LAN as claimed in claim 10, wherein said reception signal processing means comprises demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel.

14

16. A wireless LAN as claimed in claim 10, further comprising switching means for selectively coupling said antenna means to said transmission signal processing means for transmission of data and to said reception signal processing means for reception of data.

17. A peer-to-peer wireless LAN comprising:

a plurality of mobile transceivers for data transceiving operation by radio transmissions between ones thereof in a confined multipath environment, each said transceiver being coupled to a data processing means, and between each said data processing means and a corresponding said transceiver data passes to be transmitted or received, each said transceiver comprising: antenna means coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to an input data channel, and said reception signal processing means in turn coupled to an output data channel, each said transceiver being operable to transmit and receive data at radio frequencies in excess of 10 GHz, and said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths.

18. A peer-to-peer wireless LAN as claimed in claim 17, wherein said transmission signal processing means further comprises means to provide data reliability enhancement to said input data passed to said modulation means.

19. A peer-to-peer wireless LAN as claimed in claim 18, wherein said data reliability enhancement is Forward Error Correction.

20. A peer-to-peer wireless LAN as claimed in claim 19, wherein said transmission signal processing means further comprises means, interposed between said data reliability enhancement means and said modulation means, for interleaving blocks of said input data.

21. A peer-to-peer wireless LAN as claimed in claim 20, wherein said blocks of said data are bits.

22. A peer-to-peer wireless LAN as claimed in claim 17, wherein said modulation means performs, for each said sub-channel, multi-level amplitude and/or phase modulation (mQAM).

23. A peer-to-peer wireless LAN as claimed in claim 22, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

24. A peer-to-peer wireless LAN as claimed in claim 17, wherein said reception signal processing means comprises demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel.

25. A peer-to-peer wireless LAN as claimed in claim 17, further comprising switching means for selectively coupling said antenna means to said transmission signal processing means for transmission of data and to said reception signal processing means for reception of data.

26. A peer-to-peer wireless LAN comprising:

a plurality of mobile transceivers for data transceiving operation by radio transmissions between ones thereof in a confined multipath environment, each said transceiver being coupled to a data processing means, and between each said data processing means and a corre-

5,487,069

15

sponding said transceiver data passes to be transmitted or received, each said transceiver comprising: antenna means coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to an input data channel, and said reception signal processing means in turn coupled to an output data channel, each said transceiver being operable to transmit and receive data at radio frequencies, said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement to said data passed to said ensemble modulation means and means, interposed between said data reliability enhancement means and said ensemble modulation means, for interleaving blocks of said data.

27. A peer-to-peer LAN as claimed in claim 26, wherein said data reliability enhancement is Forward Error Correction.

28. A peer-to-peer LAN as claimed in claim 27, wherein said blocks of said input data are bits.

29. A peer-to-peer LAN as claimed in claim 26, wherein said modulation means performs, for each said sub-channel, multi-level amplitude and/or phase modulation (mQAM).

30. A peer-to-peer LAN as claimed in claim 29, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase shift keying (mAPK).

31. A peer-to-peer wireless LAN as claimed in claim 26, wherein said reception signal processing means comprises demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel.

32. A peer-to-peer wireless LAN as claimed in claim 26, further comprising switching means for selectively coupling said antenna means to said transmission signal processing means for transmission of data and to said reception signal processing means for reception of data.

33. A transceiver for operation in a confined multipath transmission environment, said transceiver comprising antenna means coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to an input data channel, and said reception signal processing means in turn coupled to an output data channel, said transceiver being operable to transmit and receive data at radio frequencies in excess of 10 GHz, and said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths.

34. A transceiver as claimed in claim 33, wherein said transmission signal processing means further comprises means to provide data reliability enhancement to said input data passed to said modulation means.

35. A transceiver as claimed in claim 34, wherein said data reliability enhancement is Forward Error Correction.

36. A transceiver as claimed in claim 35, wherein said transmission signal processing means further comprises

16

means, interposed between said input data reliability enhancement means and said modulation means, for interleaving blocks of said data.

37. A transceiver as claimed in claim 36, wherein said blocks of said data are bits.

38. A transceiver as claimed in claim 33, wherein said modulation means performs, for each said sub-channel, multi-level amplitude and/or phase modulation (mQAM).

39. A transceiver as claimed in claim 38, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

40. A transceiver as claimed in claim 33, wherein said reception signal processing means comprises demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel.

41. A transceiver as claimed in claim 33, further comprising switching means for selectively coupling said antenna means to said transmission signal processing means for transmission of data and to said reception signal processing means for reception of data.

42. A transceiver for operation in a confined multipath transmission environment, said transceiver comprising antenna means coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to an input data channel, and said reception signal processing means in turn coupled to an output data channel, said transceiver being operable to transmit and receive data at radio frequencies, said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement to said data passed to said modulation means and means, interposed between said data reliability enhancement means and said modulation means, for interleaving blocks of said data.

43. A transceiver as claimed in claim 42, wherein said data reliability enhancement is Forward Error Correction.

44. A transceiver as claimed in claim 43, wherein said blocks of said input data are bits.

45. A transceiver as claimed in claim 42, wherein said modulation means performs, for each said sub-channel, multi-level amplitude and/or phase modulation (mQAM).

46. A transceiver as claimed in claim 45, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

47. A transceiver as claimed in claim 42, wherein said reception signal processing means comprises ensemble demodulation means for demodulating received symbols of said plurality of sub-channels into data for said output data channel.

48. A transceiver as claimed in claim 42, further comprising switching means for selectively coupling said antenna means to said transmission signal processing means for transmission of data and to said reception signal processing means for reception of data.

49. A transmitter for operation in a confined multipath transmission environment, said transmitter comprising antenna means coupled to transmission signal processing means in turn coupled to an input data channel, said trans-

5,487,069

17

mitter being operable to transmit data at radio frequencies in excess of 10 GHz, and said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths.

50. A transmitter as claimed in claim 49, wherein said transmission signal processing means further comprises means to provide data reliability enhancement to said data passed to said modulation means.

51. A transmitter as claimed in claim 50, wherein said data reliability enhancement is Forward Error Correction.

52. A transmitter as claimed in claim 51, wherein said transmission signal processing means further comprises means, interposed between said data reliability enhancement means and said modulation means, for interleaving blocks of said data.

53. A transmitter as claimed in claim 52, wherein said blocks of said input data are bits.

54. A transmitter as claimed in claim 49, wherein said modulation means performs, for each said sub-channel, multi-level amplitude and/or phase modulation (mQAM).

55. A transmitter as claimed in claim 54, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

56. A transmitter for operation in a confined multipath transmission environment, said transmitter comprising antenna means coupled to transmission signal processing means in turn coupled to an input data channel, said transmitter being operable to transmit data at radio frequencies, said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement to said data passed to said modulation means and means, interposed between said data reliability enhancement means and said modulation means, for interleaving blocks of said data.

57. A transmitter as claimed in claim 56, wherein said data reliability enhancement is Forward Error Correction.

58. A transmitter as claimed in claim 57, wherein said blocks of said input data are bits.

59. A transmitter as claimed in claim 56, wherein said modulation means performs, for each said sub-channel, multi-level amplitude and/or phase modulation (mQAM).

60. A transmitter as claimed in claim 59, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

61. A method for transmitting data in a confined multipath transmission environment at radio frequencies in excess of 10 GHz, said data being provided by an input data channel

18

coupled to transmission signal processing means in turn coupled to antenna means, said method comprising the steps of:

modulating said data, by modulation means of said transmission signal processing means, into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of non-direct transmission paths; and

transmitting, by said antenna means, said sub-channel symbols at said radio frequencies in excess of 10 GHz.

62. A method as claimed in claim 61, comprising the further step of providing data reliability enhancement to said data in advance of said modulation step.

63. A method as claimed in claim 62, wherein said data reliability enhancement is Forward Error Correction.

64. A method as claimed in claim 63, comprising the further step of interleaving blocks of said input data between the steps of providing data reliability enhancement monitoring and step of modulation.

65. A method as claimed in claim 64, wherein said blocks of input data are bits.

66. A method as claimed in claim 61, wherein said step of modulation is multi-level amplitude and/or phase modulation (mQAM).

67. A method as claimed in claim 66, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

68. A method for transmitting data in a confined multipath transmission environment of radio frequencies, said data being provided by an input data channel coupled to transmission signal processing means in turn coupled to antenna means, said method comprising the steps of:

applying data reliability enhancement to said data;

interleaving blocks of said enhanced data;

modulating said data, by modulation means of said transmission signal processing means, into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of significant ones of non-direct transmission paths; and

transmitting, by said antenna means, said sub-channel symbols.

69. A method as claimed in claim 68, wherein said data reliability enhancement is Forward Error Correction.

70. A method as claimed in claim 69, wherein said blocks of input data are bits.

71. A method as claimed in claim 68, wherein said steps of modulation is multi-level amplitude and/or phase modulation (mQAM).

72. A method as claimed in claim 71, wherein said mQAM modulation is one of: multi-level amplitude phase shift keying (mASK), permutation modulation, binary phase shift keying (BPSK), multi-level phase shift keying (mPSK) and multi-level amplitude phase keying (mAPK).

* * * * *

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION** | § § § § | |
| **Plaintiff** | § § | **CASE NO. 2:05-CV-53** |
| vs. | § § | **PATENT CASE** |
| **BUFFALO TECHNOLOGY (USA), a Delaware corporation, and BUFFALO INC., a Japanese corporation** | § § § § | |
| **Defendant** | § | |

## ORDER

Having reviewed the technical advisors submitted by the parties, the Court hereby

**APPOINTS** Michael T. McLemore as technical consultant to the Court in this action with his costs

to be assessed equally between Plaintiff and Defendant and timely paid as billed.

**So ORDERED and SIGNED this 21st day of September, 2005.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH SCIENTIFIC INDUSTRIAL RESEARCH ORGANIZATION, | § § § § | |
| Plaintiff, | § § | CASE NO. 2:05-CV-53 PATENT CASE |
| vs. | § § | |
| BUFFALO TECHNOLOGY (USA), INC. and BUFFALO INC., | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION

This claim construction opinion interprets disputed terms in United States Patent No. 5,487,069 ("the '069 Patent"). Having considered the parties' submissions and oral arguments, the Court construes the disputed terms as follows.[1]

## BACKGROUND

Commonwealth Scientific and Industrial Research Organization ("CSIRO") filed this action on February 5, 2005 accusing Buffalo Technology (USA), Inc. and Buffalo Inc. (collectively "Buffalo") of infringing the '069 Patent. The '069 Patent relates to a wireless Local Area Network ("LAN") wherein a plurality of wireless transceivers communicate with a plurality of wireless hub transceivers. The '069 Patent provides a solution to transmitting data at a high rate and with high reliability using radio frequency signals within an indoor environment (*e.g.*, an office). The patent

---

[1] Appendix A to this Memorandum Opinion contains the relevant claims of the '069 Patent with the disputed terms indicated in boldface type. Appendix B contains the Court's Claim Construction Chart, which construes the disputed terms.

1

teaches a combination of three key techniques: parallel sub-channels (ensemble modulation) wherein the period of a sub-channel symbol is longer than a predetermined time delay of the non-direct transmission paths, data reliability enhancement with Forward Error Correction ("FEC"), and data reliability enhancement with bit interleaving. As of the conclusion of oral arguments on claim construction, the parties disputed the construction of eight claim terms.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *Id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 338 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003) (en banc).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a

2

dependent claims adds a limitation to an independent claim, courts presume that the independent claim does not include the limitation. *Id*. at 1314-15.

Claims "must be read in view of the specification, of which they are a part." *Id*. at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (en banc). This is because a patentee may define his own terms, give a claim term a different meaning that the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. The specification also may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) (en banc) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). Like

the specification, the prosecution history provides evidence of how the patent examiner and the inventor understood the patent. *Phillips*, 415 F.3d at 1317.

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* (quoting *C.R. Bard*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *See id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The '069 Patent also contains "means-plus-function" limitations that require construction. When a claim limitation is expressed in means-plus-function language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

4

Construing a means-plus-function limitation involves multiple inquiries. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). The Court may not construe a means-plus-function limitation by "adopting a function different from that explicitly recited in the claim." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311. A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

## CONSTRUCTION OF DISPUTED TERMS IN THE '069 PATENT

### "Confined multipath [transmission] environment"

The Court adopts CSIRO's proposed construction and construes the term "confined multipath [transmission] environment" to mean "an indoor environment." Buffalo argues that the Court should interpret the term more expansively to mean "a defined environment with boundaries wherein direct and/or reflected paths may be taken by radio frequency signals from a transmitter to a receiver." Though Buffalo does not dispute that "indoor environment" is consistent with the plain meaning of the claim language and concedes that the specification contains references to such an environment, Buffalo contends that neither the claim language, the specification, nor the file history limit the

5

term's construction to only an indoor environment. CSIRO argues that its proposed construction comes from the claims' plain meaning as well as their context in light of the specification and prosecution history, whereas Buffalo's construction is ambiguous and baseless.

Although on its face the term "confined" does not seem limited to an indoor area, that term clearly refers to an area with fixed boundaries—an attribute that Buffalo's proposed construction does not adequately capture. "Confined" and "defined" are hardly synonymous, and Buffalo's inclusion of the term "boundaries" in its construction conceivably includes anything that reflects radio waves creating an indirect transmission path—even a meteor trail or satellite. Without further narrowing of its proposed "defined environment," Buffalo's construction of "confined multipath environment" is too broad to permit one of ordinary skill in the art to understand the term's meaning.

The specification describes the specific multipath signal problem that the invention was designed to address. The specification notes how the invention was designed to ameliorate problems that occur more acutely in a wireless LAN multipath "office or indoor environment" and "typical rooms" than with telephone or long distance radio communications. '069 Patent, cols. 4:58-59, 5:3-15, 8:38-40. Buffalo contends that reliance on this language improperly reads an extraneous limitation from the specification into the claims, but the specification language simply defines an existing limitation and deriving interpretive guidance from such language is proper. *See Phillips*, 415 F.3d at 1317 ("It is . . . entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of claims").

The prosecution history also shows that the patentees linked "confined multipath environment" to an indoor environment. After the patent examiner rejected the patentees' original claims filed with their 1993 application as obvious in light of the prior art, the patentees amended

6

their claims and distinguished the prior art as being designed to operate over long distances instead of within "a room of an office building or the like, unlike the present invention." July 1995 Amendment to U.S. Patent Application 157,375, at 26. The prior art did not "appear[] to describe radio transmissions 'in a confined multipath environment.'" *Id*. at 27. The prosecution history thus links "confined multipath environment" with an indoor environment.

Accordingly, the Court construes "confined multipath environment" to mean "an indoor environment."

**"Radio frequencies"**

The Court adopts CSIRO's proposed construction and construes the term "radio frequencies" to mean "the frequencies in the portion of the electromagnetic spectrum that is between the audio-frequency portion and the infrared portion." Buffalo urges the Court to construe "radio frequencies" to mean "frequencies, in excess of 10 GHz but still within the electromagnetic spectrum normally associated with radio signal propagation, *i.e.*, less than or equal to 300 GHz," and argues that the doctrine of prosecution history estoppel prevents CSIRO from asserting its preferred construction.

The claim terms' context supports CSIRO's construction. Reading the term "radio frequencies" in both the asserted and unasserted claims, one of ordinary skill in the art would interpret that term to connote all frequencies in the radio portion of the electromagnetic spectrum. Construing "radio frequencies" to mean a range between 10 and 300 GHz would contradict the term's ordinary meaning[2] and render numerous claims substantively identical in scope. The doctrine of claim differentiation makes Buffalo's construction presumptively unreasonable because under the

---

[2] The parties do not dispute that the ordinary meaning of "radio frequencies" connotes a range of 3 KHz (three thousand cycles per second) to 300 GHz (three hundred billion cycles per second).

doctrine each claim in a patent is presumed to have a different scope. *Comark*, 156 F.3d at 1187; *Beachcomber v. Wildewood Creative Prods., Inc.*, 331 F.2d 1154, 1162 (Fed. Cir. 1994). The specification explicitly identifies different embodiments of the invention, some of which operate at "radio frequencies" and others that operate "in excess of 10 GHz."

Buffalo concedes these points but argues the patentees disavowed CSIRO's construction of "radio frequencies" during prosecution and therefore the doctrine of prosecution history estoppel renders Buffalo's construction the only legitimate one. Accordingly, argues Buffalo, the doctrine of claim differentiation permits adopting that construction.

Specifically, Buffalo argues that although certain claims in the '069 Patent mention an invention transmitting at frequencies exceeding 10 GHz and other claims mention an invention transmitting simply at "radio frequencies," the patentees' 1992 Australian patent application and 1993 U.S. patent application mentioned only an invention transmitting at frequencies exceeding 10 GHz. Buffalo argues that the patentees never intended to patent an invention that transmitted at frequencies less than 10 GHz and that the patentees replaced certain references to the 10 GHz limitation with the less restrictive "radio frequencies" only when they realized Institute of Electrical and Electronics Engineers standards for wireless LANs would likely permit operation at frequencies less than 10 GHz. Buffalo contends that this replacement introduces "new matter" into disclosure of the invention, which 35 U.S.C. § 112 prohibits. Therefore the claims must be limited to the scope of the embodiments describing transmission above 10 GHz.

The claim differentiation doctrine's presumption is rebutted if the claims will bear only an interpretation that makes them identical. *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 404 (Ct. Cl. 1967); *see also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir.

1998) ("[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence."). However, Buffalo errs when it contends that the law makes its construction of "radio frequencies" the only permissible interpretation. Buffalo cites *Schering Corp. v. Amgen, Inc.*, 222 F.3d 1347, 1352 (Fed. Cir. 2000), to support its argument regarding new matter, but the Federal Circuit in *Schering* imposed limitations on a term based on the patentee's explicit disavowals during prosecution, not because the patentee improperly introduced new matter. *See Affymetrix v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1219 (N.D. Cal. 2001); *Reiffin v. Microsoft*, 64 U.S.P.Q.2d (BNA) 1107, 1112 (N.D. Cal. 2002). Determining whether the patentee introduced new matter during prosecution is not appropriate during claim construction. *See, e.g., Pliant Corp. v. MSC Mktg. & Tech., Inc.*, 416 F. Supp. 2d 632, 643 n.5 (N.D. Ill. 2006) (finding that the issue of new matter "is not a matter for claim construction"); *Reiffin*, 64 U.S.P.Q.2d (BNA) at 1112 ("Courts do not [determine] whether a patent contains new matter at the claim construction stage.").

Buffalo likewise misapprehends the law of prosecution history estoppel. Prosecution history estoppel normally arises when a patentee narrows the patent's scope through amendment to avoid prior art. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 735-36 (2002) ("*Festo II*"). This precludes the patentee from recapturing subject matter through the doctrine of equivalents that the amendment relinquished. *See id.* at 733-34; *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1577-78 (Fed. Cir. 1997) (holding that prosecution history estoppel "preclud[es] a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent"). Prosecution history estoppel helps ensure that the doctrine of equivalents is used only to protect subject matter not affirmatively surrendered. *See*

9

*Festo II*, 535 U.S. at 734-35.  Though the Supreme Court has held that amendments for purposes other than avoiding prior art may still give rise to estoppel, only a *narrowing* amendment gives rise to estoppel.  *See id.* at 735-36 ("Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope."); *see also Bus. Objects, S.A. v. Microstrategy, Inc.*, 393 F.3d 1366, 1375 (Fed Cir. 2005); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003) ("*Festo III*") (holding that "[i]f the amendment was not narrowing, then prosecution history estoppel does not apply").  In this case, the portions of the 1995 amendment at issue replaced certain references to "in excess of 10 GHz" with "radio frequencies."  There is no dispute that these were broadening amendments.  Prosecution history estoppel thus cannot apply.

Finally, Buffalo points to nothing in the specification or prosecution history that reflects the patentees' clear and express disavowal of multipath propagation at frequencies below 10 GHz.  An express disavowal is the only kind that the law will recognize as effective.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324-25 (Fed. Cir. 2003) (disavowal of claim scope in prosecution history must be unequivocal); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the [patent's] claims . . . ."); *Cutlor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) ("Claims are not correctly construed to cover what was expressly disclaimed.").  Indeed, Buffalo foregoes any argument that the patentees disavowed multipath frequencies below 10 GHz entirely and relies solely on its prohibited new matter and prosecution history estoppel arguments, neither of which apply.

Therefore, the Court adopts CSIRO's construction and construes "radio frequencies" to mean "the frequencies in the portion of the electromagnetic spectrum that is between the audio-frequency portion and the infrared portion."

### "Antenna means"

The Court adopts CSIRO's proposed construction and construes the term "antenna means" to mean "a means for radiating or receiving radio waves." Nothing in the claim language, the specification, or the prosecution history supports Buffalo's contention that the term's meaning should be limited to "a means for transmitting and/or receiving radio frequency signals whereby the antenna in the mobile transceiver is a steerable antenna." Buffalo argues that the specification's language referring to a "steerable antenna" supports its interpretation, but the language Buffalo cites unmistakably designates steerability of an antenna as a preferred embodiment: "antenna 37 is preferably a steerable antenna which is electronically steerable." '069 Patent, col. 6:12-16. A preferred embodiment usually does not restrict construction of a patent's claims. *See Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments of the specification"); *see also Phillips*, 415 F.3d at 1323; *Teleflex*, 299 F.3d at 1327. *But see Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) (holding that "when the preferred embodiment is described . . . as the invention itself, the claims are not necessarily entitled to a broader scope than that embodiment"), *overruled on other grounds by Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 574 (Fed. Cir. 2000) (en banc) ("*Festo I*"). Buffalo tries to circumvent this clear principle of law by arguing that the relevant preference in the specification's text is distributed to the adverb "electronically" but somehow by-passes the adjective "steerable." This

11

construction is grammatically untenable, and a claim must be read in accordance with the precepts of English grammar. *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983).

Therefore, the Court construes "antenna means" as "a means for radiating or receiving radio waves."

**"Modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths"**

The parties agree that the Court should construe this term as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. The Court agrees with CSIRO that the claimed function is "modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths." This is the function explicitly recited in the claim. *See Micro Chem.*, 194 F.3d at 1258. Buffalo says it agrees with CSIRO's statement of the function but proposes the construction "separating an input data channel into a plurality of subchannels" merely to word the function in plain language. Regardless, CSIRO's construction captures the explicit recitation and therefore is correct.

Buffalo argues that this is irrelevant because the patent does not disclose any structure corresponding to claimed function—*i.e.*, that neither "the specification [nor] the prosecution history clearly link[] or associate[] that structure to the function recited in the claim." *Medtronic*, 248 F.3d at 1311. Buffalo contends that what CSIRO points to as corresponding structure—the Inverse Fast Fourier Transform ("IFFT") depicted in block 47 of Figure 7 and described in the text at columns 6:47-49, 8:2-8, 8:22-26, 8:37-50, 9:42-46, and 10:58-67—is nothing but a mathematical algorithm.

12

Absent some structure identified for performing the algorithm, Buffalo argues, the algorithm itself cannot be structure under controlling Federal Circuit precedent and, therefore, the claims containing the term are invalid on grounds of indefiniteness.

The Court does not need to address this argument, because it identifies the corresponding structure as "the Complex FFT (Fast Fourier Transform) Based Modulator in block 32 of Figure 6, executing the 16 Point Complex IFFT (Inverse Fast Fourier Transform) of block 47 of Figure 7, as referenced at column 6:23-31." Identification of a "modulator" is a sufficiently precise definition of a structure. Identification of a modulator as one based on an IFFT is required because the claim language states that the input data is modulated into a plurality of sub-channels. One of ordinary skill in the art would deem these descriptions to be adequate disclosures of structure for performing the specified function. Prior to CSIRO's reliance on only the IFFT block 47, Buffalo considered the corresponding structure to be the modulator of block 32.[3]  Though, as Buffalo argues, no rule precludes a party from modifying claim construction positions prior to submission of the Joint Claim Construction and Hearing Statement, the fact that Buffalo considered the block 32 modulator as structure weighs in favor of the Court's finding.

**"Demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel"**

The parties agree that the Court should construe this term as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. The Court again agrees with CSIRO's identification of the function as "demodulating received symbols of said plurality of sub-channels into output data for said output data channel" because this exact recitation adheres to the *Micro Chemical* standard.

---

[3] *See* CSIRO Opening Brief at 47 (Docket No. 58).

The process that this term describes is the reverse of the process described by the term "modulation means . . . ." '069 Patent, cols. 6:54-56, 7:1-4. The parties' arguments regarding the corresponding structure for "demodulation means . . ." generally track the parties' arguments surrounding the term "modulation means . . . ." Based on the reasoning supporting the Court's identification of structure with respect to "modulation means," the corresponding structure for "demodulation means . . ." is "the FFT-based Complex Differential Demodulator in block 33 of Figure 6, executing the 16 Point FFT (Fast Fourier Transform) of block 63 of Figure 8."

**"Ensemble demodulation means for demodulating received symbols of said plurality of sub-channels into data for said output data channel"**

The parties agree that the Court should construe this term as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. Moreover, the parties agree that this term depicts the same means-plus-function element as the term "demodulation means . . ." depicts and therefore the terms should be construed identically. The Court agrees and construes "ensemble demodulation means . . ." identically to "demodulation means . . . ."

**"Means to apply data reliability enhancement"**

The parties agree that the Court should construe this term as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6 and that the claimed function is "to apply a data reliability enhancement to said data passed to said modulation means." The Court agrees.

CSIRO contends that the corresponding structure for carrying out this claimed function is described in the specification as "(1) Forward Error Correction (FEC), or (2) Automatic Repeat Request (ARQ)," as referenced at columns 6:32-41, 9:66-10:2, 9:36-42, 8:9-16, 8:27-37, and 8:51-64. Buffalo contends, however, that the specification describes no structure corresponding to the

14

recited function. Specifically, Buffalo argues FEC and ARQ are functions carried out by algorithms or otherwise and that the patent's language reflects this by referring to forward error correction and automatic repeat request as only as "techniques or schemes," never as structure. *See, e.g.,* '069 Patent, cols. 8:27-28, 9:37-38. Buffalo likewise argues that the patent's relevant drawings—Figures 5 and 6—also disclose no corresponding structure. Rather, Buffalo contends they are simply "black boxes indicating the function to be performed but not the structure to perform it." However, the specification identifies the device capable of performing forward error correction in block 42 of Figure 7—a Rate ½ TCM (trellis coded modulation) Encoder. *See id.* at col. 6:32-46; Fig. 7, block 42. The term "encoder" is recognized by those skilled in the art as being a type of circuit structure. The Court is satisfied, therefore, that one of ordinary skill in the art would deem these descriptions to be adequate disclosures of structure corresponding to the claimed function.

Accordingly, the Court identifies the corresponding structure as "the Rate ½ TCM (trellis coded modulation) Encoder described in block 42 of Figure 7 and referenced at column 6:32-46."

**"Means . . . for interleaving blocks of said data"**

The parties agree that the Court should construe this term as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6 and that the claimed function is "interleaving blocks of data."

CSIRO contends that the corresponding structure is "link data interleaving whereby the encoded data is distributed between the carriers within the ensemble," and references as an example block 43 in Figure 7. *See* '069 Patent, cols. 8:17-21, 10:14-34. Once again, however, Buffalo contends that the specification describes no corresponding structure. Similar to its argument regarding FEC and ARQ, Buffalo argues that the patent refers to "link data interleaving" merely as

a technique or scheme, *see* cols. 8:17, 10:14-15, 10:18-19, and that the Figure 7, block 43 "Di-Bit Interleaver" identifies the function of interleaving two bits at a time but does not show any structure.

Interleaving, like FFT, IFFT, FEC and ARQ, is a technique familiar to one of skill in the art. One of skill in the art would recognize an "interleaver" as being a type of circuit structure that performs the technique. The patent need not disclose specific circuitry when describing structure adequately linked to the function; "interleaver" suffices. *See S3, Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1370-71 (Fed. Cir. 2001).

Therefore, the corresponding structure for carrying out the claimed function is "the Di-Bit Interleaver described in block 43 of Figure 7." One of ordinary skill in the art would deem this description to be an adequate disclosure of structure corresponding to the claimed function.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table as Appendix B. The claims with the disputed terms in bold are set forth in Appendix A.

**So ORDERED and SIGNED this 8th day of May, 2006.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# APPENDIX A

## CLAIMS OF U.S. PATENT NO. 5,487,069 CONTAINING DISPUTED TERMS

**10.** A wireless LAN comprising:

a plurality of hub transceivers coupled together to constitute a plurality of data sources and destinations; and

a plurality of mobile transceivers each coupled to data processing means and between each said data processing means and a corresponding said transceiver data passes to be transmitted or received, said transceivers being for data transceiving operation by radio transmissions to one of said hub receivers in a **confined multipath environment**, and each transceiver comprising: **antenna means** coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to a [*sic*] output data channel, each said transceiver being operable to transmit and receive data at **radio frequencies**, said transmission signal processing means comprising **modulation means for modulating input dada of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply a data reliability enhancement** to said data passed to said modulation means and **means**, interposed between said data reliability enhancement means and said **ensemble modulation means, for interleaving blocks of said data.**

**15.** A wireless LAN as claimed in claim 10, wherein said reception signal processing means comprises **demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel**

**16.** A wireless LAN as claimed in claim 10, further comprising switching means for selectively coupling said antenna means to said transmission signal processing means for transmission of data and to said reception signal processing means for reception of data.

**26.** A peer-to-peer wireless LAN comprising :

a plurality of mobile transceivers for data transceiving operation by radio transmissions between ones thereof in a **confined multipath environment**, each said transceiver being coupled to a data processing means, and between each said data processing means and a corresponding said transceiver data passes to be transmitted or received, each said transceiver comprising: **antenna means** coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to an input data channel, and said reception signal processing means in turn coupled to an output data channel, each said transceiver being operable to transmit and receive data at **radio frequencies**, said transmission signal processing means comprising **modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement** to said data passed to said ensemble modulation means and **means**, interposed between said

17

data reliability enhancement means and said **ensemble modulation means, for interleaving blocks of said data**.

**31.** A peer-to-peer wireless LAN as claimed in claim 26, wherein said reception signal processing means comprises **demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel**.

**32.** A peer-to-peer wireless LAN as claimed in claim 26, further comprising switching means for selectively coupling said **antenna means** to said transmission signal processing means for transmission of data and to said reception signal processing means for reception to data.

**40.** A transceiver as claimed in 33, wherein said reception signal processing means comprises **demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel**.

**42.** A transceiver for operation in a **confined multipath transmission environment**, said transceiver comprising **antenna means** coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to an input data channel, and said reception signal processing means in turn coupled to an output data channel, said transceiver being operable to transmit and receive data at **radio frequencies**, said transmission signal processing means comprising **modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement** to said data passed to said modulation means and **means**, interposed between said data reliability enhancement means and said modulation means, **for interleaving blocks of said data**.

**47.** A transceiver as claimed in claim 42, wherein said reception signal processing means comprises **ensemble demodulation means for demodulating received symbols of said plurality of subchannels into said output data channel**.

**48.** A transceiver as claimed in claim 42, further comprising switching means for selectively coupling said **antenna means** to said transmission signal processing means for transmission of data and to said reception signal processing means of reception of data.

**56.** A transmitter for operation in a **confined multipath transmission environment**, said transmitter comprising **antenna means** coupled to transmission signal processing means in turn coupled to an input data channel, said transmitter being operable to transmit data at **radio frequencies**, said transmission signal processing means comprising **modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement** to said data passed to said modulation means and **means**, interposed between said data reliability enhancement means and said modulation means, **for interleaving blocks of said data**.

**68.** A method for transmitting data in a **confined multipath transmission environment** of **radio frequencies**, said data being provided by an input data channel coupled to transmission signal processing means in turn coupled to **antenna means**, said method comprising the steps of:

18

applying data reliability enhancement to said data;

interleaving blocks of said enhanced data;

modulating said data, by **modulation means of said transmission signal processing means, into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of significant ones of non-direct transmission paths**; and

transmitting, by said antenna means, said sub-channel signals.

19

APPENDIX B

CLAIMS CONSTRUCTIONS FOR U.S. PATENT NO. 5,487,069

| Disputed Claim Term | Court's Construction |
|---|---|
| **"confined multipath [transmission] environment"**<br><br>Claims 10, 26, 42, 56, 58 | An indoor environment. |
| **"transmission signal processing means"**<br><br>Claims 10, 16, 26, 32, 42, 48, 56, 68 | [AGREED]<br><br>Transmission signal processing means is comprised of modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement to said data passed to said modulation means and means, interposed between said data reliability enhancement means and said modulation means, for interleaving blocks of said data.<br><br>This definition applies only to the asserted claims. |
| **"reception signal processing means"**<br><br>Claims 10, 15, 16, 26, 31, 32, 42, 47 | [AGREED]<br><br>Means to modify received signals by performing essentially the reverse procedures of those in the corresponding elements in the transmission signal processing means. |
| **"radio frequencies"**<br><br>Claims 10, 26, 42, 56, 68 | The frequencies in the portion of the electromagnetic spectrum that is between the audio-frequency portion and the infrared portion. |
| **"antenna means"**<br><br>Claims 10, 26, 32, 42, 48, 56, 68 | A means for radiating or receiving radio waves. |

20

| | |
|---|---|
| **"forward error correction"**<br><br>Claims 11, 27, 43, 57, 69 | **[AGREED]**<br><br>Means of error control for data transmission wherein the receiving device has the capability to detect and correct signals received in error using any forward error correction scheme such as, but not limited to Reed-Solomon, convolutional coding or trellis coding. |
| **"applying data reliability enhancement"**<br><br>Claim 68 | **[AGREED]**<br><br>The utilization of techniques to enhance the reliability of the data received by the receiver, such as automatic repeat request (ARQ) and forward error correction (FEC). |
| **"modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths"**<br><br>Claims 10, 26, 42, 56, 68 | "Modulation means . . ." is a means-plus function element under 35 U.S.C. § 112, ¶ 6.<br><br>The claimed function is "modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths."<br><br>The corresponding structure for the claimed function is "the Complex FFT (Fast Fourier Transform) Based Modulator in block 32 of Figure 6, executing the 16 Point Complex IFFT (Inverse Fast Fourier Transform) of block 47 of Figure 7, as referenced at column 6:23-31." |
| **"ensemble modulation means"**<br><br>Claims 10, 26, 47 | **[AGREED]**<br><br>"Ensemble modulation means" is the same as "modulation means for modulating a plurality of sub-channels," as defined above. |

| | |
|---|---|
| **"demodulation means for demodulating received symbols of said plurality of sub-channels into output data for said output data channel"**<br><br>Claims 15, 31, 40, 47 | "Demodulation means . . ." is a means-plus-function element under 35 U.S.C. § 112, ¶ 6.<br><br>The claimed function is "demodulating received symbols of said plurality of sub-channels into output data for said output data channel."<br><br>The corresponding structure for carrying out the claimed function is "the FFT-based Complex Differential Demodulator in block 33 of Figure 6, executing the 16 Point FFT (Fast Fourier Transform) of block 63 of Figure 8." |
| **"ensemble demodulation means for demodulating received symbols of said plurality of sub-channels into data for said output data channel"**<br><br>Claim 47 | "Ensemble demodulation means . . ." is a means-plus-function element under 35 U.S.C. § 112, ¶ 6.<br><br>The claimed function is "demodulating received symbols of said plurality of sub-channels into output data for said output data channel."<br><br>The corresponding structure for carrying out the claimed function is "the FFT-based Complex Differential Demodulator in block 33 of Figure 6, executing the 16 Point FFT (Fast Fourier Transform) of block 63 of Figure 8." |
| **"means to apply a data reliability enhancement"**<br><br>Claims 10, 26, 42, 56 | "Means to apply a data reliability enhancement" is a means-plus-function element of 35 U.S.C. § 112, ¶ 6.<br><br>The claimed function is "to apply a data reliability enhancement to said data passed to said modulation means."<br><br>The corresponding structure for carrying out the claimed function is "the Rate ½ TCM (trellis coded modulation) Encoder described in block 42 of Figure 7 and referenced at column 6:32-46." |

22

| **"means . . . for interleaving blocks of said data"** | "Means . . . for interleaving blocks of said data" is a means-plus-function element under 35 U.S.C. § 112, ¶ 6. |
| --- | --- |
| Claims 10, 26, 42, 56 | The claimed function is "interleaving blocks of data." |
| | The corresponding structure for carrying out the claimed function is "the Di-Bit Interleaver described in block 43 of Figure 7." |
| **"data processing means"** | **[AGREED]** |
| Claims 10, 26 | A means to process electronic signals. |
| **"coupled [coupling]"** | **[AGREED]** |
| Claims 10, 26, 32, 42, 46, 48, 56, 68 | Connected [connection] directly or indirectly. |

EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

COMMONWEALTH SCIENTIFIC AND   §
INDUSTRIAL RESEARCH   §
ORGANISATION   §
  §
     Plaintiff   §
  §
  §      CASE NO. 6:06-CV-324
vs.   §      PATENT CASE
  §
BUFFALO TECHNOLOGY (USA), a Delaware §
corporation, and BUFFALO INC., a Japanese §
corporation   §
  §
     Defendant   §

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion for Summary Judgment of Invalidity (Docket No. 71), which the Court **DENIES**; Commonwealth Scientific and Industrial Research Organization's ("CSIRO") Cross-Motion for Summary Judgment of Validity (Docket No. 76), which the Court **GRANTS**; CSIRO's Motion for Summary Judgment of Validity (Docket No. 120), which the Court **GRANTS**; Defendants' Motion for Summary Judgment of Invalidity (Docket No. 126), which the Court **DENIES**; Defendants' Motion for Summary Judgment of Non-Infringement (Docket No. 127), which the Court **DENIES**; and CSIRO's Motion for Summary Judgment of Infringement (Docket No. 130), which the Court **GRANTS**.

Also before the Court are Buffalo's Objections and Motions to Strike Cited Portions of CSIRO's Evidence (Docket Nos. 81 and 90) and CSIRO's Motion to Strike Bagby's Declaration (Docket No. 159). In order to have the most complete summary judgment record, the Court **DENIES** these motions.

1

At the Pretrial Conference, the parties informed the Court that the majority of this case could be disposed of on cross-motions for summary judgment. Both sides filed cross-motions for summary judgment on infringement, invalidity based on prior art, and invalidity for lack of sufficient written description. CSIRO filed a motions for summary judgment on obviousness, but Buffalo did not file a cross-motion. The Court continued the trial setting and set the summary judgment motions for hearing. At the hearing, the parties stipulated that there are no triable fact issues on anticipation and if there are any factual issues relating to what has been briefed the Court should decide them.

## BACKGROUND

The '069 Patent relates to a Wireless Local Area Network ("WLAN") having a network topology wherein each component, either a station or access point (hub), has a radio transceiver and antenna. Two or more station components can communicate in a peer-to-peer configuration. Also, multiple stations can communicate to an access point hub, which acts as a bridge to a wired network. The IEEE published a standard 802.11 for WLANs. The original 802.11 standard provided for data rates at up to 2 Mbps at 2.4 GHz using either Frequency Hopping Spread Spectrum ("FHSS") or Direct Sequence Spread Spectrum ("DSSS"). The 802.11a supplement provided for use of Orthogonal Frequency Division Multiplexing ("OFDM") to provide data rates to 54 Mbps in the 5 GHz U-NII bands. Both the 2.4 GHz and 5 GHz frequencies are in the Industrial Scientific and Medical ("ISM") bands, designated for use without the need for licensing by the Federal Communication Commission ("FCC"). The U-NII band has more spectra and allows room for 12 non-overlapping channels.

Radio frequency wave propagation characteristics must be considered in implementing a WLAN. Radio waves can be reflected by some materials such as walls, furniture, and other indoor

items, creating "multipath" where a radio signal is dispersed and arrives at the receiver from different paths. As a result, there can be multiple copies of the signal with different signals strengths. The problem that can result is called "intersymbol interference" ("ISI"), which is an overlap in arrival of the same symbol from different paths. ISI is the result of time differences between the arrivals of reflected copies of the same signal. This time difference is referred to as "delay spread." As the data transmission speed gets faster, the time duration of the transmitted symbols (symbol period) gets smaller and more susceptible to ISI. In conventional radio transmission, the symbol period is set to be longer than the delay spread. Thus, multipath places an upper limit on data transmission rate. That is, as the delay spread increases, the symbol period must get longer, which in turn means that the data transmission rate necessarily decreases.

Radio transmission of information relies upon the concept of superimposing information on, or "modulating," a carrier wave. In conventional radio transmission, the carrier is at a specific "narrowband" frequency. The receiver must be tuned to that same narrowband frequency to receive the transmission. If there are many transmissions occurring at the same time at the narrowband frequency, interference will result. In order to minimize interference, various techniques have been developed.

One technique to avoid interference from other transmission sources is to spread the signal over a wider range of frequencies. This is referred to as "spread spectrum." A particular approach to the reduction of interference is FHSS, or Frequency Hopping Spread Spectrum, where the signal carrier is transmitted for a short period of time ("dwell time") on one narrowband frequency and is then hopped to another narrowband frequency. A WLAN that uses FHSS to reduce interference with other devices operates on a predetermined hopping sequence that is known to the receiver and can

3

be followed by it. The dwell time, however, must be consistent with the delay spread to avoid ISI. Thus, FHSS is a wideband modulation scheme that uses multiple carriers one at a time and avoids interference with other transmission signals in the same band by hopping over many different frequencies. During any one hop, the FHSS signal appears to be a narrowband signal.

Another technique is to use multiple carriers simultaneously rather than one at a time. This is technically not a spread spectrum because the carriers remain stationary and are not moved, but it serves the same purpose of spreading the signal power over a large band. This is known as Orthogonal Frequency Division Multiplexing ("OFDM") or Multicarrier Modulation ("MCM"). The data is broken into subparts and each subpart is simultaneously transmitted on a different carrier frequency. Again, the transmission period of each part (channel symbol length) must be consistent with the delay spread to avoid ISI. Because there is simultaneous transmission of all the signal parts, the data transmission rate is higher than with FHSS.

In addition to various modulation schemes for RF transmission of data, an important aspect of WLAN data transmission is the addition of data reliability enhancement afforded by using coding of the actual data prior to its conversion to a modulated transmission signal. Forward Error Correction ("FEC") coding is one type of digital signal processing that improves data reliability by introducing a known structure into a data sequence prior to transmission. This structure allows a receiver to detect and possibly correct errors caused by corruption from the channel without requesting re-transmission of the original information. In a system that employs FEC, a digital information source sends a data sequence to an encoder. The encoder inserts redundant bits, thereby outputting a longer sequence of code output bits as a "codeword." One type of FEC is known as "convolutional coding." The incoming data is in a stream of bits. A Rate ½ convolutional encoder

4

provides two data "di-bits" for every input bit.

Additional protection to data corruption due to adjacent burst errors is data "interleaving," which spreads data over a variable period of time. With data interleaving, data is transmitted by spacing the content of consecutive data packets. Interleaving is used in conjunction with FEC. Burst errors are distributed over many data packets and the FEC has fewer errors to correct in each packet. Data interleaving works by shuffling the data.

## INVALIDITY: ANTICIPATION

### Applicable Law

A patent is entitled to a presumption of validity, and an accused infringer must prove invalidity by clear and convincing evidence. *Metabolite Labs., Inc. v. Lab. Corp.*, 370 F.3d 1354, 1365 (Fed. Cir. 2004).

> A person shall be entitled to a patent unless–
> (a) the invention was known or used by others in this country . . . before the invention thereof by the applicant for patent, or
> (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
> . . . .
> (g) . . . (2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102. To invalidate patent claims based on prior art, the challenger to the patent must show by clear and convincing evidence that the earlier invention is prior art under section 102 and the earlier invention includes all elements of the claims at issue. *Metabolite Labs.*, 370 F.3d at 1365, 1367; *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002). For prior art to

5

anticipate a patent under section 102(a), the knowledge must be publicly known and sufficient to enable one of ordinary skill in the art to practice the invention. *Minnesota Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). For prior art to anticipate because it was used, the use must be accessible to the public. *Id.*

To be invalid under section 102(g), another must have actually reduced the invention to practice or constructively reduced the invention to practice by filing a patent application. *In re Katz*, 687 F.2d 450, 454 (C.C.P.A. 1982). Reduction to practice requires that the invention be sufficiently tested to show that it will work for its intended purpose. *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1445 (Fed. Cir. 1984). "'When the invention has not quite passed beyond experiment and has not quite attained certainty and has fallen short of demonstrating the capacity of the invention to produce the desired result, the invention itself is still inchoate.'" *Id.* (quoting 1 *Deller's Walker on Patents,* § 46 at 202 (2d ed. 1964)). Whether a prior art reference anticipates a patent is a factual determination that is reviewed for substantial evidence. *Metabolite Labs.*, 370 F.3d at 1359.

"To anticipate, every element and limitation of the claimed invention must be found in a single prior art reference, arranged as in the claim." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001); *see Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). Anticipation is a question of fact. *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 20 (Fed. Cir. 2000). By statute, a patent is presumed to be valid. 35 U.S.C. § 282.

**Analysis**

<u>1. Wilkinson Publication</u>

  *A. Incorporation of Bingham*

   Buffalo's expert, Bagby, concludes in his report that Wilkinson and Bingham anticipate claims 10-16, 26-32, 56-60, and 68-72. This conclusion depends on the assumption that Wilkinson incorporates the Bingham publication by reference. Thus, the Court must first determine whether and to what extent Wilkinson incorporates Bingham. This is a question of law. *Advanced Display Sys., Inc. v. Kent State Univ.*, 121 F.3d 1272, 1283 (Fed. Cir. 2000).

   Proper incorporation by reference requires citing material in such "a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein." *Id.* at 1282. The host document, Wilkinson, must identify with particularity what specific material from the reference document, Bingham, it incorporates and clearly indicate where that material is found in Bingham. *See id.*

   The Wilkinson publication references the Bingham publication in a footnote. *See* Wilkinson at 6/4, n.7. Wilkinson gives no specific discussion of Bingham's contents. Wilkinson merely cites to Bingham to identify possible techniques for achieving increased information rates in the context of using parallel carrier frequencies simultaneously rather than hopping between parallel frequencies. The specific reference in Wilkinson is a general statement in regard to OFDM.

   Bingham is directed to MCM, which has also been called OFDM. This is illustrated in Fig. 1 of Bingham as a "Basic Multicarrier Transmitter." Bingham states that his article includes nine different sections of discussion relating to MCM. In one section, Bingham discusses early MCM and conventional FDM technology using filters to produce the modulation carriers for transmission

7

of sub-bands of a multicarrier system as shown. *See* Bingham at 5 & Fig. 2. In a later section, Bingham discusses the use of Inverse FFT as an equivalent to the use of filters in producing modulation carriers for the sub-bands of a multicarrier system. *See* Bingham at 8.

There is no particular identification in Wilkinson as to the aspect of Bingham that is being referenced as COFDM. The cite in Wilkinson to Bingham is such that it is merely an invitation to the reader to learn more about MCM techniques for obtaining increased information rates. Therefore, the Wilkinson publication does not meet the legal standard for incorporation by reference as to the Bingham publication.

*B. Anticipation by Wilkinson*

In opposition to CSIRO's motion for summary judgment that the claims of the '069 patent are not invalid, Buffalo submits the Declaration of David Bagby, which contains an anticipation analysis for Wilkinson that relies upon the Bagby Report. The Bagby Report opines that Wilkinson has each of the limitations of each of the claims 10-16, 26-32, 42-48, 56-60, and 68-72. According to the Bagby Report, the modulation means limitation in Wilkinson is provided by virtue of its citation to Bingham. However, since Bingham is not part of the Wilkinson disclosure, the Bagby Report's finding that the modulation means is present in Wilkinson is without basis. Consequently, Buffalo's evidence of anticipation based on Wilkinson is insufficient.

Even if Wilkinson had incorporated Bingham, the Bagby Report provides only conclusory assertions as evidence. For example, as to claim 10, the Bagby Report gives a graphical representation of the limitations of claim 10, which depicts the modulation means as 10(i) in Fig. 7. In regard to the modulation means, the Bagby Report only characterizes the function as "multiple sub-channel modulation" and adds "which is simply OFDM with the symbol length chosen

appropriately for the amount of delay spread expected within the anticipated usage environment." *See* Bagby Report at 24-25. While this may be an acceptable paraphrasing of the claim language that specifies the function of the modulation means, the Bagby Report only provides the conclusion that "Wilkinson discloses this modulation." Nowhere does the Bagby Report identify where "this modulation" is disclosed in Bingham or explain the basis for that conclusion.

Later at page 58, the Bagby Report again makes the conclusory statement that "Wilkinson and Bingham discloses the use of COFDM which is an ensemble modulation technique." A reference is made to section 4.2.5 of the Bagby Report, which merely states, "Among the modulation techniques discussed, Wilkinson described ways to 'combat severe multi-path' with the use of OFDM to 'achieve increased information rates' in the presence of 'delay spread in the environment' for 'indoor radio propagation.'" Again, there is no identification as to where this is disclosed in Wilkinson or any explanation as to the basis for that conclusion.

Moreover, the paraphrasing in the Bagby Report does not fully meet the claim limitation, as construed, which requires the IFFT-based modulator 47 or an equivalent thereof. Absent is any analysis identifying anything in particular in Wilkinson or Bingham as an IFFT-based modulator. The Bagby Report does offer that "OFDM inherently discloses the use of IFFT/FFT algorithms." But, again, only a conclusory statement is made and absent in the Bagby Report is any explanation for it other than reference to unidentified systems that Dr. Bagby says, "I have seen" and an assertion that one skilled in the art would have known that economically viable implementations of OFDM would have utilized digital logic to perform IFFT/FFT algorithm calculations. Thus, the Bagby Report finds inherent disclosure of an IFFT-based modulator based only upon the mere mention of OFDM and the opinion that the knowledge of one skilled in the art is that OFDM can be

9

implemented using IFFT digital logic. However, the knowledge of those of ordinary skill in the art does not necessarily equate to inherency. *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). Furthermore, the Bagby Report does not account for Bingham's characterization of an MCM (i.e., OFDM) modem implemented using filters rather than digital logic performing IFFT calculations. Thus, the Bagby Report does not show that a person of ordinary skill in the art following Wilkinson and Bingham would necessarily implement OFDM using digital logic performing IFFT calculations. Inherency cannot be established by probabilities or possibilities. The possibility of implementing OFDM using digital logic performing IFFT calculations is not legally sufficient to show anticipation. *Mehl/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).

In any event, the Bagby Report provides no detailed analysis as to the presence of an identical functional, structural identity, or structural equivalency in Wilkinson for the modulation means, even with Bingham included. Buffalo is required to designate specific facts showing that there is a genuine issue for trial. Specifically, Buffalo has the burden of demonstrating that there are genuine issues as to whether Wilkinson discloses a device that performs the identical function of the modulation means using structure that is the same as or equivalent to the IFFT-based modulator 47.[1] Particularly in view of the clear and convincing evidentiary standard that is to be applied, such generalized testimony and unsupported conclusions on the ultimate issue as to the presence of a claim limitation in a prior art disclosure will not suffice to raise a genuine issue of material fact.

---

[1] The Bagby Report provides similar conclusory statements in regard to the presence of the data reliability enhancement means, and the interleaving means.

*Arthur A. Collins Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046-48 (Fed. Cir. 2000).[2]

In support of its motion for summary judgment that the claims of the '069 patent are not invalid, CSIRO submitted the declaration of Dr. Peter Monsen (Docket No. 125). At pages 25-30, Dr. Monsen provides a prior art summary. In the summary, there is admission that Wilkinson contains the limitations in claims 10, 26, 42, 56 and 68 other than the modulation means, the data reliability enhancement means, and the interleaving means.[3]

Turning to a comparison of these claim limitations with Wilkinson, the function of the modulation means is "modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a sub-channel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths." Wilkinson discloses the use of FHSS and OFDM for modulation to address time dispersion in a multi-path indoor radio propagation channel that leads to ISI. Wilkinson at 6/1. Both techniques involve the use of multiple carrier frequencies. The FHSS approach decreases interference with other transmission sources at the same frequency by switching transmission between multiple adjacent carrier frequencies such that the multiple carriers are used one at a time. The OFDM multi-tone approach also decreases interference by transmitting data on multiple adjacent carrier frequencies rather than on a single frequency.[4] As in conventional radio transmission at a single frequency, OFDM has symbol durations that are long relative to the multi-path dispersion

---

[2] Buffalo agreed at the hearing conducted on August 14, 2006, that the application of a means-plus-function claim limitation for purposes of establishing anticipation is the same as that of establishing literal infringement.

[3] Based upon the parties' agreed construction of "transmission signal processing means," method claim 68 includes the same means-plus-function constructions for the modulation means, the data reliability enhancement means, and the interleaving means that obtain for the apparatus claims.

[4] Levesque Declaration (Docket No. 124) at 10.

time.[5] As explained in Wilkinson, in FHSS, the frequency hop bandwidth is less than the coherence bandwidth in the environment.[6] Thus, the transmitted information on a particular frequency will not be corrupted by ISI. Wilkinson at 6/2. Thus, the channel symbol length in FHSS is chosen to be smaller than the multi-path spread. As further explained in Wilkinson, because FHSS has only a single sub-channel carrier active at any point in time, the information rate is limited; and it is advantageous to use multiple carriers simultaneously (i.e., OFDM) to obtain a higher information data rate. Otherwise, as the information rate is increased, the symbol rate (i.e., frequency hop bandwidth) becomes greater than the coherence bandwidth and ISI is encountered.[7]

Thus, both FHSS and OFDM perform the specified function of the modulation means.[8] However, absent from Wilkinson is any disclosure of a modulator structure. Accordingly, absent from Wilkinson is disclosure of the modulation means limitation of the claims.

FEC is a form of data reliability enhancement ("DRE"). Wilkinson discloses FEC coding. Thus, the function of the DRE means is disclosed in Wilkinson. However, absent from Wilkinson is any disclosure of a structure for performing the function.

Finally, Wilkinson discloses the use of interleaving. Accordingly, the function of the

---

[5] *Id.*

[6] This refers to the dwell time on each sub-channel carrier and defines the symbol duration. It must be longer than the multi-path spread (i.e., time delay) of the channel, which defines the coherence bandwidth of the channel.

[7] *See* Monsen Declaration (Docket No. 125) at 22. Monsen's statement that "longer than a predetermined period" does not happen in an FHSS is in the context of a high data rate that results in a short modulation symbol that is vulnerable to multi-path. However, the claims do not specify any information data rate or multi-path dispersion time. *See also*, '069 patent at cols. 8:38-49, 2:6-11. CSIRO's tutorial at 22 indicates that in FHSS, the data rate is limited by the need to keep the symbol period long while carrying only one symbol at a time over the frequency band.

[8] It is to be noted that, while FHSS does not use a plurality of carriers simultaneously whereas in OFDM a plurality of carriers simultaneously exist, the claim language does not specify that the sub-channels must exist simultaneously. OFDM is technically not spread spectrum because the sub-carriers remain stationary and are not spread, but it serves the same purpose as FHSS of spreading the signal power over a large band.

12

interleaving means is disclosed in Wilkinson, but absent from Wilkinson is any disclosure of a structure for performing the function.

Absent from Wilkinson are structures which are capable of performing the functions of the recited modulation means, DRE means, and interleaving means.[9] Accordingly, the Court concludes that that Buffalo has failed to demonstrate by clear and convincing evidence that Wilkinson anticipates any of claims 10-16, 26-32, 42-48, 56-60, and 68-72.

2. The Rault Publication

CSIRO admits that Rault has the modulation means, DRE means, and interleaving means of the claims. As to independent claims 42, 56 and 68, CSIRO contends that only the limitation "in a confined multipath transmission environment" is absent from Rault.[10] The term has been construed to mean "an indoor environment." CSIRO argues that Rault discloses a transmitter that is for operation in an outdoor environment. Buffalo's position is that "the *techniques* disclosed in Rault necessarily operate in both the indoor and outdoor environment" and that "Rault inherently discloses indoor environments." Buffalo relies upon the Bagby Report. *See* Buffalo's Response (Docket No. 147) at 12-14.

From a review of the prosecution history, the basis for allowance was the limitation to radio

---

[9] There does not appear to be a dispute that Wilkinson discloses the functional combination of FEC, interleaving, and FHSS in a WLAN. The record also contains Saleh (U.S. Patent No. 5,048,057), which similarly discloses an encoder 13 (DRE means), interleaver 16 (interleaving means), and FHSS modulator 21. *See* Monsen Declaration (Docket No. 125) at 27. The '069 patent indicates that OFDM is interchangeable with FHSS in the absence of specified information data rate and transmission path time delay. *See* cols. 2:6-11, 8:38-42. *See also*, Monsen Declaration at 21-22; and Wilkinson at 6/2. A factor that will support a conclusion that the prior art element is a §112, ¶6, equivalent is that a person of ordinary skill in the art would have recognized the interchangeability of the element shown in the prior art for the corresponding structure disclosed in the specification. *See Chiuminatta Concrete Concepts, Inc.v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998). However, Buffalo specifically agreed at the hearing that Saleh is not relied upon for anticipation and that an FHSS modulator and an OFDM modulator are not equivalent structures.

[10] *See* Monsen Declaration (Docket No. 125) at 26-30.

13

transmission operation in an indoor environment. Neither of the references, Schuchman et. al. (U.S. Patent No. 5,283,780) and Smith (U.S. Patent No. 4,630,314), described radio transmissions in an indoor environment.[11]

The Declaration of David Bagby submitted in opposition to CSIRO's motion for summary judgment relies upon the Bagby Report, which provides a conclusory overview analysis of the Rault publication and offers only conclusions in regard to anticipation by Rault. *See* Bagby Report at 47-53. The Bagby Declaration in paragraph 16 merely observes that multipath is an inherent aspect of radio signal propagation for both indoor and outdoor environments; and it cites to disclosures in Rault that concern only an outdoor environment. In fact, the basis for Buffalo's argument that an indoor environment is inherently disclosed in Rault rests solely on the fact that multi-path dispersion occurs both indoors and outdoors.

First, the conclusory statements of the Bagby Declaration and the Bagby Report will not suffice to raise a genuine issue of material fact. Second, nowhere does Buffalo identify where there is an express disclosure in Rault of apparatus that is operable indoors. The inherency argument also fails. There is no evidence in the record that a person of ordinary skill in the art following Rault would necessarily implement apparatus for operation in an indoor environment. Inherency cannot be established by probabilities or possibilities. The possibility of implementing Rault for operation indoors is not legally sufficient to show anticipation.

Accordingly, the Court concludes that Buffalo has failed to demonstrate by clear and convincing evidence that Rault anticipates any of claims at issue.

---

[11] Both Smith and Schuchman were characterized as not disclosing a sub-channel period longer than a multi-path time delay. *See* Amendment of Feb. 7, 1995, at 27. However, the '780 Schuchman discusses environmental delay spread (col. 3:12-30) and the use of frequency hopping at a period longer than the delay spread (col. 4:30-33).

# INVALIDITY: OBVIOUSNESS

**Applicable Law**

A claimed invention is unpatentable if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a); *see Graham v. John Deere Co.*, 383 U.S. 1, 14 (1966). The ultimate determination of whether an invention is or is not obvious is a legal conclusion based on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness. *See Graham*, 383 U.S. at 17-18. An essential evidentiary component of an obviousness showing is a teaching or suggestion or motivation to combine the references. Moreover, the obviousness of a patent claim must be established by clear and convincing evidence. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1351 (Fed. Cir. 1998).

**Analysis**

Buffalo relies upon the Bagby Declaration, which references the Bagby Report, in opposition to CSIRO's motion that the claims of the '069 patent are not invalid for obviousness. The Bagby Report advances several different combinations of prior art references in support of a conclusion that the claims of the '069 patent would have been obvious. These combinations include: Fattouche and Rault; Fattouche and Cimini; Budin and Rault; and Wilkinson or Fattouche in combination with any of Cimini, Rault, Budin and/or Saleh. *See* Bagby Report at 94-100.

1. Fattouche and Rault

The Bagby Report gives only conclusions that Fattouche and Rault disclose all of the elements of each of the claims and that all of the claims are obvious. Bagby Report at 94-96. There

15

is no delineation as to what elements of the claims are absent from any particular one of the references that are supplied by the other reference in the combination of Fattouche and Rault.

The Monsen Declaration states that Fattouche does not disclose the DRE means. Monsen Declaration at 14. The Bagby Declaration agrees. Bagby Declaration at 4, ¶13. As previously discussed, CSIRO admits that Rault has the modulation means, DRE means, and interleaving means of the claims. But, the limitation "in a confined multipath transmission environment" is not met by Rault. CSIRO admits that Fattouche does disclose a system for use indoors.

2. Fattouche and Cimini

Turning to the combination of Fattouche and Cimini, the analysis advanced by Buffalo with regard to that combination is no more exhaustive than was provided for Fattouche and Rault. Again, Buffalo relies upon the Bagby Declaration, which references the Bagby Report. The Bagby Report gives only the same conclusions that Fattouche and Cimini together disclose all of the elements of each of the claims and that all of the claims are obvious. Bagby Report at 96-98. Once again, there is no delineation as to what elements of the claims are absent from any particular one of the references that are supplied by the other reference in the combination of Fattouche and Cimini.

In regard to Cimini, the Monsen Declaration states that Cimini does not include interleaving. The Bagby Declaration does not discuss Cimini, but the Bagby Report indicates agreement that Cimini does not include an interleaver means (e.g., element 10[k]). *See* Bagby Report at 90. The Bagby Report only indicates that Fattouche shows an interleaver as part of a prior art arrangement. *See* Bagby Report at 11. The Bagby Declaration at page 4, paragraph 12, appears to attempt to dispute the Monsen Declaration. But, the declaration is only that Fattouche discloses that the use of interleaving is common in the prior art to Fattouche. CSIRO admits that Cimini has the

16

modulation means and DRE means; but, CSIRO contends that the limitation "in a confined multipath transmission environment" is not met by Cimini.  CSIRO, as stated above, admits that Fattouche does disclose a system for use indoors.

3. Budin and Rault

The evidence submitted by Buffalo based on the combination of Budin and Rault mirrors that of the combination of Fattouche and Rault.  But, whereas Fattouche expressly disclosed use of OFDM to implement wideband modulation, Budin uses Direct Sequence Spread Spectrum ("DSSS").  Once again, Buffalo relies upon the Bagby Report, which merely gives conclusions that Budin and Rault together disclose all of the elements of each of the claims and that all of the claims are obvious without specifying what elements of the claims are absent from any particular one of the references that are supplied by the other reference in the combination.  *See* Bagby Report at 98-100.

4. Wilkinson or Fattouche in combination with any of Cimini, Rault, Budin and/or Saleh

The analysis of the combination of Wilkinson or Fattouche and any of Cimini, Rault, Budin and/or Saleh is even more cursory.  *See* Bagby Report at 100.[12]  In support of a motivation for one skilled in the art to combine the various combinations of references, Buffalo relies upon the Bagby Declaration and the Bagby Report.  In the Bagby Declaration, the evidence of motivation is that of a common desire of the references to deal with multipath propagation effects.  In addition, there is only the reliance on the Bagby Report that it would be natural for one skilled in the art to combine the references because IEEE publications and United States Patents are primary sources of technical information.  *See* Bagby Declaration at 6-7.  There is an important distinction, however, between the

---

[12] As pointed out previously in n.9, CSIRO admits that Saleh has all the claim elements except for the modulation means. Saleh uses FHSS for wideband modulation rather than OFDM. The record is without any obviousness analysis with regard to Saleh as the primary reference.

general motivation to address a problem and the motivation to create a particular solution to the problem. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1377 (Fed. Cir. 2004).

First, the Court concludes that the conclusory statements in the Bagby Declaration and the Bagby Report do not raise a genuine issue of material fact as to any of the factual inquiries specified by *Graham*. Second, Buffalo has not proffered specific evidence as to the source of a teaching, suggestion, or motivation to combine the prior art references. Buffalo has simply stated that multipath is common in indoor and outdoor radio communications and that persons skilled in the art naturally consider patents and IEEE publications in seeking technical information. Absent, however, is identification of any specific evidence in the combinations of references (or anywhere else in the record) that suggests combining them in a manner that results in the claimed subject matter. An identification of similarities between the references and that the references together describe all the limitations of the claims is insufficient to meet the burden of demonstrating obviousness by clear and convincing evidence.[13] Buffalo has not, as a matter of law, carried its burden of making a prima facie case that the claims of the '069 patent are invalid for obviousness based on any combination of the prior art set forth in the Bagby Declaration and Bagby Report.

## INVALIDITY: WRITTEN DESCRIPTION REQUIREMENT

As one of its invalidity defenses, Buffalo contends that the asserted claims (10-16, 26-32, 42-48, 56-60 and 68-72) of the '069 patent are invalid because the specification of the originally-filed application for the '069 patent does not contain a written description of the invention set forth in the

---

[13] Wilkinson would seem to suggest to one skilled in the art that OFDM can be used in substitution for FHSS (i.e., in the arrangement disclosed in Saleh) to obtain increased information rates in a WLAN, but the record does not contain any evidence to that effect.

asserted claims as required by §112, ¶ 1.[14]  In other words, Buffalo argues the asserted claims are invalid because their scope is unsupported by the written description in the original application. *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1323 (Fed. Cir. 2002) (a broadly drafted claim must be fully supported by the written description and drawings).  Buffalo and CSIRO have both moved for summary judgment on this issue.

**Applicable Law**

One purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003).  However, the test is not the presence or absence of literal support. *See Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1575-76 (Fed. Cir. 1985).  In order to satisfy the written description requirement, the disclosure of the application for the '069 patent must reasonably convey to one skilled in the art that the inventors were in possession of the claimed subject matter to the extent of the scope of the asserted claims. *Vas-Cath Inc. v Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991).

Although the application must show the inventor was in possession of the claimed invention, "a claim may be broader than the specific embodiment disclosed in a specification." *In re Rasmussen*, 650 F.2d 1212, 1215 (C.C.P.A. 1981).  Further, a specification may contain an adequate written description of a broadly claimed invention without describing all species that the claim encompasses. *Ralston Purina*, 772 F.2d at1575.

"Compliance with the written description requirement is essentially a fact-based inquiry that

---

[14] Buffalo does not contend in its motion that the written description fails to adequately describe the claimed invention aside from the "in excess of 10 GHz" issue, although at the claim construction stage of the proceedings, Buffalo did allege that there was no disclosure of corresponding structure for the means-plus-function limitations of the asserted claims. The Court dispatched this argument in its claim construction order.

19

will 'necessarily vary depending on the nature of the invention claimed.'" *Enzo Biochem v. Gen-Probe, Inc.*, 323 F.3d 956, 963 (Fed. Cir. 2002) (citation omitted).  Determining whether a priority application contains sufficient disclosure under §112 is a question of law; but compliance with the written description aspect of that requirement is a question of fact.  *Waldemar Link v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994).

**Analysis**

Buffalo specifically argues that the originally-filed application does not support the limitation of "radio frequencies" to the full range of 3 KHz to 300 GHz. Buffalo contends that the specification does not reasonably convey to one skilled in the art that the inventors were in possession of a system in accordance with their invention that would operate at radio frequencies other than those in excess of 10GHz.[15]

Much of the parties' briefing has been in connection with a dispute as to whether the changes to the specification made in the 1995 Amendment constituted "new matter."[16]  There is no dispute, however, that if the Australian application reasonably conveys to one skilled in the art that the

---

[15] Buffalo contends that support for the asserted claims is only present in alleged "new matter" that was added to the specification both upon the filing of the application in the United States Patent and Trademark Office and upon the filing of the July 3, 1995 amendment, which also broadened the claims from "said radio transmissions have a frequency in excess of 10 GHZ" to "transmit and receive data at radio frequencies."  Broadening a claim does not add new matter since an applicant is entitled to claim as broadly as the prior art and his disclosure will allow. Moreover, although the prohibition against new matter during patent prosecution under §132 is closely related to the requirement that the specification provide adequate support for the claims under §112, first paragraph, *see Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 926-27 (Fed. Cir. 1990), a determination of the validity of the asserted claims of the '069 patent under §112, first paragraph, does not require an analysis of that specific issue. *In re Rasmussen*, 650 F.2d at 1212-16. Further, while new matter and written description issues can have implications with regard to whether an application is entitled to the filing date of an earlier application under §120, the parties have not raised the issue as a matter of priority for purposes of establishing a filing date in relation to prior art.

[16] The record is clear that the claims of the initially filed U.S. application were subsequently broadened and the specification amended in the 1995 Amendment. The parties have focused exclusively on the propriety of the applicants doing so in terms of §132. No issue has been presented, however, with regard to compliance with 35 U.S.C. §115 or whether a supplemental oath was required.

20

inventors were in possession of subject matter to the extent of the scope of the asserted claims, then the applicants were entitled to obtain the asserted claims, and the asserted claims are not invalid under §112, first paragraph.

Buffalo first argues that the Australian application only claimed operation at a frequency in excess of 10 GHZ and broadening the claim scope by removing the "in excess of 10 GHZ" limitation was an afterthought motivated by changes in FCC regulations, which permitted unlicensed devices operating in the 2.4 GHz band. However, there is nothing improper about amending claims during prosecution for the purpose of obtaining a broader right to exclude based upon knowledge obtained after filing the application. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed. Cir. 2004).

Relying on the inventors' testimony, Buffalo argues that in trying to develop a WLAN that would have a data rate of 100 Mbps the inventors only considered their invention feasible when operating at a frequency in excess of 10 GHz. As pointed out by CSIRO, the claimed invention in the Australian application did not specify any minimum data transmission rate. CSIRO Opposition Br. at 24. Further, the inventors' testimony is clear that they were only attempting to identify an area of the radio frequency spectrum where there was sufficient bandwidth available for the higher data rates sought.[17] The inventors' testimony does not compel a conclusion that they were in possession of an invention that only worked at frequencies in excess of 10 GHz.

Buffalo also argues that the disclosure in the Australian application was expressly limited to

---

[17] In a 1992 publication by the inventors, they state: "None of the bands below 60 GHz has more than 100 MHz available and are in congested part of the spectrum where expansion is not possible. Therefore, these are not likely candidates for use in a high-speed WLAN system. The best option for radio transmission appears to be 60 GHz." *See* Exhibit G to the Gardner Declaration at 60. This testimony is completely unlike the inventor's testimony in *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998), where the inventor admitted that he had not even considered the more broadly claimed subject matter until he became aware that others were doing it.

an invention wherein operation was at a frequency in excess of 10 GHz and one skilled in the art would conclude that the invention required the transmission of data at frequencies in excess of 10 GHz. In support, Buffalo points to the statement in the Australian application that "[f]or radio transmission at a frequency in excess of 10 GHz, a multipath mode of transmission from the transmitter 3 to receiver 4 occurs." Buffalo's Br. at 6-7.[18] Buffalo also relies upon the Bagby Declaration filed November 18, 2005, at ¶7. Bagby's Declaration testimony, however, does not even mention the Australian application. Moreover, Bagby's Declaration does not support Buffalo's statement that "one skilled in the art reading the application would unquestionably conclude that the invention required the transmission of data frequencies in excess of 10 Ghz." Buffalo Br. at 7. In fact, all the Bagby Declaration states is that one skilled in the art would understand that a change was made in the application that significantly broadened the scope of the '069 patent. The Bagby Declaration does not address the question as to what the statement in the Australian application would mean to one skilled in the art in regard to whether the inventors were in possession of the subject matter of the asserted claims. Significantly, the Bagby Declaration does not indicate that one skilled in the art would necessarily understand the statement in the Australian application and the teaching to use OFDM as a solution to multipath to mean that the inventors were addressing a problem that only occurs at frequencies in excess of 10 GHz.[19]

---

[18] The inventors' 1992 publication (Exhibit G to the Gardner Declaration) at page 61 explains: "The use of a higher carrier frequency does result in some minor changes in the reflection and transmission properties of office construction materials. The loss in transmission through materials will increase in proportion to the square root of the increase in frequency." This suggests that the inventors considered that a greater multimode reflection problem would exist at higher frequencies.

[19] Bagby admits that there is nothing inherent in OFDM that makes it usable only in transceivers transmitting at frequencies in excess of 10 GHz. Bagby Deposition of December 6, 2005, at 69.

The patentee's statements in the written description of the Australian application fall far short of those in *Gentry. Supra*, at n.17. The court in *Gentry* concluded that the inventor had clearly expressed in the written description that he considered his invention to be limited to the specific location of the controls on the console on the sofa ("the only possible location") and that any variation was "outside the stated purpose of the invention." *Gentry Gallery*, 134 F.3d at 1479.

As to invalidity, the Bagby Report includes a discussion of the propagation of radio signals and the effect of multipath. The Bagby Report explains that the impact on a radio signal that is reflected off a barrier is dependent on the radio frequency used. However, there is no indication that multipath is restricted to any particular portion of the radio frequency spectrum. *See* Bagby Report at 5. In support of its validity contentions, CSIRO submitted the Levesque Report (Docket No.124), which also contains a discussion of the problem of multipath propagation in an indoor environment. The Levesque Report nowhere indicates that multipath is restricted to any particular portion of the radio frequency spectrum. Levesque Report at 9. Based on these reports, there is an inference that multipath occurs throughout the radio frequency spectrum. There is no evidence to the contrary. Moreover, a reasonable inference can be drawn that those skilled in the art would read the Australian application knowing that multipath occurs throughout the radio frequency spectrum to different extents.[20]

In order for a claim to be invalid under §112, first paragraph, the disclosure must contain a clear statement to one skilled in the art that restricts the scope of the invention. *Johnson Worldwide*

---

[20] A frequency in excess of 10 GHz can be considered as only one species of frequency within the genus of the radio frequency spectrum that spans 3 KHz to 300 GHz. There was no requirement for the inventors to disclose operation of their invention in all portions (species) of the radio frequency spectrum. *See, e.g., Utter v. Hiraga*, 845 F. 2d 993 (Fed. Cir. 1998). Further, this situation is in contrast to *Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998), where the court held that a claim limitation that read broadly on various shapes was not supported because the specification asserted advantages of the conical shape over prior art shapes.

23

*Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 993 (Fed. Cir. 1999). Buffalo has not shown that the statement in the Australian application makes a clear statement that the structure of the disclosed WLAN OFDM-based transceivers was restricted to only frequencies in excess of 10 GHz and did not extend to operation at frequencies less than 10 GHz.

Buffalo cites to the prosecution history where, in the 1995 Amendment, a statement was made that the cited prior references of Smith and Schuchman did not operate at frequencies in excess of 10 GHz. *See* Buffalo Br. at 1, n.1. As CSIRO points out, the prior art was distinguished on three separate grounds. Also, there were claims pending that contained the in excess of 10 GHz limitation. CSIRO Opposition Br. at 27-28. Buffalo nowhere explains why this portion of the prosecution history is important to a determination as to the adequacy of the written description under §112, first paragraph.

In support of its cross-motion, CSIRO submitted with its opposition brief the Andrews Declaration. Andrews testifies that the box 32 in Fig. 6 contains the baseband processing (i.e., FEC, interleaving and IFFT-based modulator), box 34 contains an intermediate frequency (IF) stage, and box 35 contains the final output stage producing the transmission carrier at a frequency of 60 GHz. Andrews Declaration at ¶8. Buffalo submitted with its reply brief a rebuttal Bagby Declaration. Bagby does not dispute Andrews' characterization of boxes 32, 34 and 36. *See* Bagby Declaration at ¶6. Andrews also testifies that the baseband processing of box 32 shown in more detail in Fig. 7 of the '069 patent is the central focus of the claimed invention. Andrews Declaration at ¶9. The Bagby Declaration does not dispute that point. Bagby Declaration at ¶7.[21] Such focus, of course,

---

[21] This corresponds to the '069 patent disclosure at col. 7:66-8:26, wherein the OFDM, FEC and interleaving are highlighted as the techniques used to "provide a high speed bit transmission rate in the hostile radio environment described above."

necessarily excludes the upconversion of the IF stage 34 and the carrier output stage 35. Andrews further states that "the choice of carrier frequencies is arbitrary from a technical point of view." Andrews Declaration at ¶9. Although Bagby disputes other aspects of paragraph 9 of the Andrews Declaration, Bagby does not dispute that the choice of carrier frequencies is arbitrary from a technical point of view.

There is no showing by Buffalo as to why one skilled in the art would not read the Australian application with an understanding that multipath occurs at all radio frequencies, that FCC regulations place a limit on what portion of the spectrum could be used (i.e., available bandwidth) depending upon the desired data rate, that absorption and reflectivity of radio frequency signals is dependent upon frequency, that use of the disclosed baseband processing (FEC, interleaving and OFDM) is not constrained to a particular transmission carrier frequency, and that the particular choice of carrier frequency is arbitrary. The inference is that one skilled in the art when reading the content of the Australian application would necessarily have all these things in mind. Then, in so reading the Australian application, one skilled in the art would understand that the inventors were in possession of a WLAN OFDM-based transceiver transmitting with a carrier at any frequency within the radio frequency spectrum.

CSIRO has demonstrated that there is no genuine issue of material fact to preclude summary judgment on the issue of the validity of the asserted claims (10-16, 26-32, 42-48, 56-60 and 68-72) under §112, first paragraph. Further, Buffalo has failed to demonstrate by clear and convincing evidence that the written description of the Australian application could not or does not reasonably convey to one skilled in the art that the inventors were in possession of the claimed subject matter

25

of the asserted claims.[22]  Buffalo's evidence essentially reduces to just the fact that the Australian application does not *expressly* state that data transmission can be at any radio frequency in the 3 KHz to 300 GHz range.  However, the applicants for the '069 patent were not required to describe exactly the subject matter of the asserted claims; the description needed only to allow persons skilled in the art to recognize that they had invented what is claimed in the asserted claims.  *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 424 F.3d 1161, 1165 (Fed. Cir. 2005).

## INFRINGEMENT

CSIRO has moved for partial summary judgment that the accused Buffalo products directly and literally infringe claims 42-48, 56-60, and 68-72 of the '069 patent.  CSIRO has the burden to prove infringement by a preponderance of the evidence.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).  The accused Buffalo products include mobile products, hub products, and other products.[23]  The structure of these products is detailed in the Expert Report of Thomas Conte.[24]  The parties agree that there is no dispute as to the structure of the accused products.  *See* Buffalo Response Br. at 2.  The dispute between the parties is with respect to two limitations: means to apply a data reliability enhancement and means . . . for interleaving blocks of said data.  There is a third dispute as to the proper construction of the term "blocks" in the function specified as "interleaving blocks of said data."  *See* Buffalo Response Br. at 2.

---

[22] It necessarily follows that Buffalo has failed to overcome the presumption that no new matter was added by the 1995 Amendment. *See Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555 (Fed. Cir. 1992).

[23] These accused products are identified by product number at pages 2-3 of CSIRO's brief in support of its motion for summary judgment.

[24] With one exception the accused Buffalo products use a baseband processor chip (integrated circuit) manufactured by Broadcom Corporation. The other product uses a Ralink baseband processor. There is no dispute that each processor implements the relevant portions of the IEEE 802.g standard for WLAN.

**Applicable Law**

It is standard doctrine that determining infringement is a two-step process. *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed. Cir. 1996). First, a court must construe the asserted claims as a matter of law to ascertain their meaning and scope. *Id.* Second, the claims as construed are compared to the allegedly infringing device. *Id.* To infringe a claim, each claim limitation must be present in the accused product. *Id.*; *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1220 (Fed. Cir. 1996).

The Court has construed "means to apply data reliability enhancement" as "the Rate ½ TCM (trellis coded modulation) Encoder described in block 42 of Figure 7 and referenced at column 6:32-46." Hereinafter, this will be referred to as the "DRE means."

The Court has construed "means . . . for interleaving blocks of said data" (interleaving means") as "the Di-Bit Interleaver described in block 43 of Figure 7."

Literal infringement of a §112, ¶6, limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be either identical to or equivalent to the corresponding structure in the specification. *See, e.g., Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999); *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987) (en banc) (overruled on other grounds). Functional identity and either structural identity or equivalence are both necessary. *See Pennwalt*, 833 F.3d at 934.

The test for structural equivalence under §112, ¶6 is closely related to the test under the doctrine of equivalents, involving "similar analyses of insubstantiality of the differences." *Al-Site*, 174 F.3d at 1321. In the doctrine of equivalents context, the test for equivalency often used is whether the "function, way, and result" of the substituted structure is substantially different from that

27

described by the claim limitation. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 40 (1997). If so, equivalence is not established. *Id*. However, under §112, ¶6 the "way" and "result" at issue—whether the "way" the structure of the accused device performs the claimed function and the "result" of that performance—are insubstantially different from the "way" the claimed function is performed by the corresponding structure described in the specification and the result of that performance. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). Thus, if the structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification, there is equivalence and literal infringement. *Id*. This test for equivalence, however, does not involve a component-by-component comparison of the two structures. *Id.* at 1267-68.

**Analysis**

"Means to apply data reliability enhancement"

It is undisputed that the accused Buffalo products perform an identical function to the "means to apply data reliability enhancement." It is also undisputed that the function is performed in the accused Buffalo products by a convolutional encoder. The dispute is whether the convolutional encoder is the same as, or a structural equivalent to, "the Rate ½ TCM (trellis coded modulation) Encoder described in block 42 of Figure 7 and referenced at column 6:32-46."

As evidence that Buffalo's products literally infringe, CSIRO submits the Monsen Declaration (Docket No. 130). Monsen gives the opinion that the accused Buffalo products literally infringe because the accused Buffalo products have an equivalent structure performing the specified function of the DRE means structure. In support, Monsen states that a TCM encoder is a form of convolutional encoder. Monsen also states that the way the TCM encoder of block 42 performs the

28

function of applying data reliability enhancement is to add redundancy with a delay line and that the result is that the output bit rate is larger than the input bit rate. Monsen Declaration at 14-15.

In opposition, Buffalo relies upon the Lanning Declaration. The Lanning Declaration states that "TCM" stands for trellis coded modulation. Lanning shows the structure for TCM and states that a combination of coding and modulation is involved in TCM. Lanning Declaration at 5-6, ¶¶ 11-12. The structure of the coding portion of TCM is identified as a convolutional encoder. The additional structure provides signal mapping to the output of the convolutional encoder. In Lanning's opinion, the accused Buffalo products do not have an equivalent DRE means because block 42 includes of both coding and modulation (mapping), whereas the Buffalo products use only coding without signal mapping. Lanning Dec. at ¶¶9, 17, 20.

To reach his opinion, Lanning compares combined structures of a convolutional encoder and a signal mapping device to a structure with just a convolutional encoder. The difference identified is, of course, the signal mapping device. Based on that difference, Lanning points out that the TCM Encoder converts a stream of data to a constellation map, whereas the convolutional encoder standing alone only adds additional bits to the stream of data. Lanning then states, "The two structures perform different functions . . . ." Lanning Declaration at ¶ 20. But, Buffalo does not dispute that the accused Buffalo products perform the identical function of the claimed DRE means. *See* Buffalo's Response to Plaintiff's Statement of Undisputed Facts at p. 5, ¶ 18, and at p. 9, ¶ 35.

Lanning improperly bases his opinion as to the lack of equivalency on a component-by-component comparison and not the overall structure corresponding to the claimed function.[25] While

---

[25] The individual components of an overall structure that corresponds to the claimed function are not claim limitations. Thus, structures having different numbers of parts can be equivalent under §112, ¶6. *See, e.g., Al-Site,* 174 F.3d at 1321-22.

Lanning gives the opinion that there are substantial differences between the TCM Encoder 42 and the convolutional encoder in the Buffalo products, the only difference Lanning points to is the addition of the mapping function for modulation. Absent is any discussion as to why that difference is substantial in the way the function of applying data reliability enhancement is performed or the result that is obtained.

The diagram of Fig. 2 in paragraph 11 of the Lanning Declaration is evidence that the "encoder" used in TCM is, in fact, a convolutional encoder. A TCM Encoder is a "type" of convolutional encoder; it just also adds a mapping function to the stream of data after additional bits for redundancy have already been added. There is nothing in the Lanning Declaration that even suggests that the redundancy of the added bits introduced by the convolutional encoder is in any way removed by the downstream mapping function.[26]

Moreover, Lanning does not dispute Monsen's opinion that the way the function of data reliability enhancement is performed by block 42 is by adding redundancy bits by a delay line and that the result obtained is having a larger output bit rate than the input bit rate. Thus, there is no dispute that the claimed function is being performed in substantially the same way by a convolutional encoder standing alone (adding redundancy bits) or that the result obtained by a convolutional encoder standing alone (larger output bit rate than the input bit rate) is not substantially the same. All Lanning points to is the addition of a signal mapping device that makes the output from a TCM Encoder a stream of coordinate bit pairs, which necessarily has redundancy added to it by the upstream convolutional encoder.

---

[26] Buffalo submitted Exhibit # 791 from the Levesque deposition. At page 300, there is a statement that the advantage of TCM over traditional error-correction coding schemes "is in its ability to achieve improved power efficiency without the customary bandwidth expansion introduced by the use of coding." At page 301, there is the statement that TCM is used to "create redundancy." This is consistent with the '069 patent at col. 9:66-10: 2.

CSIRO has demonstrated that there is no genuine issue as to the existence of the DRE means in the accused Buffalo products. Further, by a preponderance of the evidence, the accused Buffalo products include the same or an equivalent structure as the "the Rate ½ TCM (trellis coded modulation) Encoder described in block 42 of Figure 7 and referenced at column 6:32-46."

"Blocks"

As to the "means . . . for interleaving blocks of said data," the parties dispute whether the identical function is performed in the accused Buffalo products. There is no dispute that the accused Buffalo products use bit-by-bit interleaving. Rather, the dispute is one of claim construction as to whether the term "blocks" means that a block of data can have one or more bits or that a block of data must have multiple bits.

CSIRO argues that a block can have one or more bits. In support, CSIRO points to the '069 specification as disclosing both a QPSK (Quadrature Phase Shift Keying) embodiment (Fig. 7) and a BPSK (Binary Phase Shift Keying) "embodiment." *See* col. 9:29-34.[27] CSIRO also points out that the dependent claims (e.g., claim 14) specifies BPSK. The significance is that a QPSK symbol has multiple bits to be processed but a BPSK symbol has only a single bit. Thus, the '069 patent discloses that the interleaving function could involve either a single bit or multiple bits.

Buffalo argues that a block must have multiple bits because the Court's claim construction identified the corresponding structure as the Di-Bit Interleaver described in block 43 of Figure 7. Buffalo's argument turns claim construction of a means-plus-function limitation on its head. The term "blocks" is within the language that specifies the function being performed by the means. At

---

[27] The discussion of the BPSK "embodiment" addresses only functional operation and does not provide a description of corresponding structure for a BPSK implementation. This is sufficient for construction of the recitation of the function specified in the means-plus-function limitation.

the threshold stage of construing the language setting forth the specified function, there is no consideration of the corresponding structure.  The corresponding structure disclosed in the specification is only evaluated after the function has been construed.  Buffalo's construction of "blocks" begins with a structure to construe the function.  To adopt Buffalo's position would result in impermissibly reading limitations of the preferred embodiment into the claim limitation, thereby narrowing the specified function.

The Court construes "blocks" to mean "a block of data having one or more bits."

"Means for interleaving blocks of data"

The Court defined the function of this means-plus-function term as "interleaving blocks of data."  The Court identified "the Di-Bit Interleaver described in block 43 fo Figure 7" as the corresponding structure.  Buffalo contends its interleaver only interleaves single bits, not di-bits. Thus, as with "means for applying data reliability enhancement," the Court must determine whether the "way" Buffalo's interleaver performs the claimed function and the "result" of that performance are insubstantially different from the "way" the corresponding structure performs the function and the "result"of that performance.

Given the construction of "blocks," there is no dispute that the accused Buffalo products perform an identical function of interleaving blocks of data.  There also is no dispute that the accused Buffalo products do not have a di-bit interleaver.  Thus, CSIRO must demonstrate that the bit-by-bit interleaver in the accused Buffalo products is only insubstantially different from the di-bit interleaver described in block 43 of Figure 7.

The Monsen Declaration submitted by CSIRO gives an opinion that a bit-by-bit interleaver is insubstantially different from a di-bit interleaver.  Monsen explains that the size of the blocks to

32

be handled by an interleaver is a parameter that depends on the modulation format, data reliability enhancement technique, and channel conditions. Monsen Declaration at 16. In either case, a reordering algorithm (way) is used so that the output block pattern is different than the input block pattern (result). Thus, according to Monsen, interleavers that handle different block sizes are insubstantially different. Monsen Declaration at 15.

The Lanning Declaration submitted by Buffalo agrees that the way the di-bit interleaver performs the specified function is by "shuffling" the di-bit blocks with the other di-bit blocks. Lanning Declaration at 9-10. Also, Lanning does not disagree that the result is an output block pattern that is different than the input block pattern. The basis for Lanning's opinion that the bit-by-bit interleaver is substantially different from the di-bit interleaver is that the latter operates on "married" di-bits. Lanning Declaration at 9-13. In reaching that opinion, Lanning considers not just the di-bit interleaver but combines with it the operation of the Rate ½ TCM Encoder and the QPSK Encoder as to the input data structure to the di-bit interleaver and as to the output data structure from it. From that point of view, the only distinction that Lanning identifies is the unremarkable observation that with the single bit interleaver each bit remains as an individual bit and is not grouped together in pairs. Lanning Declaration at 11. Other than the different configuration of the data structure that is input to and output from a di-bit interleaver from that of single bit interleaver, Lanning does not indicate any difference in the way each of the interleavers performs the interleaving function or as to the result obtained by them. Once again, Lanning is applying an approach akin to a component-by-component comparison of the two interleavers, which is improper.

CSIRO has demonstrated that there is no genuine issue as to the structural equivalence of the bit-by-bit interleaver in the accused Buffalo products and the Di-Bit Interleaver described in block

33

43 of Figure 7. Further, by a preponderance of the evidence, the accused Buffalo products include

an equivalent structure to the Di-Bit Interleaver described in block 43 of Figure 7.

## CONCLUSION

For the foregoing reasons, the asserted claims of the '069 Patent are not invalid as anticipated

or obvious. Further, the asserted claims are not invalid for lack of support in the written

specification. Finally, Buffalo infringes the asserted claims.

**So ORDERED and SIGNED this 13th day of November, 2006.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

34

# EXHIBIT E

# United States Court of Appeals for the Federal Circuit

2007-1449

## COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,

Plaintiff-Appellee,

v.

## BUFFALO TECHNOLOGY (USA), INC.
## and BUFFALO, INC.,

Defendants-Appellants.

# Judgment

ON APPEAL from the United States District Court for the Eastern District of Texas

in CASE NO(S) 2:05-CV-53.

This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

**AFFIRMED IN PART, VACATED IN PART, and REMANDED.**

ENTERED BY ORDER OF THE COURT

DATED **SEP 1 9 2008**

*Jan Horbaly* /kw

Jan Horbaly, Clerk

**ISSUED AS A MANDATE:** OCT 2 4 2008

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By: *Valerie* Date: 10/24/08

# United States Court of Appeals for the Federal Circuit

2007-1449

COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH ORGANISATION,

Plaintiff-Appellee,

v.

BUFFALO TECHNOLOGY (USA), INC.
and BUFFALO, INC.,

Defendants-Appellants.

Daniel J. Furniss, Townsend and Townsend and Crew LLP, of Palo Alto, California, argued for plaintiff-appellee. With him on the brief were Gary H. Ritchey and Nancy L. Tompkins.

Richard D. Kelly, Oblon, Spivak, McClelland, Maier & Neustadt, P.C., of Alexandria, Virginia, argued for defendants-appellants. With him on the brief were Robert C. Mattson, Frank J. West, Takahiro Miura, and Robert C. Nissen. Of counsel were Joanna H. Kim and Richard J. Codding, Akin, Gump, Strauss, Hauer & Feld, LLP, of Los Angeles, California.

Richard C. Vasquez, Morgan Miller Blair, a Law Corporation, of Walnut Creek, California, for amici curiae Accton Technology Corporation (Taiwan). With him on the brief were Jeffrey T. Lindgren, Kevin R. Brodehl, and Eric W. Benisek.

Ruffin B. Cordell, Fish & Richardson P.C., of Washington, DC, for amicus curiae Microsoft Corporation. With him on the brief was Barry K. Shelton, of Austin, Texas.

Theodore B. Olson, Gibson, Dunn & Crutcher LLP, of Washington, DC, for amici curiae Atheros Communications, Inc., et al. With him on the brief were Matthew D. McGill, Amir C. Tayrani, and Thomas A. Burns.

Roy T. Englert, Jr., Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, of Washington, DC, for amici curiae Battelle Memorial Institute, et al. With him on the brief was Mark T. Stancil.

Kathleen M. Sullivan, Quinn Emanuel Urquhart Oliver & Hedges, LLP, of Redwood Shores, California, for amici curiae Nokia Corporation, et al. With her on the brief were Brian C. Cannon and Tun-Jen Chiang. Of counsel on the brief were Ronald A. Antush and David L. Cohen, Nokia Corporation and Nokia Inc., of Irving, Texas.

Richard W. Clary, Cravath, Swaine & Moore LLP, of New York, New York, for amicus curiae Qualcomm Incorporated.

Steffen N. Johnson, Winston & Strawn LLP, of Washington, DC, for amicus curiae Technology Properties Limited. With him on the brief were Gene C. Schaerr, Andrew C. Nichols, and James F. Hurst, of Chicago, Illinois.

Robert A. Cote, McKool Smith, P.C., of New York, New York, for amicus curiae Wi-LAN, Inc. With him on the brief were Robert E. Goodfriend and Jason Blackstone, of Dallas, Texas, Rodney R. Sweetland, III, of Washington, DC, and Gretchen K. Harting and Seth R. Hasenour, of Austin, Texas.

Appealed from:  United States District Court for the Eastern District of Texas

Judge Leonard Davis

# United States Court of Appeals for the Federal Circuit

2007-1449

COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,

Plaintiff-Appellee,

v.

BUFFALO TECHNOLOGY (USA), INC.
and BUFFALO, INC.,

Defendants-Appellants.

Appeal from the United States District Court for the Eastern District of Texas
in case no. 2:05-CV-53, Judge Leonard Davis.

---

DECIDED: September 19, 2008

---

Before LOURIE, RADER, and BRYSON, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> BRYSON. Opinion concurring in the result filed by <u>Circuit Judge</u> LOURIE.

BRYSON, <u>Circuit Judge</u>.

Commonwealth Scientific and Industrial Research Organisation ("CSIRO") is Australia's national science agency. It engages in a range of basic and applied scientific research in diverse fields. One of its research projects has been directed to solving problems presented by indoor wireless local area networks ("WLANs"). WLANs usually have a network topology consisting of one or more access points with a wired connection to a local area network. They feature wireless connections to one or more transceivers that reside on remote devices such as laptop computers. The remote

devices communicate with the network access points by way of radio wave transmissions.

One of the difficulties encountered by those who sought to develop WLAN systems was the problem of multiple, echoed signals traveling from transmitters to receivers. The multiple, echoed signals are caused by the "bouncing" of transmitted radio waves off objects within a room or building, causing the echoed signals to reach the receiver at different times subsequent to the receipt of the main signal. The "echo effect" caused by the bouncing signals creates what is known as the "multiple path propagation" or "multipath" problem. When the multipath problem is present, a single signal sent from a transmitter will be received multiple times by the receiver over a short period of time. When that happens, the echoes from a first transmission may mask subsequent transmissions.

One means of dealing with the multipath problem is to delay the transmission of subsequent signals sufficiently to avoid the masking effect. Delaying the transmission of subsequent signals, however, reduces the maximum data rate the network can achieve and thereby renders the wireless transmission system less useful for many applications.

In order to combat the multipath problem without reducing the data transmission rate of the system, CSIRO invented a solution that was ultimately described and claimed in U.S. Patent No. 5,487,069 ("the '069 patent"). The proposed solution was to transmit different portions of a series of signals containing the data to be transmitted over a number of different frequency channels. By transmitting data on many different frequencies, the system would ensure that none of the signals in the series (or their

echoes) would interfere with other signals transmitted on different channels. And by transmitting a number of signals on different frequencies simultaneously, the WLAN system could achieve a high overall transmission rate while still allowing sufficient temporal separation between each signal transmitted on each frequency to avoid inter-symbol interference.

In a patent infringement action filed in the United States District Court for the Eastern District of Texas, CSIRO accused Buffalo Technology (USA), Inc., and Buffalo, Inc., (collectively, "Buffalo") of infringing various claims of the '069 patent. After construing the disputed claim terms of the '069 patent, the district court addressed the parties' cross-motions for summary judgment. In its order on those motions, the court granted summary judgment in favor of CSIRO on the contested issues of patent validity and infringement.

Independent claim 42 is one of the claims that the district court found to be infringed. That claim provides as follows:

> A transceiver for operation in a confined multipath transmission environment, said transceiver comprising antenna means coupled to transmission signal processing means and to reception signal processing means, said transmission signal processing means in turn coupled to an input data channel, said transceiver being operable to transmit and receive data at radio frequencies, said transmission signal processing means comprising modulation means for modulating input data of said input data channel into a plurality of sub-channels comprised of a sequence of data symbols such that the period of a subchannel symbol is longer than a predetermined period representative of the time delay of significant ones of non-direct transmission paths, means to apply data reliability enhancement to said data passed to said modulation means and means, interposed between said data reliability enhancement means and said modulation means, for interleaving blocks of said data.

Independent claim 56, which the court also found to be infringed, is similar to claim 42, but it claims a transmitter instead of a transceiver. Independent claim 68, also found to

be infringed, contains many of the elements of claim 42, but instead of claiming an apparatus, it claims a method of transmitting data in a confined multipath environment of radio frequencies.

Following the district court's entry of summary judgment of infringement, CSIRO moved for the entry of a permanent injunction. After a hearing, the court entered an injunction against Buffalo, as requested.

On appeal, we affirm the district court's summary judgment rulings in all but one respect. With respect to the issue of validity, we uphold the court's entry of summary judgment that the '069 patent was not anticipated. We also uphold the district court's entry of summary judgment that the '069 patent was not invalid because of the addition of new matter to the application or because the asserted claims lacked a sufficient written description in the original specification. With respect to the issue of obviousness, however, we conclude that the district court erred by entering summary judgment against Buffalo because we hold that there was a disputed issue of material fact as to whether the prior art references that were before the district court were combinable in a manner that would have rendered the asserted claims of the '069 patent obvious. Although we vacate the summary judgment of obviousness, we have nonetheless addressed the issue of infringement, on which the district court entered summary judgment against Buffalo, because that issue will continue to be important to the ultimate disposition of the case unless the claims are held to be invalid for obviousness. As to that issue, we uphold the district court's summary judgment of infringement.

I

The summary judgment proceedings in this case were unusual in that the parties stipulated that the district court could make findings of fact with respect to disputed factual issues in the course of deciding the cross-motions for summary judgment.  At the summary judgment hearing on August 15, 2006, the trial judge asked the parties to confirm "with respect to the issue of infringement and with respect to the issue of validity that both sides agree that the Court has before it all of the record that it needs to determine both of these issues, whichever way it might ultimately determine to go." Both parties agreed.  For further clarification, the court then asked the parties, "[I]f the Court gets into anything where there is a factual issue that needs to be determined, are you both stipulating that you have before the Court the record and are agreeing that the Court can make that factual determination?"  Again, both parties agreed.  Buffalo's counsel later stated that the stipulation permitting the court to decide any fact issues that might arise applied only to those issues on which Buffalo had moved for summary judgment.  Those issues included infringement, anticipation, and invalidity because of a written description violation based on the alleged introduction of new matter.  But with respect to obviousness, as to which Buffalo did not file a cross-motion for summary judgment, Buffalo's counsel stated that "any factual issues that came up in the context of obviousness would be reserved for later adjudication."  After a brief colloquy between the court and counsel, it was agreed that the court would not make findings of fact on obviousness, but instead would decide on summary judgment whether Buffalo had met its burden of "presenting enough evidence to raise a fact issue sufficient to get to a jury on the question of obviousness."

On appeal, Buffalo acknowledges that the parties agreed to allow the court to decide factual issues at the summary judgment stage, but it argues that with respect to anticipation the stipulation was limited to claims 68-72. The record on that point is somewhat unclear. Buffalo's counsel stated at one point that the stipulation was intended to permit the court to decide any factual issues that arose in connection with any matters as to which the parties had filed cross-motions for summary judgment, "to the extent that those cross-motions really overlap." Buffalo now contends that with respect to anticipation the stipulation was limited to claims 68-72 because even though CSIRO moved for summary judgment of no anticipation as to all the asserted claims, Buffalo moved for summary judgment of anticipation only as to claims 68-72.

While the record is not as clear as it could be on this point, the district court interpreted the stipulation to grant it the authority to decide any factual issues relating to anticipation. Given that the district court is in the best position to understand the position of the parties as expressed through their series of exchanges with the court at the summary judgment hearing, we sustain the court's interpretation of the stipulation. Accordingly, we will apply the same standard on appeal that applies to the decisions of a district court after a bench trial with respect to the court's rulings on (1) anticipation, (2) invalidity because of new matter and written description violations, and (3) infringement of the asserted claims. With respect to the issue of obviousness, we will review the trial court's rulings under the conventional summary judgment standard.

II

Buffalo's principal argument on anticipation is based on an article by J.C. Rault and others entitled "The Coded Orthogonal Frequency Division Multiplexing (COFDM)

Technique, and its Application to Digital Radio Broadcasting Towards Mobile Receivers." That article, which was published by the Institute of Electrical and Electronics Engineers ("IEEE") in 1989, describes the problems presented by transmitting signals to mobile receiving stations (such as moving vehicles) in a dense urban area. In particular, the article addresses the dual problems of (1) frequency variation in signals received by moving vehicles due to the Doppler effect and (2) multipath propagation of signals "due to multiple reflections by buildings and other scattering structures around the vehicle." According to the Rault article, those problems could both be addressed by the use of coded orthogonal frequency division mulitiplexing ("COFDM"). That is, the data could be transmitted by interleaving a sequence of short symbol transmissions over multiple channels of different frequencies so that the transmission rate for each symbol could be slow enough to avoid interference from signal reflections, while the transmission rate for the entire multiplexed transmission would still be high enough to be useful for high-speed applications. At the same time, the spacing of the multiplexed sub-channels could be large enough to compensate for the frequency variations caused by the Doppler effect.

The trial court found that Rault disclosed several of the limitations of independent claims 42, 56, and 68—the modulation means, the data reliability enhancement means, and the interleaving means. The district court did not find that Rault anticipated any of the claims, however, because the court found that Rault failed to disclose the limitation, found in the preamble of each of the independent claims, that referred to the use of the invention "in a confined multipath transmission environment." The trial court construed

the words "in a confined multipath transmission environment" to mean "in an indoor environment."

On appeal, Buffalo first argues that Rault anticipates the relevant claims of the '069 patent because the district court improperly construed the preamble language to constitute a limitation of each of the claims. CSIRO responds that Buffalo waived that argument by not raising it below. In response to the claim of waiver, Buffalo contends that it preserved the "preamble" argument because, in the course of the parties' arguments over claim construction, it argued that the phrase "confined multipath transmission environment" should not be limited to an indoor environment. Instead, Buffalo argued, that term should embrace both indoor and outdoor environments that have defined or confined multipath transmission environments.

That argument, which was made by Buffalo in the district court with respect to claim construction, is quite different from the argument it now makes with respect to anticipation, i.e., that the recitation of "confined multipath transmission environment" in the preambles of the asserted independent claims is not a claim limitation that should be considered for purposes of anticipation. Before the district court, Buffalo could have argued both (1) that the phrase "confined multipath transmission environment" does not mean "indoor environment," and (2) that, in any event, the environment of use defined in the preamble should not be treated as a separate limitation. But Buffalo made only the first argument. It has therefore waived the argument that the relevant language in the preamble does not limit the claims.

In the alternative, Buffalo argues that Rault anticipates the asserted claims even if the language in the preamble is treated as a limitation, because Rault discloses the

use of the invention in an indoor environment. In support of that argument, Buffalo first quotes language from Rault indicating that outdoor urban environments can be "hostile" and can pose multipath problems. Buffalo then notes that the '069 patent deals with multipath problems and concludes that "Rault disclosed communication techniques applicable to both indoor and outdoor environments." The trial court considered that issue, however, and found as a factual matter that Rault's discussion of outdoor environments did not anticipate the use of the patented technique in an indoor environment. Buffalo's cursory assertion that the trial court was incorrect as to that ruling is not enough to overcome the "clear error" standard that applies to the factual finding that Rault does not disclose an indoor environment and therefore does not anticipate. Accordingly, we affirm the decision of the district court on that aspect of Buffalo's anticipation argument.

III

Buffalo next contends that the asserted claims are anticipated based on the combination of two articles. One is an article by T.A. Wilkinson and S.K. Burton entitled "Spread Spectrum for Radio LANs," which was published in May 1992 in an IEEE Colloquium on Radio LANs. The other is an article by J.A.C. Bingham entitled "Multicarrier Modulation for Data Transmission: An Idea Whose Time Has Come," which was published in May 1990 in the IEEE's Communications Magazine. Buffalo acknowledges that in the district court it did not argue obviousness based on the combination of those two references. For that reason, it has not argued in this court that the asserted claims would have been obvious based on the combination of those references. Instead, Buffalo argues anticipation based on those references; it contends

that the two references serve as the single reference that is required for anticipation, see Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991), because Bingham is incorporated by reference in Wilkinson.

To support its contention that Bingham is incorporated by reference, Buffalo cites Advanced Display Systems v. Kent State University, 212 F.3d 1272 (Fed. Cir. 2000). That case sets forth the rule as to when a document will be deemed incorporated by reference in another document for purposes of validity analysis. The Advanced Display Systems case states the following with respect to that issue:

> Incorporation by reference provides a method for integrating material from various documents into a host document—a patent or printed publication in an anticipation determination—by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein. To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents.

212 F.3d at 1282 (internal citations omitted). The court's role in such cases is to decide "what material in addition to the host document constitutes the single reference" needed to serve as the basis for a finding of anticipation. Id. at 1283.

In pertinent part, Wilkinson describes "parallel [frequency hopping] . . . where multiple frequency slots are used simultaneously or COFDM could be used to achieve increased information rates." At the point that Wilkinson refers to COFDM, it contains a footnote citation, without comment, to Bingham. The footnote citation in Wilkinson could provide a justification for combining the references for obviousness purposes, but there is nothing about the reference to Bingham that appears to constitute an incorporation of any or all of the information from the Bingham reference under the standard set forth in Advanced Display Systems. In particular, the reference to

2007-1449                              10

Bingham does not "identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents." Advanced Display Systems, 212 F.3d at 1282; see also Zenon Envtl., Inc. v. U.S. Filter Corp., 506 F.3d 1370, 1378 (Fed. Cir. 2007). Because Wilkinson does not incorporate Bingham by reference, we affirm the district court's ruling that the combination of Wilkinson and Bingham does not anticipate the asserted claims of the '069 reference. We do not reach the merits of the question whether each limitation of each asserted claim is disclosed by the combination of the two references.

IV

Buffalo next contends that the district court improperly granted summary judgment that the asserted claims of the '069 patent are not invalid for obviousness.

A

Before the district court, Buffalo relied on a number of different combinations of references. On appeal, Buffalo focuses on two of them: the combination of the Rault article and the article by Wilkinson; and the combination of the Rault article and a U.S. patent to Fattouche entitled "Method and Apparatus for Multiple Access Between Transceivers in Wireless Communications Using OFDM Spread Spectrum." In arguing that it introduced sufficient evidence on the issue of obviousness to avoid summary judgment, Buffalo relies principally on the declaration and report of its expert, David Bagby.

With respect to the combination of Rault and Fattouche, the district court faulted the Bagby declaration and report for offering "only conclusions" that those references disclose all of the elements of each of the claims and that all of the claims would have

been obvious. The court stated that "[t]here is no delineation as to what elements of the claims are absent from any particular one of the references that are supplied by the other reference in the combination of Fattouche and Rault."

That criticism of Buffalo's evidence is misplaced. Mr. Bagby's report contains a limitation-by-limitation analysis of each of the claims and sets forth where each limitation of the claims is found in the various prior art references. Moreover, as the district court elsewhere acknowledged, CSIRO's expert admitted that Rault discloses the modulation means, the data reliability enhancement means, and the interleaving means recited in independent claims 42, 56, and 68. The only limitation of the asserted independent claims that the district court found not to be disclosed in Rault was the "in a confined multipath transmission environment" (i.e., indoor environment) limitation. As to that limitation, however, CSIRO conceded, as the district court noted, that "Fattouche does disclose a system for use indoors."

With respect to the combination of the two IEEE publications authored by Rault and by Wilkinson, the district court criticized Mr. Bagby's analysis as "cursory." The court stated that the evidence of motivation to combine the references was limited to the "common desire to deal with multiple propagation effects" and Mr. Bagby's conclusion that it would be natural for one of skill in the art to combine the references because IEEE publications are primary sources of technical information. Invoking the so-called "teaching, suggestion, and motivation" ("TSM") test, the district court held that the evidence was insufficient to show a sufficient teaching, suggestion, or motivation to combine those references. The court based its conclusion on the ground that there is "an important distinction between the general motivation to address a problem and the

motivation to create a particular solution to the problem." According to the court, Buffalo did not "proffer[] specific evidence as to the source of a teaching, suggestion, or motivation to combine the prior art references." What the court found lacking in Buffalo's submission was "identification of any specific evidence in the combination of references (or anywhere else in the record) that suggests combining them in a manner that results in the claimed subject matter."

B

Buffalo argues that the district court's analysis of the evidence submitted on summary judgment and its reliance on the absence of any specific teaching, suggestion, or motivation to combine the prior art references was erroneous, particularly in light of the Supreme Court's recent decision in KSR International Co. v. Teleflex Inc., 127 S. Ct. 1727 (2007). In KSR, which was decided after the district court entered its summary judgment order in this case, the Supreme Court criticized this court's application of the TSM test for being unduly rigid. The KSR case involved the same kind of problem that is presented here—the question of obviousness as applied to an invention that consists of a combination of elements, all of which are found in prior art references. In that setting, the Court stated, a "combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." Id. at 1739.

In addressing the TSM test, the Supreme Court acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," but the Court warned against converting that inquiry into a "rigid and mandatory formula[]."

KSR, 127 S. Ct. at 1741.  The Court criticized this court's application of the TSM test as focusing only on the precise problem the patentee was trying to solve.  Under the correct analysis, the Court wrote, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." Id. at 1742.

The Court further criticized this court for "its assumption that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem."  127 S. Ct. at 1742.  To the contrary, the Court explained, "familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle. . . .  A person of ordinary skill is also a person of ordinary creativity, not an automaton." Id.

In light of the analytical framework set forth by the Supreme Court in KSR, the district court's analysis of the summary judgment dispute was flawed.  As noted, the trial court found (and CSIRO's expert acknowledged) that Rault teaches all of the limitations of the independent claims except for use in an indoor environment. Moreover, Buffalo points out that Rault and Wilkinson both address the multipath problem, and that Wilkinson and Fattouche address solutions to that problem in an indoor environment.  As Mr. Bagby explained in his report, although Wilkinson is principally directed to other methods of dealing with the multipath problem, it refers to dealing with that problem in "an indoor environment," and it specifically refers to the use of COFDM "to achieve increased information rates" in a radio frequency LAN where it is necessary to "combat severe multipath."   Like Rault and Wilkinson, Fattouche

addresses the multipath problem, and like Wilkinson, it discloses the use of OFDM in a wireless LAN. Moreover, Fattouche expressly states that its system "can be used indoors as well as outdoors using the same transceivers."

Buffalo argues that the suggestion to combine Rault with Wilkinson or Fattouche derives from the fact that all three references address the same problem: solving the multipath problem that affects wireless radio communications in hostile environments. In his declaration, Mr. Bagby pointed out that the common thread in each of those references "is the express focus[] on the specific area of multipath reflection problems in wireless communications," which is "precisely the same problem that the '069 Patent purports to solve." Moreover, Mr. Bagby stated that Rault prescribes the use of "frequency division multiplexing, coding and/or interleaving to specifically mitigate the multipath problem" in the context of a wireless radio frequency communication. Accordingly, Mr. Bagby concluded, "it would be natural for one skilled in the art to combine these references." Furthermore, Mr. Bagby stated that "multipath is an inherent aspect of radio signal propagation, whether indoor or outdoor." Therefore, he concluded, the prior art solutions for mobile radio communications were equally applicable to indoor radio communications.

In defense of the district court's summary judgment order, CSIRO argues that Mr. Bagby did not proffer sufficient specific evidence as to the source of a teaching, suggestion, or motivation to combine the cited references. CSIRO cites the declaration of its expert, Dr. Bantz, who stated that in his work on wireless LANs at IBM, the use of OFDM "was almost immediately dismissed . . . as unsuitable for an indoor wireless environment." CSIRO further asserts that "the propagation of radio waves indoors is

very different than propagation out-of-doors, and was poorly understood" at the time of the invention.  Because relatively low-speed outdoor radio applications were regarded as presenting a very different problem from indoor LANs requiring a high data rate, CSIRO contends that there would have been no reason to combine Rault with either Wilkinson or Fattouche.  Accordingly, CSIRO argues, this is not a case "where there could have been a simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement."

CSIRO's argument is highly factual and underscores the factual nature of the dispute that is at the core of the obviousness issue presented in this case.  While the ultimate question of patent validity is a question of law, the proper resolution of that ultimate question typically turns on underlying factual inquiries, including the scope and content of the prior art and the differences between the prior art and the claims at issue.  See Graham v. John Deere Co., 383 U.S. 1, 17 (1966).  CSIRO's contention that the prior art deals with a problem that is not directly analogous to the problem facing the inventors of the '069 patent is a factual question that has been put into issue by Mr. Bagby's declaration and report and cannot be resolved on summary judgment.

CSIRO's argument also fails to take sufficient account of the Supreme Court's ruling in KSR that "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." 127 S. Ct. at 1742.  Buffalo introduced evidence that all of the references on which it relied were directed to solving the same problem—the multipath problem for wireless communication using radio frequencies.  It also offered evidence that a person of ordinary skill in the art, seeking to solve that well-known

problem, would be motivated to look to references of the sort that Buffalo cited to the district court, including Rault, Wilkinson, and Fattouche. While CSIRO offered evidence to counter Mr. Bagby's declaration and report, the facts set forth in the competing expert presentations in this case cannot be resolved on summary judgment on the grounds invoked by the district court.

Even before KSR, this court had made clear that the motivation to combine particular references could be found in the nature of the problem to be solved. In re Gartside, 203 F.3d 1305, 1320-21 (Fed. Cir. 2000); Pro-Mold Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1573 (Fed. Cir. 1996) (motivation to combine "may also come from the nature of a problem to be solved, leading inventors to look to references relating to possible solutions to that problem"). In that regard, this court's decision in Cross Medical Products v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293 (Fed. Cir. 2005), is instructive. In that case, as in this one, the district court granted summary judgment of nonobviousness over the accused infringer's objections. This court reversed the summary judgment, holding that there was sufficient evidence to create a triable issue of fact as to whether a person of ordinary skill in the art would have been motivated by the nature of the problem to combine references that offered ways to solve it. The problem in Cross Medical was that a particular surgical device used in back surgery was widely recognized as presenting difficulties to surgeons. That problem, the court held, "provided sufficient motivation to navigate the prior art in the spinal implant field in search of a teaching on how one might modify the [prior art] device" in the manner achieved in the patent. 424 F.3d at 1322. In the course of its discussion, the Cross Medical court rejected the argument that the problem addressed

by the patent differed somewhat from the problem encountered by surgeons who used the prior art device. "One of ordinary skill in the art," the court wrote, "need not see the identical problem addressed in a prior art reference to be motivated to apply its teachings." Id. at 1323.

In this case, the problem addressed by Rault, Wilkinson, and Fattouche was the same, or at least quite similar—the multipath problem encountered by systems of radio frequency communications in hostile environments. All of the references addressed the problem and suggested the use of an OFDM-based system to solve the problem. Wilkinson involved indoor applications and suggested the use of COFDM to achieve high rate communications in a very hostile environment; Fattouche suggested the use of OFDM for indoor wireless communications between transceivers, and Rault suggested the combination of COFDM and the other elements of the invention in a hostile urban environment. As in Cross Medical, the problems addressed by the references are sufficiently similar to the problem presented by high-speed indoor wireless LANs that there is a factual question whether a person of skill in the art would have looked to the teaching of those references in seeking to solve the multipath problem for a wireless indoor LAN. See In re Translogic Tech., Inc., 504 F.3d 124, 1262 (Fed. Cir. 2007) ("court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ"; a person of ordinary skill in the art "would have solved this design need by pursuing known options within his or her technical grasp"); In re Dillon, 919 F.2d 688, 694 (Fed. Cir. 1990) (en banc) (a reference is not from non-analogous art if "the reference is reasonably pertinent to the particular problem with which the inventor was involved"). Thus, as in Cross Medical, there is a

factual issue as to the motivation to combine prior art references that requires that we vacate the district court's order of summary judgment with respect to obviousness.

C

CSIRO makes several alternative arguments in support of summary judgment, arguments that the district court did not address. First, CSIRO argues that the secondary considerations addressed in its experts' declarations show that the claims of the '069 patent would not have been obvious. In <u>Graham</u>, the Supreme Court held that secondary considerations such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented" and "may have relevancy" as indicia of obviousness or nonobviousness. 383 U.S. at 17-18.

In his declaration, CSIRO expert David Bantz stated that while he was with IBM in 1988, he worked on the problem of an indoor wireless connection for computers and that neither his group nor others working in the field came up with the solution that CSIRO invented. He added that he was surprised that CSIRO had "approach[ed] the problem through the use of OFDM, an approach rejected by IBM and by every other company of which I was aware," and he concluded that CSIRO had "hit on the solution that so many others, including IBM, had tried but failed to find." A second CSIRO expert, Allen Levesque, summarized several approaches that had been tried in the field of wireless LANs by the early 1990s and concluded that there had been "considerable, but ultimately unsuccessful efforts expended by leading technical organizations attempting to meet the need for an effective wireless alternative to traditional cabled LANs."

The secondary consideration evidence offered by CSIRO's experts would be useful to a trier of fact in determining whether the invention of the '069 patent would have been obvious to a person of ordinary skill at the time of the invention, as we have recognized that such evidence "constitutes independent evidence of nonobviousness." Ortho-McNeil Pharm., Inc. v. Mylan Labs., 520 F.3d 1358, 1365 (Fed. Cir. 2008); see also Gambro Lundia AB v. Baxter Healthcare Corp., 110 F.3d 1573, 1579 (Fed. Cir. 1997). But it does not justify the entry of summary judgment in CSIRO's favor in light of the evidence Buffalo introduced as to the primary considerations bearing on obviousness. That is particularly true in light of the fact that Buffalo offered evidence explaining why those seeking to devise high-speed wireless LANs in the early 1990s did not succeed. Buffalo's expert stated that those working on such projects were constrained by market considerations requiring, for example, that wireless LAN adaptors be usable with personal computers and thus be relatively inexpensive. Because of the state of the art of silicon process development, Buffalo's expert stated that LANs operating at high frequencies were not commercially attractive at that time. Moreover, he explained that in the United States in the early 1990s, limitations on the use of desirable portions of the radio spectrum discouraged the development of wireless LAN systems. The secondary consideration evidence, like the evidence with regard to the primary considerations, thus presents factual issues for a trier of fact.

CSIRO also argues that Buffalo failed to show that the prior art references disclosed the elements of the asserted claims in the same order that they appeared in the claims and that the references failed to disclose the particular structures corresponding to the means-plus-function limitations in the asserted claims. While the

district court did not address that issue, we note that Rault on its face appears to contemplate a structure having the disclosed elements in the same order as in the asserted claims. In Rault's diagram of a receiver according to the described structure, Rault depicts a demodulator, a deinterleaver, and data reliability enhancement mechanisms, in that order. The reverse sequence of structures in the corresponding transmitter would be lined up in exactly the order recited in the asserted claims of the '069 patent.

Next, CSIRO argues that Buffalo's references do not "show structure corresponding to the structure found for the means-plus-function elements of the patent." CSIRO is apparently referring to the structures disclosed in the specification of the '069 patent that correspond to the modulation means, the data reliability means, and the interleaving means. One of the inventors testified, however, that interleaving, multi-level modulation, and data reliability enhancement in the form of forward error correction were all well known in the art at the time of the invention. He added that the elements that performed those functions in the system of the invention were also known in the art. In its brief to the district court, CSIRO made the same admission, acknowledging that "[t]he Wireless LAN system disclosed in the '069 patent is comprised of a variety of elements, all of which were known in the prior art." Furthermore, Mr. Bagby stated that the structures disclosed in Rault corresponded to the structures described in the '069 patent, and CSIRO offered no contrary evidence on that issue. Finally, CSIRO's argument is seemingly at odds with the representation of its own expert, Peter Molsen, who characterized each of those limitations as having

been disclosed in Rault. The summary judgment therefore cannot be sustained on this ground.

CSIRO's last contention is that even if Buffalo has shown that the independent claims would have been obvious, it has not made that showing in the case of the dependent claims. Mr. Bagby presented a limitation-by-limitation analysis of the dependent claims as well as the independent claims. CSIRO's showing in the district court with respect to the dependent claims consisted principally of a claim chart in which its expert asserted, without elaboration, that various limitations of the independent and dependent claims were not found in particular references. The district court did not address the dependent claims at all in connection with the obviousness summary judgment order. In light of the absence of any discussion of the dependent claims by the district court and in light of the conflicting expert evidence as to the dependent claims, we are not prepared to hold that the record at this point supports a summary judgment of nonobviousness as to those claims.

In sum, we conclude that the evidence offered by Buffalo created a genuine issue of material fact as to whether there was a motivation to combine prior art references dealing with the multipath problem and whether the combination of those prior art references disclosed all of the limitations of the independent claims of the '069 patent. We therefore vacate the district court's summary judgment of nonobviousness and remand for further proceedings on that issue.

V

Buffalo next argues that the applicant for the '069 patent impermissibly added new matter to the application, in violation of 35 U.S.C. § 132, when the applicant

amended the application on July 3, 1995, and that the asserted claims of the '069 patent, all of which were first added to the application at that time, are invalid under the prohibition against adding new matter, which this court enforces under 35 U.S.C. § 112, ¶ 1, because the claims are not supported by the disclosure in the original application.

As originally filed, the application identified the invention as relating to a wireless LAN "in which the devices communicate by way of radio transmissions." Several statements in the specification, however, referred to radio transmissions at frequencies "in excess of 10 GHz," and the claims were limited to transmissions in that frequency range.

The 1995 amendment to the application replaced several of the references to frequencies in excess of 10 GHz with the words "radio frequencies." The effect of the change was to increase the range of frequencies specifically referenced by the affected passages from radio frequencies in excess of 10 GHz to frequencies ranging from 3 KHz to 300 GHz, which the parties agree is the conventional understanding of the range of "radio frequencies." The same amendment added new claims, including the claims asserted in this case, that did not contain references to frequencies in excess of 10 GHz. Instead, the new claims referred to transmissions at "radio frequencies."

Buffalo argues that the effect of those changes was to broaden the disclosure of the patent, thereby improperly adding new matter to the application, in violation of section 132. As a consequence, Buffalo contends that the new claims that were introduced at that time are invalid in light of the written description requirement of section 112, paragraph 1.

The question presented by this issue is whether the specification of the original application contained a written description of the invention sufficient to allow persons of ordinary skill in the art to recognize that the inventor invented the subject matter that is claimed in the asserted claims. Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 993 (Fed. Cir. 1999).[1] If it did not, the legal consequences would be that the 1995 amendment would be considered to have added new matter to the application, and the newly added claims would not be supported by the original specification.

While Buffalo has asserted both "new matter" and "written description" violations, the two issues turn on a single question in this case: whether the 1995 amendment to the specification broadened the disclosure of what the inventors invented. As Buffalo acknowledges, "Whether you call this a written description issue or a new matter issue, you end up at the end of the day at the same point. And it is really the same analysis as to what happened." Because the first question in the inquiry is whether the amendment to the specification added new matter to the application, and because the disposition of the written description issue turns on the answer to that question, we address Buffalo's argument under the rubric of new matter.

---

[1]     Quoting from the district court's opinion, Buffalo argues that the court applied the wrong standard to this issue, requiring Buffalo to show that the disclosure contained a clear statement restricting the scope of the invention. While it is true that the district court at one point employed language suggesting the use of that more restrictive standard, other references throughout the court's lengthy treatment of the issue demonstrate that the court understood and applied the correct standard. At the outset of its discussion of the issue, for example, the court correctly stated that "[i]n order to satisfy the written description requirement, the disclosure of the application for the '069 patent must reasonably convey to one skilled in the art that the inventors were in possession of the claimed subject matter to the extent of the scope of the asserted claims."

The question whether new matter has been added to an application is a question of fact. Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1574 (Fed. Cir. 1992). As noted above, the trial court was authorized by the parties to act as the finder of fact with regard to any disputed facts relating to the section 132 validity issue. The district court made a reference to the absence of any genuine issue of material fact, which calls into question whether the court regarded the issue as presented to it as fact-finder or presented as a summary judgment issue. Immediately after that reference, however, the court made the following statement: "Buffalo has failed to demonstrate by clear and convincing evidence that the written description of the Australian application could not or does not reasonably convey to one of skill in the art that the inventors were in possession of the claimed subject matter of the asserted claims." In light of that statement, we interpret the court's action as constituting a ruling on the section 132 issue on both legal and factual grounds, including making findings of fact based on the evidence submitted to the court, as the court was permitted to do by the parties' stipulations. We therefore review the district court's new matter ruling under the clear error standard.

Moreover, in the context of a validity challenge based on new matter, the fact that the United States Patent and Trademark Office ("PTO") has allowed an amendment without objection "is entitled to an especially weighty presumption of correctness" in a subsequent validity challenge based on the alleged introduction of new matter. Brooktree, 977 F.2d at 1574-75 (citations omitted). Buffalo therefore not only must overcome the clear error standard, but it must do so in the face of a

presumption of validity based on the PTO's issuance of the patent despite the amendments.

Viewed in isolation, the substitution of the references to "radio frequencies" in place of the references to the minimum transmission frequency of 10 GHz in the original application is suggestive of a broadening of the disclosure. Reviewing the application as a whole, however, we conclude that there is enough material in the original disclosure to support the district court's finding that the invention was in fact broader than systems operating only in the frequency range "in excess of 10 GHz."

At the outset, it is important to note that no one has suggested that the 10-GHz minimum reflects a distinction that has any technical significance. Nor has Buffalo sought to show that transmissions above 10 GHz and transmissions below 10 GHz are distinct in any way relevant to patentability. To the contrary, it is apparent from the original application itself that the references to the 10-GHz minimum transmission frequencies were presented as useful embodiments of the invention, not as limitations to the invention as a whole. For example, the reference in the abstract to a "wireless transceiver and method of transmitting data, all of which are capable of operating at frequencies in excess of 10 GHz" (emphasis added) suggests a system that has the capacity to operate at those frequencies, not one that is limited to that frequency range. Similarly, each of the references to transmission of radio frequencies "in excess of 10 GHz" in the portion of the specification that was amended were in the context of descriptions of particular embodiments of the invention. Those passages do not make express reference to lower transmission rates, but they also do not express a limitation on the scope of the invention.

Importantly, even in the original specification the references to frequency range were not limited to frequencies in excess of 10 GHz. There is one explicit reference in the original specification to a transmission rate of less than 10 GHz. The application refers to the need to "have a relatively high transmission rate and therefore transmit on a relatively high frequency, of the order of 1 GHz or higher." That reference provides explicit support for a lower transmission rate, at least down to the order of 1 GHz. That reference also makes clear that the choice of high frequency is simply a preference, in light of the higher transmission speeds available at that frequency, not a requirement driven by some limitation on the capacity of the invention.

A more subtle allusion to a different frequency range is found in Figure 6 of the '069 patent, which was present in the original application. That figure contains a reference to an output of 2-3 GHz, which is then combined with a carrier wave having a frequency of 58 GHz to produce a broadcast frequency of 60-61 GHz for external transmission. Figure 6 does not directly disclose a sub-10-GHz transmission system, but it would appear to be clear to a person of ordinary skill in the art that the step up in frequency from 2-3 GHz to 60-61 GHz is an optional step that is separate from and not essential to the operation of the invention. That is, Figure 6 can be viewed as disclosing two discrete pieces of equipment, the first operating at 2-3 GHz and the second consisting of a standard frequency step-up device that operates at a higher frequency. Viewed in that manner, Figure 6 supports CSIRO's argument that the invention described in the original application was not confined to a frequency range in excess of 10 GHz.

The testimony of Buffalo's expert, Mr. Bagby, provides additional support for concluding that the district court did not commit clear error in its resolution of the new matter issue. Mr. Bagby admitted that Figure 6 discloses to a person of ordinary skill in the art that one would not need to step up the transmission rate to 61 GHz, but instead could transmit at much lower rates, as long as the carrier frequency stayed at or above 2-3 GHz, which is the output of the transmitter that is at the heart of the invention. In fact, Mr. Bagby admitted that one skilled in the art "would understand from [Figure 6] that if you wanted to you wouldn't have to step it up at all and you could simply transmit at 2 to 3 GHz if sufficient bandwidth were available to do that." In response to a question whether one could transmit at the 2.4 GHz ISM band by using Figure 6 "and simply eliminating the step-up/step-down oscillator," he stated, "It's a possibility." And in response to the ultimate question whether Figure 6 "disclose[s] the fact that this invention can be used at less than 10 GHz," Mr. Bagby responded, "If there is sufficient bandwidth, then this is a possibility."

It is true that Mr. Bagby later stated that he believed the originally filed application was "intended to be 10 GHz and up," but that later statement merely refers to the express contents of the original application; it does not undermine Mr. Bagby's earlier testimony that one of ordinary skill in the art would understand from the original application that it discloses an invention that is operable at lower frequencies. Moreover, that is the way the trial court understood and characterized Mr. Bagby's statement. The court observed that Mr. Bagby's statement "does not address the question as to what the statement in the [original] application would mean to one skilled in the art in regard to whether the inventors were in possession of the subject matter of

the asserted claims" and that Mr. Bagby's statement "does not indicate that one skilled in the art would necessarily understand the statement in the Australian application and the teaching to use OFDM as a solution to multipath to mean that the inventors were addressing a problem that only occurs at frequencies in excess of 10 GHz." In its capacity as fact-finder, the trial court was justified in relying in part on Mr. Bagby's admissions to conclude that the original application disclosed an invention that could operate below 10 GHz.

Significantly, CSIRO's expert, Dr. Andrews, testified that one of skill in the art would understand from the original specification that the inventors of the '069 patent had invented, were in possession of, and had described a digital communication technique "that could be operated successfully over the radio spectrum, including frequencies over 10 GHz and frequencies down below even 1 GHz." Dr. Andrews explained that the techniques described in the patent were frequency independent and therefore that there is no reason a person of skill in the art would expect them to operate differently at frequencies above 10 GHz than at lower frequencies within the radio portion of the electromagnetic spectrum.

Finally, as additional support for its finding on the new matter issue, the district court relied on the testimony and publications of the inventors to find that they were in possession of and had described an invention that was not limited to operation at frequency levels above 10 GHz. Inventor O'Sullivan testified that in the work that led up to the patent application the inventors had "proposed experimentation at 40 [GHz]" and "demonstrated measurements at 2.4 GHz," and that "the testbed developed actually operated initially at 2.4 [GHz]." The court also referenced a publication co-authored by

two of the inventors that discussed choosing 60 GHz as the transmission frequency because "[n]one of the bands below 60 GHz has more than 100 MHz available and are in congested parts of the spectrum where expansion is not possible. Therefore, these are not likely candidates for use in a high-speed WLAN system." The court found that the "inventors' testimony is clear [with respect to the references to 10 GHz] that they were only attempting to identify an area of the radio frequency spectrum where there was sufficient bandwidth available for the higher data rates sought. The inventors' testimony does not compel a conclusion that they were in possession of an invention that only worked at frequencies in excess of 10 GHz." Thus, acting as finder of fact, the district court concluded that the inventors were in possession of and had described an invention that was not limited to operation above 10 GHz and that a person of ordinary skill would not interpret the original application to be so limited.

For the reasons given above, we uphold the district court's ruling refusing to invalidate the asserted claims based on the alleged improper addition of new matter to the application. Buffalo has not offered a sufficient basis for us to conclude that the district court's finding on that issue was clearly erroneous and thus has failed to overcome the demanding burden imposed on it by the applicable standard of review.

VI

Buffalo next challenges the district court's finding that it infringed claims 42-48, 56-60, and 68-72 of the '069 patent. In so doing, Buffalo focuses on the means-plus-function limitations that recite "means to apply data reliability enhancement" and "means for interleaving blocks of said data." Those limitations are found in independent claims 42 and 56 as well as in their dependent claims. Claim 68 and its dependent

claims are method claims and do not contain means-plus-function limitations, although they each contain limitations closely analogous to the means-plus-function limitations at issue.

A

Under section 112, paragraph 6, of the Patent Act, 35 U.S.C. § 112, ¶ 6, a patentee may express an element in a claim as a means for performing a specified function without reciting the particular structure that performs the recited function.   In such a case, the "means-plus-function" limitation "must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.  Literal infringement of a section 112, paragraph 6, limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1266-67 (Fed. Cir. 1999) (internal citations and quotations omitted).

The district court construed one of the means-plus-function limitations of the asserted independent claims—the "means to apply data reliability enhancement" limitation—as corresponding to the "[r]ate ½ TCM (trellis coded modulation) encoder described in block 42 of Figure 7 and references at 6:32-46" of the '069 patent.  Buffalo does not dispute that its accused devices perform the function recited in that limitation. Thus, the question for infringement purposes is whether the devices have a structure that is identical or equivalent to the structure disclosed in the specification.   Buffalo argues that its devices contain "convolutional encoders," which are not the same as, or equivalent to, the structure identified in the specification of the '069 patent.

As noted by Buffalo's own expert, Mr. Lanning, the rate ½ TCM encoder discussed in the '069 patent has two sub-components, each of which performs a distinct function. The first is a convolutional encoder, which the parties agree performs the data reliability enhancement function of the means-plus-function limitation. The second subcomponent performs what the parties have referred to as signal mapping. Buffalo argues that the functions of the two subcomponents of the rate ½ TCM encoder are inseparable and therefore if its accused products do not perform both functions of the encoder as a whole, then the devices do not infringe the claims. Mr. Lanning, however, conceded that the subcomponents and their functions are distinct. He explained that after generating the convolutional encoder output, "[t]hen you have to generate the TCM output. [Convolution encoding] is only the first step in the process . . . only the start. The TCM encoding then takes place on the output of the Convolution Encoder, as well as considering other input bits that have not come from the Convolution Encoder." Because the second subcomponent of the rate ½ TCM encoder receives output from the first subcomponent and then processes that input, the two subcomponents are properly viewed as separable and distinct, even though the patent describes them as performed by a single device. Therefore, Buffalo is essentially arguing that its products do not infringe because its convolutional encoders are not coupled to a second subcomponent that performs signal mapping.

Buffalo does not avoid infringement simply because the device disclosed in the patent subsequently performs a function distinct from that required by the data reliability enhancement means limitation. With respect to that function, Buffalo has not offered any reason to conclude that the convolutional encoder in its products is not identical or

equivalent to the convolutional encoder that is part of the data reliability enhancement means described in the patent. Although the trial court stated that the rate ½ TCM encoder corresponds to the data reliability enhancement means, it is clear from the court's discussion of the issue that it was comparing the separable convolutional encoding subcomponent of the disclosed rate ½ TCM encoder to the accused devices.

As part of its argument, Buffalo points out that, in an embodiment disclosed in the '069 patent, the output of the rate ½ TCM encoder is sent to a quadrature phase-shift keying encoder by way of an interleaver. '069 patent, col. 2, ll. 38-41, Figure 7. Buffalo then points to the testimony of Mr. Lanning to argue that the patented device would not work properly if Buffalo's convolutional encoder were used in place of the rate ½ TCM encoder, which includes the signal mapper. That argument, however, simply restates the point that Buffalo's convolutional encoder differs from the rate ½ TCM encoder in that the latter contains both a convolutional encoder and a signal mapper. Buffalo does not argue that there is any relevant difference between its convolutional encoder and the convolutional encoding subcomponent of the TCM encoder. Nor does Buffalo dispute that if one were to add a signal mapper to its device connected serially to its convolutional encoder, it would provide an appropriate output to the interleaver and the quadrature phase-shift keying encoder. The district court therefore properly concluded that the accused devices contain structure that performs the data reliability enhancement function of that means-plus-function limitation and that the structure that performs that function in the accused devices is identical or equivalent to the structure described in the '069 specification.

B

Buffalo's second non-infringement argument is that its devices do not have structure that performs the "means . . . for interleaving blocks of said data" as required by the asserted claims.    Buffalo concedes that its products perform bit-by-bit interleaving.  It contends, however, that the trial court erred in construing "blocks of data" to mean "blocks of data having one or more bits." Buffalo contends that under the normal meaning of the term "block," a "block of data" consists of two or more bits and that to construe a block of data as consisting of one or more bits impermissibly reads the term "block" out of the claims.  We disagree.  There is no suggestion in the use of the term "block of data" that the data must be contained in a plurality of subparts or components.    While in ordinary parlance, a "block" is generally considered to be a group acting or treated as a unit, even in that context there is no requirement that every "block" or group contain multiple members (for example, the independent block in the U.S. Senate currently consists of one Senator).  In the context of computer engineering, the term "block of data" typically refers to any unit of data that is the subject of some operation; it is irrelevant to the definition of "block" whether it consists of a single bit or many.  For example, the IBM Dictionary of Computing (10th ed. 1993), defines the term "block" to include "one or more records" or "one or more logical records."  Id. at 67. Therefore, in this context, a block of data is most reasonably understood to consist of one or more bits.  Nor does the fact that the patent describes a di-bit interleaver and the interleaving of data in two-bit blocks mean that the claims must be limited to devices

that interleave blocks consisting of at least two bits.[2]  See Ventana Med. Sys. v. Biogenex Labs., Inc., 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

In any event, CSIRO points out that the '069 patent discloses an embodiment employing binary phase shift keying ("BPSK"), which it contends requires single-bit interleaving.  '069 patent, col. 9, line 29, through col. 10, line 2.  Buffalo's expert conceded that BPSK requires single bit interleaving.  In its reply brief, Buffalo appears to agree that the BPSK embodiment requires single-bit interleaving:  "Although the BPSK embodiment described in the dependent claims would be combined with a single-bit interleaver, the dependent claims cannot broaden the corresponding structure for the 'means . . . for interleaving blocks of data.'"  Because the evidence indicates that a BPSK embodiment discloses a single bit interleaver (and thus single-bit blocks), we conclude that the specification supports the district court's construction of the term "blocks of data" to refer to data packets consisting of one or more bits of data.  We therefore sustain the trial court's decision construing the term "blocks of data" to refer to data consisting of one or more bits.

Buffalo next argues that its products do not infringe because they use single-bit interleavers, which are not the structural equivalents of the di-bit interleavers disclosed in the specification.  In response to that argument, the district court referred to what appears to be uncontroverted evidence from the declaration of CSIRO's expert, Dr.

---

[2]    Buffalo does not contend that the '069 patent is limited to the described embodiment using pairs of bits.  For example, Buffalo seems to agree that a device interleaving blocks of four bits would infringe the claims.

Monsen, that "interleavers that handle different block sizes are insubstantially different." Instead of arguing that the di-bit and single-bit interleavers are somehow significantly different devices, Buffalo instead argues that the type of interleaving performed is different. In doing so, however, Buffalo is simply returning to its argument about the appropriate construction for the term block size. The proper inquiry is whether there are insubstantial differences in the way that the interleavers operate on data and the result that is obtained. Based on the uncontroverted evidence, the district court permissibly concluded that the accused device and the structure in the patent interleave data in substantially similar manners and produce the same result: interleaved blocks of data. We therefore uphold the trial court's finding of infringement.

VII

Buffalo challenges the district court's decision to enter a permanent injunction in this case, and several amici have filed briefs supporting and opposing the issuance of injunctive relief rather than remitting CSIRO to its legal remedy of an award of damages. Because we are remanding this case to the district court for further proceedings on the issue of obviousness, we do not reach the question whether the entry of a permanent injunction constituted an abuse of discretion.

Each party shall bear its own costs for this appeal.

AFFIRMED IN PART, VACATED IN PART, and REMANDED.

# United States Court of Appeals for the Federal Circuit

2007-1449

COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,

Plaintiff-Appellee,

v.

BUFFALO TECHNOLOGY (USA), INC.
and BUFFALO, INC.,

Defendants-Appellants.

Appeal from the United States District Court for the Eastern District of Texas
in case no. 2:05-CV-53, Judge Leonard Davis.

LOURIE, Circuit Judge, concurring.

I join the court's opinion and concur in its judgment on the basis of the thorough analysis by Judge Bryson and the standard of review by which we review district court decisions. However, the case is very close and there is a sound basis for an alternative conclusion, viz., that the patent is invalid for violation of the prohibition against introduction of new matter. I believe it is worthwhile to briefly note that alternative basis.

The written description of the patent states that the radio transmissions at which the claimed wireless LAN operates are at > 10 GHz. Figure 6 does not disclose otherwise, and testimony indicated that it was a mere "possibility" that the invention could be used at less than 10 GHz. However, by amendment, applicants cancelled portions of the specification that stated that the transmissions of the invention occur at > 10 GHz, leaving only one such reference and substituting other paragraphs stating that the invention operates "at radio frequencies." The granted patent eventually contained claims reciting "at radio frequencies," not limited to "in excess of 10 GHz."

The patentees have now asserted such broader claims against transceivers that apparently would not infringe the original, more limited claims.

The new matter statute, 35 U.S.C. § 132, provides that "[n]o amendment shall introduce new matter into the disclosure of the invention." In my view, given the total record in the case, it would be reasonable to conclude that applicants changed the nature of the specification by amendment from one describing their invention as being one operating at > 10 GHz to one lacking that limitation. Such a change could well be viewed as the introduction of new matter that invalidates the patent.

Notwithstanding the above, given the fact that the district court found otherwise, and the court's persuasive analysis, I join the court, having noted what I believe is a reasonable alternative view.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By: _Valerie_____  Date: _10/24/08_