1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JAMES M. WAGSTAFFE (95535)
wagstaffe@kerrwagstaffe.com
MICHAEL NG (237915)
mng@kerrwagstaffe.com
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105–1528
Telephone: (415) 371-8500
Fax: (415) 371-0500


Attorneys for Defendant
COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH
ORGANISATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| CISCO-LINKSYS LLC, CISCO SYSTEMS, INC. AND CISCO SYSTEMS WIRELESS NETWORKING (AUSTRALIA) PTY, LTD.<br><br>        Plaintiffs,<br><br>    v.<br><br>COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,<br><br>        Defendant. | Case No. SACV0900178-DOC(MLG)<br><br>**DECLARATION OF DENIS REDFERN IN SUPPORT OF DEFENDANT CSIRO'S MOTION TO DISMISS AND MOTION TO TRANSFER VENUE**<br><br>DATE: August 10, 2009<br>TIME: 8:30 a.m.<br>COURTROOM: 9D<br><br>TRIAL: [None]<br><br>**Hon. David O. Carter** |

I, Denis Leslie Redfern, FAICD, declare as follows:

1.     I am a resident of Pymble in the State of New South Wales, Australia. I make this declaration of my own personal knowledge, except where otherwise noted, and if called as a witness could and would testify competently thereto.

2.     I have worked in the electronics field since 1964, and am a Fellow of the Australian Institute of Company Directors.

3.     Between 1964 and 1970 I was employed by Plessey UK Ltd in various roles, and between 1971 and 1985 I was employed by Wormald International Aust. Pty. Ltd., also in various roles.  Between September 1985 and February 1990 I was employed by Austek Microsystems Pty. Ltd. and Austek Microsystems, Inc. in various roles, including chief executive of its United States operation based in Santa Clara, California.

4.     In or about June 1990, I was contacted by Dr. R.H. Frater of Commonwealth Scientific and Industrial Research Organisation ("CSIRO"), who asked me whether I would be interested in working with CSIRO.  This discussion led to a consulting assignment with CSIRO Division of Radiophysics. CSIRO subsequently offered me a position with its commercialization subsidiary, Sirotech Ltd., which I accepted.

5.     Since approximately September 1990, up to the present date, I have been employed in various capacities by CSIRO or its subsidiaries, either directly or through my company, Norsfield Pty. Ltd.  During my time at CSIRO, in addition to working on the wireless local area network ("WLAN") project, I have been involved in many other commercialization activities.  For the past four years until the present date, I have been directly employed by WLAN Services Pty. Ltd., a wholly owned subsidiary of CSIRO, assisting with its WLAN licensing program.

6.     CSIRO is Australia's national science agency, and one of the world's leading scientific research organizations.  It is an agency of the government of the Commonwealth of Australia, and was created in 1926 by the Australian

– 1 –

1  Parliament's passage of the Science and Industry Research Act.  CSIRO operates

2  pursuant to a 1949 amendment to the Act as an Australian government authority

3  under government control and direction, with ultimate reporting to the Minister for

4  Innovation, Industry, Science and Research.  A true and correct copy of the current

5  version of the Science and Industry Research Act is attached hereto as Exhibit A.

6  CSIRO is largely funded by the Australian government.

7         7.      Though its mission is wide-ranging, CSIRO has long nurtured a

8  particular expertise in radio technology, drawn from an Australian legacy

9  developed when that country served as the front line for Allied radar defenses

10  during the Second World War, and from its research in radio astronomy.

11         8.      In the early 1990s, as the world's leading computer companies

12  struggled to develop a workable technology for indoor wireless data

13  communications, CSIRO scientists worked out a solution to the myriad tricky

14  problems still befuddling the competing teams of researchers, and created the

15  essential technology behind what is now the standard for the latest generations of

16  wireless local area networks, or "WLANs."

17         9.      On or around December 10, 1990, I was retained by CSIRO to assist

18  in the marketing of intellectual property of its Division of Radiophysics, which led

19  to me being involved in the planning and creation of the Program for Local Area

20  Networks and Services ("PLANS").  PLANS had two subsidiary projects, one of

21  which was the Wireless Local Area Networks ("WLAN") project, devoted to

22  developing high-speed wireless networking technology.  One of the outcomes of

23  PLANS was the wireless networking invention for which CSIRO was later

24  awarded United States Patent Number 5,487,069 (the "069 Patent")—technology

25  at the core of the WLAN technology now in wide use and commonly referred to as

26  "Wi-Fi."  CSIRO also holds Australian, European and Japanese patents on the

27  technology.

28

10.     Additional work was needed to develop CSIRO's invention into a functional WLAN, including additional development of the various devices, circuits and systems that comprise a WLAN. For assistance with that effort, CSIRO turned to Macquarie University in Sydney, which had access to various computer systems and other facilities necessary to the further development efforts. Through a 1993 agreement between the two, CSIRO agreed to fund Macquarie to undertake simulation, testing, and microchip development aimed at further developing CSIRO's WLAN technology, a project that came to be known as the Devices and Systems Hardware Project, or "DASH."

11.     Pursuant to that agreement and a series of other amendments and proposals through 1997, CSIRO and Macquarie continued work to refine CSIRO's WLAN systems. Working through significant technical challenges, the joint project continued to refine the technology, and by 1997 was working on a functional prototype system, including a microchip known as the DMT50.

12.     In late 1997, three members of the Macquarie and CSIRO research team spun off from the CSIRO project to create a separate company aimed at developing commercial applications for CSIRO's WLAN technology. The three included one of the original CSIRO researchers, Terry Percival, and two others who worked on the Macquarie joint venture, Neil Weste and David Skellern. The three formed Radiata Communications Pty Ltd. ("Radiata").

13.     CSIRO and Radiata worked together closely. Between 1998 and 2002, CSIRO seconded staff to Radiata, and Radiata rented laboratory and office space from CSIRO through July 2000. In the early days of the company's existence, Radiata was housed in a shed in the back of a CSIRO facility in Marsfield, located in suburban Sydney. The arrangement benefitted Radiata, which was able to borrow equipment and workshop facilities from CSIRO.

14.     In December 1997, I was personally involved in negotiating a technology license agreement (the "TLA") between CSIRO and Radiata. The

TLA, dated February 23, 1998, was intended to enable Radiata to continue its efforts to prove the functionality and develop commercial applications for CSIRO's technology. The TLA granted Radiata a non-exclusive license to certain CSIRO technology. The document describes that technology in part as "Circuit descriptions, HDL code and test suites," a reference to such technology developed by CSIRO and Macquarie University in the late 1990s, including through their joint project. The technology licensed under the TLA was protected by patents issued in Australia, Japan and Europe, and the United States, all of which are listed in the TLA itself.

15. The TLA also imposed requirements on Radiata that benefitted CSIRO. For example, it granted CSIRO a permanent, free license in any improvements to the technology for research purposes, and a complete assignment of any such improvements upon termination of the agreement. The TLA also required Radiata to make best efforts to commercialize the technology and bring it to market, for example, mandating that it sell 10,000 products by the end of 2001.

16. The TLA, and all of its subsequent amendments, have included an explicit choice of law provision selecting the law of New South Wales to govern the contract. All of the negotiations concerning the TLA took place entirely in Australia. The Radiata and CSIRO staff and attorneys who were involved in the negotiations were all located in Australia, as were the senior management of CSIRO who approved the agreement and are all residents of Australia. The TLA was signed by all parties in Australia.

17. Attached hereto as Exhibit B is a true and correct copy of the TLA.

18. In 1999, the Institute of Electrical and Electronics Engineers ("IEEE") ratified Standard IEEE 802.11a. I have been informed by experts that CSIRO's United States Patent 5,487,069 is essential to practice that standard. I have also been informed that the '069 is essential to practice subsequent standards, IEEE

1  802.11g standard, released in 2003, and draft standard IEEE 802.11n, which is still

2  to be ratified.

3      19.    Though Radiata continued to develop potential applications for

4  CSIRO's technology, I have been informed that the company itself never marketed

5  a product.  Nevertheless, I am now aware that Radiata was negotiating with a

6  number of potential suitors concerning potential acquisition.

7      20.    In early 2001, Radiata informed CSIRO that it had agreed to be

8  acquired by Cisco Systems, Inc.  CSIRO was not involved in negotiations or any

9  other aspect of the prior agreement.  Radiata did, however, request that CSIRO

10  agree to amend the TLA to reflect the sale, and to grant Radiata the right to transfer

11  the TLA to a Cisco subsidiary.  CSIRO eventually agreed, and CSIRO and Radiata

12  entered a short amendment to the TLA dated February 1, 2001.  Cisco was not a

13  party to the amendment.  Attached hereto as Exhibit C is a true and correct copy of

14  that first amendment to the TLA.

15      21.    All of the negotiations concerning that first amendment to the TLA

16  took place entirely in Australia.  The Radiata and CSIRO staff and attorneys who

17  were involved in the negotiations were all located in Australia, as were the senior

18  management of CSIRO who approved the agreement and are Australian

19  government officials.  The amendment was signed by all parties in Australia.

20      22.    The amendment included the right to novate the TLA to one of the

21  "Cisco Group of Companies," defined as Cisco Systems (Bermuda) limited or

22  another wholly owned subsidiary of Cisco.  The novation agreement was to follow

23  a form that was originally intended to be included as an attachment to the

24  amendment, but the form deed of novation was never completed.

25      23.    The amendment also allowed Radiata or another licensee to grant a

26  sublicense of the technology for the purpose of manufacturing products for the

27  licensee.  Notice to and consent by CSIRO of the sublicense was required, and

28

KERR
&
WAGSTAFFE
LLP

– 5 –

1  transfer of the technology in a form that that would enable the sublicensee to

2  redesign or make improvements to the technology was forbidden.

3      24.    CSIRO engaged in no commercial activity in the United States in

4  connection with the TLA or its first amendment.

5      25.    Radiata, which was subsequently renamed Cisco Systems Wireless

6  Networking (Australia) Pty, Ltd., continued its active operations in Australia until

7  at least 2003, including the development of chips for Cisco, and continues its

8  separate corporate existence today.  Beginning in 2002 Cisco began paying

9  royalties under the TLA for certain chips that utilize WLAN technology.

10     26.    In August 2002, CSIRO and Cisco entered into a second amendment

11  that retroactively permitted Cisco to a sublicense the technology to Marvell

12  Technology Group, Ltd. and Marvell International Ltd., who I was informed had

13  been manufacturing chips for Cisco, and a few other clean-up matters.  I was also

14  involved with the negotiation of that second amendment, and signed it on CSIRO's

15  behalf.  That amendment, a true and correct copy of which is attached hereto as

16  Exhibit D, was negotiated at various locations in northern California, including at

17  Cisco's offices in San Jose.

18     27.    In 2003, Cisco purchased Linksys (now Cisco-Linksys LLC, a

19  plaintiff here), one of the leading manufacturers of WLAN networking products.  I

20  am aware from market studies that the purchase significantly expanded Cisco's

21  wireless product offerings.

22     28.    Starting in approximately 2003, a disagreement between the parties

23  arose concerning the amount of royalties paid under the TLA.  At its origin, the

24  parties' disagreement centered on the scope of the TLA and the breadth of any

25  right Cisco might have to a license under that agreement.  From their inception

26  through 2009, I was involved in discussions aimed at resolving those

27  disagreements.  (Pursuant to the protective order issued by the United States

28  District Court for the Eastern District of Texas in the various patent enforcement

1  cases involving the '069 Patent before that court, I elected to discontinue my

2  involvement in negotiations between CSIRO and Cisco related to the wireless

3  LAN field, and signed the undertaking required under that protective order on

4  April 29, 2009.  The statements contained in this declaration and otherwise set

5  forth in the brief supporting are not based on information learned in discovery in

6  the Eastern District of Texas cases except as authorized by that court's orders.)

7       29.     Over the course of those discussions and based on my own research

8  concerning those rights, we learned of a number of other breaches of the TLA,

9  including: (1) the failure to mark products with CSIRO's patent numbers, a clear

10  requirement under the TLA and necessary to put any subsequent purchasers on

11  notice of CSIRO's intellectual property rights; (2) the granting of certain

12  sublicenses without CSIRO's required consent; (3) the granting of sublicenses

13  purporting to allow sublicensees to grant additional sublicenses; and (4) the failure

14  to notify CSIRO of improvements to the licensed technology.  At various points in

15  negotiations, CSIRO gave Cisco written notice of said breaches.  One of Cisco's

16  sublicensees has participated in litigation against CSIRO asserting the invalidity of

17  CSIRO's patent rights related to the technology, also a violation of the TLA.

18  Though settlement negotiations have been ongoing since approximately 2003 in

19  both Australia and the United States, this dispute does not arise out of those

20  settlement negotiations but out of the original meaning of the TLA itself.

21       30.     At the end of 2008, those negotiations broke down, and on October

22  24, 2008, CSIRO informed Radiata and Cisco of its intent to terminate the TLA, as

23  was its clear right under sections 16 and 17 of the TLA, if Cisco did not cure its

24  breaches within the contractually specified period.  Cisco subsequently asked

25  CSIRO to extend the cure period to December 31, 2008, to which CSIRO agreed.

26       31.     Before that deadline was reached, Cisco filed this suit on Christmas

27  Eve, December 24, 2009.  Once the cure period had lapsed, CSIRO sent notice of

28  termination of the TLA.  I have been informed that Cisco amended its complaint to

reflect that termination.  I have also been informed that CSIRO filed suit (the "Australian action") a few days after the termination became effective in trial court in New South Wales, the Australian state whose law governs the TLA and all its amendments.

32.     I have been informed about the claims brought by Cisco in this suit, and am familiar generally with the dispute between the parties through my long involvement in negotiations between them.

33.     I am aware, for example, that the parties disagree as to the scope of the technology licensed under the TLA, which is defined in reference to the information actually transferred between CSIRO, Macquarie and Radiata, whether the design of Cisco products was derived from the technology obtained from the CSIRO/Macquarie joint venture, or it was generated independently.  Very little, if any, of the documents, code and other information concerning the transfer of technology to Radiata exists in CSIRO's records—all of it is, or at least was, housed in the records of Macquarie University.  I am aware from CSIRO's efforts in prior litigation related to the '069 Patent that CSIRO does not have access to or control over the Macquarie  records, and that accessing them is therefore likely to require a subpoena or other legal process.

34.     I am also aware that some of the relevant information is not documented at all, and therefore obtained only by testimony from witnesses involved in the early research efforts at CSIRO, Macquarie University and Radiata. I am aware that most if not all of those witnesses are still residents of Australia.

35.     For example, I am still in regular communication with each of the three founders of Radiata, all of whom still reside in Australia.  David Skellern is now the Chief Executive of NICTA, Australia's Information and Communications Technology Centre of Excellence, another research organization founded by the government of Australia, a position with significant time demands that make travel for other purposes difficult.  Terry Percival is the Director of NICTA's Sydney

1    Research Laboratory at Kensington. I am aware that Dr. Percival is scheduled to

2    undergo major surgery in the coming weeks that will limit his mobility and ability

3    to travel for the forseeable future. Neil Weste also resides in Australia, and like the

4    Dr. Percival and Dr. Skellern, is not an employee of CSIRO and not under its

5    control.

6        36.    I am also aware that two key CSIRO employees (Philip Ryan, a chip

7    designer, and John Olip) seconded to Radiata and therefore familiar with the

8    technology at issue are also still Australian residents. Similarly, John O'Sullivan,

9    who was responsible for critical work on CSIRO's original invention, is in

10    extremely poor health and unable to travel at all, much less to make the fourteen

11    hour flight to the United States. Even if they agreed to make themselves available,

12    certain of those witnesses may simply be unavailable for trial in the United States.

13    On information and belief, including my review of CSIRO and publicly available

14    records, other potential witnesses who have knowledge of the exchange of

15    technology with Radiata and other issues relating to Radiata's use of that

16    technology include: Tom McDermott, who worked in digital chips for Radiata;

17    Richard Keany, the head of hardware development for Radiata; Gordon Foyster,

18    who worked in microprocessor design; and Ludovico de Souza, Alireza Moini,

19    Said Al-Sarawi, Ari Parker, Geoff Smith, Andrew Adams, Chris Corcoran and

20    Alex Lam, all Radiata employees. None are current CSIRO employees. At the

21    time, all were Australian residents, and I have been informed that the results of

22    public record searches and other information acquired by CSRIO indicate that all

23    of these individuals remain Australian residents.

24        37.    I am also aware that the other witnesses with knowledge of the

25    CSIRO-Radiata agreements, the parties' intentions with respect to those

26    agreements, the circumstances surrounding those agreements and the approval for

27    the agreements are all Austrialians who still reside in Australia. To the extent that

28    witnesses are still within CSIRO's control, the cost of bringing them to the United

1  States for litigation purposes would be significant.  Any such cost would
2  necessarily impact the funding available for the agency's core scientific research
3  mission.

4      38.    CSIRO maintains no presence in southern California.  In contrast, I
5  am aware that Cisco maintains a number of offices in Australia, including an
6  Australian headquarters located in North Sydney, in New South Wales.

7

8      I declare under penalty of perjury under the laws of the United States of
9  America that the foregoing is true and correct.  Executed on this 15th day of July,
10  2009, at North Ryde, Australia.

11

12

13

14

15      _____
16          Denis Leslie Redfern

17

18

19

20

21

22

23

24

25

26

27

28

KERR
WAGSTAFFE
LLP

# EXHIBIT A



# Science and Industry Research Act 1949

**Act No. 13 of 1949 as amended**

This compilation was prepared on 10 September 2007
taking into account amendments up to Act No. 84 of 2007

The text of any of those amendments not in force
on that date is appended in the Notes section

The operation of amendments that have been incorporated may be
affected by application provisions that are set out in the Notes section

Prepared by the Office of Legislative Drafting and Publishing,
Attorney-General's Department, Canberra

# Contents

**Part I—Preliminary** 1
1 Short title [*see* Note 1]................................................1
2 Commencement [*see* Note 1].........................................1
7 Interpretation .........................................................1

**Part II—The Commonwealth Scientific and Industrial Research Organisation** 3
8 Commonwealth Scientific and Industrial Research Organisation ......................................................3
9 Functions of the Organisation.........................................3
9AA Powers of the Organisation............................................4
9A Organisation may accept gifts etc. and act as trustee.................5
10 Co-operation with other organizations ...............................6

**Part IIA—The Chief Executive of the Organisation** 7
10A Chief Executive of the Organisation..................................7
10B Appointment of Chief Executive etc. .................................7
10C Leave of absence ....................................................7
10D Resignation .........................................................8
10E Termination of appointment ..........................................8
10F Disclosure of interests .............................................8
10G Acting Chief Executive ..............................................9
10H Remuneration of Chief Executive.....................................10
10J Delegation .........................................................10

**Part III—The Board of the Organisation** 12
11 Establishment of Board .............................................12
12 Functions of Board .................................................12
13 Directions and guidelines given by Minister ........................12
14A Constitution of Board ..............................................13
15 Meetings ...........................................................14
15A Chief Executive not to take part in certain deliberations of Board .............................................................14
16 Terms and conditions of appointment etc. of part-time members ............................................................15
17 Remuneration of Chairperson and the Deputy Chairperson ...........15
19 Remuneration of other part-time members ............................15
20 Resignation of part-time members....................................16
22 Termination of appointment .........................................16
22A Delegation by Board.................................................16

**Part IV—Advisory committees**                                    18
    24    Advisory committees ................................................................. 18

**Part VI—Staff**                                                  19
    32    Staff ................................................................................................ 19

**Part VII—Strategic plans and annual operational plans**        20
    33    Planning periods .......................................................................... 20
    34    Strategic plans ............................................................................ 20
    35    Annual operational plans ........................................................... 21
    36    Compliance with plans .............................................................. 21

**Part VIII—Finance**                                             23
    46    Moneys payable to Organisation ............................................... 23
    48    Application of moneys ............................................................... 23
    51    Extra matters to be included in annual report ........................... 23
    53    Liability to taxation ................................................................... 24

**Part IX—Miscellaneous**                                         25
    54    Inventions etc. by officers ......................................................... 25
    56    Consultative Council ................................................................. 25
    58    Regulations ................................................................................. 25

**Notes**                                                         27

# An Act relating to the Commonwealth Scientific and Industrial Research Organisation

## Part I—Preliminary

### 1  Short title [*see* Note 1]

This Act may be cited as the *Science and Industry Research Act 1949*.

### 2  Commencement [*see* Note 1]

This Act shall come into operation on a date to be fixed by Proclamation.

### 7  Interpretation

In this Act, unless the contrary intention appears:

***advisory committee*** means an advisory committee established under subsection 24(1).

***annual operational plan*** means an annual operational plan formulated under subsection 35(1).

***appoint*** includes re-appoint.

***Board*** means the Board of the Organisation.

***Chairperson*** means the Chairperson of the Board.

***Chief Executive*** means the Chief Executive of the Organisation.

***Deputy Chairperson*** means the Deputy Chairperson of the Board.

***member*** means a member of the Board and includes the Chairperson, the Deputy Chairperson and the Chief Executive.

***officer*** means an officer of the Organisation.

**Part I** Preliminary

## Section 7

*Organisation* means the Commonwealth Scientific and Industrial Research Organisation established under this Act.

*part-time member* means a member of the Board other than the Chief Executive.

*science* includes technology.

*strategic plan* means a strategic plan formulated under subsection 34(1).

Section 8

# Part II—The Commonwealth Scientific and Industrial Research Organisation

## 8 Commonwealth Scientific and Industrial Research Organisation

(1) There shall be a Commonwealth Scientific and Industrial Research Organisation.

(2) The Organisation:

    (a) is a body corporate with perpetual succession; and

    (b) must have a seal; and

    (c) may acquire, hold and dispose of real and personal property; and

    (d) may sue and be sued.

> Note:   The *Commonwealth Authorities and Companies Act 1997* applies to the Organisation. That Act deals with matters relating to Commonwealth authorities, including reporting and accountability, banking and investment and conduct of officers.

(3) All courts, judges and persons acting judicially must:

    (a) take judicial notice of the imprint of the Organisation's seal appearing on a document; and

    (b) presume that the document was duly sealed.

(4) The seal of the Organisation must be kept in such custody as the Board directs and must not be used except as authorised by the Board.

## 9 Functions of the Organisation

(1) The functions of the Organisation are:

    (a) to carry out scientific research for any of the following purposes:

        (i) assisting Australian industry;

        (ii) furthering the interests of the Australian community;

Section 9AA

      (iii) contributing to the achievement of Australian national objectives or the performance of the national and international responsibilities of the Commonwealth;

      (iv) any other purpose determined by the Minister;

  (b) to encourage or facilitate the application or utilization of the results of such research;

 (ba) to encourage or facilitate the application or utilisation of the results of any other scientific research;

(bb) to carry out services, and make available facilities, in relation to science;

  (c) to act as a means of liaison between Australia and other countries in matters connected with scientific research;

  (d) to train, and to assist in the training of, research workers in the field of science and to co-operate with tertiary-education institutions in relation to education in that field;

  (e) to establish and award fellowships and studentships for research, and to make grants in aid of research, for a purpose referred to in paragraph (a);

  (f) to recognize associations of persons engaged in industry for the purpose of carrying out industrial scientific research and to co-operate with, and make grants to, such associations;

  (h) to collect, interpret and disseminate information relating to scientific and technical matters; and

  (j) to publish scientific and technical reports, periodicals and papers.

(2) The Organisation shall:

  (a) treat the functions referred to in paragraphs (1)(a) and (b) as its primary functions; and

  (b) treat the other functions referred to in subsection (1) as its secondary functions.

## 9AA  Powers of the Organisation

(1) The Organisation has power to do all things necessary or convenient to be done for or in connection with the performance of its functions and, in particular, may:

Section 9A

    (a) arrange for scientific research or other work to be undertaken, on behalf of the Organisation, by any person or body;

    (b) form, or participate in the formation of, a partnership or company;

    (c) make available to a person, on such conditions and on payment of such fees or royalties, or otherwise, as the Chief Executive determines, a discovery, invention or improvement that is the property of the Organisation;

    (d) pay to officers, or to persons undertaking work on behalf of the Organisation, such bonuses as the Chief Executive, with the approval of the Board, determines in respect of discoveries or inventions made by them; and

    (e) charge such fees, and agree to such conditions, as the Chief Executive determines for research and other services carried out, or facilities made available, by the Organisation at the request of any person.

## 9A  Organisation may accept gifts etc. and act as trustee

(1) The Organisation may, in or in connection with the performance of its functions and the exercise of its powers:

    (a) accept money or other property given, devised, bequeathed, assigned or otherwise made available to the Organisation (whether on trust or otherwise); and

    (b) agree to any conditions subject to which money or other property is given, devised, bequeathed, assigned or otherwise made available to the Organisation; and

    (c) act as trustee of money or other property vested in the Organisation upon trust.

(2) Notwithstanding anything contained in this Act, where the Organisation has agreed to any conditions subject to which moneys have, or other property has, been given, devised, bequeathed, assigned or otherwise made available to the Organisation or the Organisation holds any moneys or other property upon trust, the moneys or other property shall be dealt with by the Organisation in accordance with those conditions or in accordance with the powers and duties of the Organisation as trustee, as the case may be.

Section 10

## 10  Co-operation with other organizations

The Organisation shall, as far as possible, co-operate with other organizations and authorities in the co-ordination of scientific research, with a view to:

  (a)  the prevention of unnecessary overlapping; and

  (b)  the most effective use of available facilities and staffs.

# Part IIA—The Chief Executive of the Organisation

### 10A  Chief Executive of the Organisation

(1)  There shall be a Chief Executive of the Organisation.

(2)  The affairs of the Organisation shall, subject to subsection (3), be conducted by the Chief Executive.

(3)  The Chief Executive shall, in conducting any of the affairs of the Organisation and in exercising any powers conferred on the Chief Executive by this Act or the regulations or by the *Science and Industry Endowment Act 1926*, act in accordance with any policies determined, and any directions given, by the Board.

(4)  All acts and things done in the name of, or on behalf of, the Organisation by or with the authority of the Chief Executive shall be deemed to have been done by the Organisation.

### 10B  Appointment of Chief Executive etc.

(1)  The Chief Executive shall be appointed by the Board and, subject to this Act, holds office on a full-time basis for such period, not exceeding 5 years, as is specified in the instrument of appointment.

(2)  The Board must consult with the Minister before appointing a person as Chief Executive.

(4)  The Chief Executive holds office on such terms and conditions (if any) in respect of matters not provided for by this Act as are determined by the Board.

### 10C  Leave of absence

(1)  The Chief Executive has such recreation leave entitlements as are determined by the Remuneration Tribunal.

(2)  The Board may grant the Chief Executive leave of absence, other than recreation leave, on such terms and conditions as to remuneration or otherwise as the Board determines.

---

Section 10D

---

## 10D  Resignation

The Chief Executive may resign the office of Chief Executive by writing signed by the Chief Executive and delivered to the Board.

## 10E  Termination of appointment

(1) The Board may terminate the appointment of the Chief Executive for misbehaviour or physical or mental incapacity.

(2) If the Chief Executive:

  (a) becomes bankrupt, applies to take the benefit of any law for the relief of bankrupt or insolvent debtors, compounds with his or her creditors or makes an assignment of his or her remuneration for their benefit;

  (b) fails, without reasonable excuse, to comply with section 10F of this Act or section 27F or 27J of the *Commonwealth Authorities and Companies Act 1997*;

  (c) is absent from duty, except on leave of absence, for 14 consecutive days or for 28 days in any period of 12 months;

  (d) is absent, except on leave granted by the Board, from 3 consecutive meetings of the Board; or

  (e) engages in paid employment outside the duties of the office of Chief Executive without the consent of the Board;

  the Board may terminate the appointment of the Chief Executive.

(3) The Board may terminate the appointment of the Chief Executive if the Board is satisfied that the performance of the Chief Executive has been unsatisfactory for a significant period.

(4) The Board must consult with the Minister before terminating the appointment of the Chief Executive.

## 10F  Disclosure of interests

The Chief Executive shall give written notice to the Board of all direct or indirect pecuniary interests that the Chief Executive has or may have in any business or in any body corporate carrying on a business.

---

### 10G  Acting Chief Executive

(1) The Board may appoint a person to act in the office of Chief Executive:

    (a) during a vacancy in that office, whether or not an appointment has previously been made to that office; or

    (b) during any period, or during all periods, when the person holding that office is absent from duty or from Australia or is, for any other reason, unable to perform the functions of that office.

(2) An appointment of a person under subsection (1) may be expressed to have effect only in such circumstances as are specified in the instrument of appointment.

(3) A person appointed under subsection (1) to act during a vacancy shall not continue so to act for more than 12 months.

(4) Where a person is acting in the office of Chief Executive in accordance with paragraph (1)(b) and the office becomes vacant while the person is so acting, then, subject to subsection (2), the person may continue so to act until the Board otherwise directs, the vacancy is filled or a period of 12 months from the date on which the vacancy occurs ends, whichever first happens.

(5) While a person is acting in the office of Chief Executive, the person has and may exercise all the powers, and shall perform all the functions, of Chief Executive under this Act or the regulations or under the *Science and Industry Endowment Act 1926*.

(6) The Board may:

    (a) determine the terms and conditions of appointment, including remuneration and allowances, of a person acting in the office of Chief Executive; and

    (b) terminate such an appointment at any time.

(7) A person appointed under subsection (1) may resign the appointment by writing signed by the person and delivered to the Board.

Section 10H

(8) Nothing done by or in relation to a person purporting to act under subsection (1) is invalid on the ground that:

(a) the occasion for the person's appointment had not arisen;

(b) there was a defect or irregularity in connection with the person's appointment;

(c) the person's appointment had ceased to have effect; or

(d) the occasion for the person to act had not arisen or had ceased.

## 10H  Remuneration of Chief Executive

(1) The Chief Executive shall be paid such remuneration as is determined by the Remuneration Tribunal, but, if no determination of that remuneration is in operation, the Chief Executive shall be paid such remuneration as is prescribed.

(2) The Chief Executive shall be paid such allowances as are prescribed.

(3) This section has effect subject to the *Remuneration Tribunal Act 1973*.

## 10J  Delegation

(1) The Chief Executive may, either generally or as otherwise provided by the instrument of delegation, by writing signed by the Chief Executive, delegate to an eligible person, or to a committee of eligible persons, all or any of the Chief Executive's powers under this Act or the regulations, other than this power of delegation.

(2) The Chief Executive shall not delegate a power under subsection (1) except with the approval of the Board.

(3) A power so delegated, when exercised by the delegate, shall, for the purposes of this Act and the regulations, be deemed to have been exercised by the Chief Executive.

(4) A delegate is, in the exercise of a power so delegated, subject to the directions of the Chief Executive.

(5) Where the Chief Executive delegates a power to a committee of persons, the Chief Executive:

    (a) shall appoint one of the members of the committee to be the Chairperson of the committee; and

    (b) may determine the procedure to be followed in relation to meetings of the committee, including matters with respect to:

        (i) the convening of meetings of the committee;

        (ii) the number of members of the committee who are to constitute a quorum;

        (iii) the selection of a member of the committee to preside at meetings of the committee at which the Chairperson of the committee is not present; and

        (iv) the manner in which questions arising at a meeting of the committee are to be decided.

(6) A delegation under this section does not prevent the exercise of a power by the Chief Executive.

(7) In this section, *eligible person* means:

    (a) an officer; or

    (b) a director or employee of a company where:

        (i) the company and the Organisation are partners in a partnership; or

        (ii) the Organisation holds a controlling interest in the company.

Section 11

# Part III—The Board of the Organisation

## 11  Establishment of Board

There is established a Board of the Organisation.

## 12  Functions of Board

(1) The functions of the Board are:
   (a) to ensure the proper and efficient performance of the functions of the Organisation;
   (b) to determine the policy of the Organisation with respect to any matter;
   (c) to give directions to the Chief Executive under subsection 10A(3); and
   (d) such other functions as are conferred on it by this Act.

(2) The Board has power to do all things necessary or convenient to be done for or in connection with the performance of its functions.

## 13  Directions and guidelines given by Minister

(1) The Minister may give to the Board, in writing, directions and guidelines with respect to the performance of the functions, or the exercise of the powers, of the Board or of the Organisation, and the Board shall ensure that any directions or guidelines so given are complied with.

(2) The power of the Minister to give a direction or guideline to the Board under subsection (1) in relation to an act or thing may be exercised notwithstanding that the doing of the act or thing (whether by the Board or the Chief Executive) is subject to the approval of the Minister or of another person.

(3) Nothing in section 14 limits the generality of subsection (1) of this section.

### 14A  Constitution of Board

(1)  The Board shall consist of:

    (a)  the Chief Executive; and

    (b)  not fewer than 7 and not more than 9 other members.

(2)  The members of the Board other than the Chief Executive hold office on a part-time basis.

(3)  The part-time members shall be appointed by the Governor-General.

(4)  The Governor-General shall appoint one of the part-time members to be the Chairperson of the Board and another of the part-time members to be the Deputy Chairperson of the Board.

(5)  A part-time member appointed as Chairperson or as Deputy Chairperson:

    (a)  subject to paragraph (c), holds office as Chairperson or as Deputy Chairperson until the end of his or her term of office as a part-time member;

    (b)  may resign the office of Chairperson or of Deputy Chairperson by writing signed by the part-time member and delivered to the Governor-General;

    (c)  ceases to be Chairperson or Deputy Chairperson if he or she ceases to be a part-time member; and

    (d)  ceases to be a part-time member if he or she resigns the office of Chairperson or of Deputy Chairperson.

(7)  The performance of a function, or the exercise of a power, by the Board is not affected by reason only of:

    (a)  the number of part-time members falling below 7 for a period of not more than 6 months; or

    (b)  there being a vacancy in the office of Chairperson, of Deputy Chairperson or of Chief Executive.

Note:    For the manner in which the Chairperson and the Deputy Chairperson may be referred to, see section 18B of the *Acts Interpretation Act 1901*.

Section 15

## 15  Meetings

(1) The Board shall hold such meetings as are necessary for the performance of its functions.

(2) The Chairperson may, at any time, convene a meeting of the Board, and shall do so if so directed by the Minister.

(3) At a meeting, a quorum is constituted:

   (a) where the Board consists of 9 or 10 members—by 5 members; or

   (b) in any other case—by 4 members.

(4) The Chairperson shall preside at all meetings at which he or she is present.

(5) If the Chairperson is not present at a meeting of the Board:

   (a) the Deputy Chairperson must preside at the meeting; or

   (b) if the Deputy Chairperson is not present at the meeting—the members present must elect one of their number to preside at the meeting.

(6) A question arising at a meeting shall be decided by a majority of the votes of members present and voting.

(7) At a meeting, the Chairperson or other member presiding has a deliberative vote and, in the event of votes being equal, also has a casting vote.

## 15A  Chief Executive not to take part in certain deliberations of Board

The Chief Executive:

   (a) must not take part in any deliberation or decision of the Board with respect to him or her; and

   (b) is to be disregarded for the purpose of constituting a quorum of the Board for any such deliberation or decision.

## 16  Terms and conditions of appointment etc. of part-time members

(1) Subject to this Act, a part-time member holds office for such period, not exceeding 5 years, as is specified in the instrument of appointment.

(2) A part-time member holds office on such terms and conditions (if any) in respect of matters not provided for by this Act as are determined by the Governor-General.

## 17  Remuneration of Chairperson and the Deputy Chairperson

(1) The Chairperson and the Deputy Chairperson shall be paid such remuneration as is determined by the Remuneration Tribunal, but, if no determination of that remuneration is in operation, the Chairperson and the Deputy Chairperson shall be paid such remuneration as is prescribed.

(2) The Chairperson and the Deputy Chairperson shall be paid such allowances as are prescribed.

(3) This section has effect subject to the *Remuneration Tribunal Act 1973*.

## 19  Remuneration of other part-time members

(1) A part-time member shall be paid such remuneration as is determined by the Remuneration Tribunal, but, if no determination of that remuneration by the Tribunal is in operation, the member shall be paid such remuneration as is prescribed.

(2) A part-time member shall be paid such allowances as are prescribed.

(3) This section has effect subject to the *Remuneration Tribunal Act 1973*.

(4) A reference in this section to a part-time member does not include a reference to the Chairperson or the Deputy Chairperson.

Section 20

## 20  Resignation of part-time members

A part-time member may resign the office of member by writing signed by the member and delivered to the Governor-General.

## 22  Termination of appointment

(1) The Governor-General may terminate the appointment of a part-time member by reason of misbehaviour or physical or mental incapacity.

(2) If a part-time member:

    (a) becomes bankrupt, applies to take the benefit of any law for relief of bankrupt or insolvent debtors, compounds with his or her creditors or makes an assignment of his or her remuneration for their benefit;

    (b) is absent, except on leave granted by the Minister, from 3 consecutive meetings of the Board; or

    (c) fails, without reasonable excuse, to comply with section 27F or 27J of the *Commonwealth Authorities and Companies Act 1997*;

the Governor-General may terminate the appointment of the member.

## 22A  Delegation by Board

(1) The Board may, by resolution, delegate to an eligible person, or to a committee of eligible persons, all or any of the Board's powers under this Act or the regulations.

(2) A delegate is, in the exercise of a power so delegated, subject to the directions of the Board.

(3) If the Board delegates a power to a committee of eligible persons, the Board:

    (a) must appoint one of the members of the committee to be the Chairperson of the committee; and

    (b) may determine the procedure to be followed in relation to meetings of the committee, including matters with respect to the following:

      (i)  the convening of meetings of the committee;

     (ii)  the number of members of the committee who are to constitute a quorum;

    (iii)  the selection of a member of the committee to preside at meetings of the committee at which the Chairperson of the committee is not present;

    (iv)  the manner in which questions arising at a meeting of the committee are to be decided.

(4)  In this section:

*eligible person* means:

   (a)  a member of the Board, other than the Chief Executive; or

   (b)  an officer of the Organisation who is concerned in, or takes part in, the management of the Organisation;

but does not include a person who is a member of the Consultative Council established under section 56.

Section 24

# Part IV—Advisory committees

## 24  Advisory committees

(1) The Board may establish advisory committees, consisting of such persons as the Board appoints, to give advice to the Board on particular matters or classes of matters relating to the functions of the Organisation.

(2) The Board shall appoint one of the members of each advisory committee to be the Chairperson of that committee.

(3) The Board may determine:

    (a) the manner in which an advisory committee is to perform its functions; and

    (b) the procedure to be followed in relation to meetings of an advisory committee, including matters with respect to:

        (i) the convening of meetings of the advisory committee;

        (ii) the number of members of the advisory committee who are to constitute a quorum;

        (iii) the selection of a member of the advisory committee to preside at meetings of the advisory committee at which the Chairperson of the advisory committee is not present; and

        (iv) the manner in which questions arising at a meeting of the advisory committee are to be decided.

(4) If the Board decides that the members of an advisory committee should be remunerated, those members shall be paid by the Organisation such remuneration as is determined by the Remuneration Tribunal.

(5) Members of an advisory committee shall be paid by the Organisation such allowances as are prescribed by the regulations.

(6) Subsections (4) and (5) have effect subject to the *Remuneration Tribunal Act 1973*.

# Part VI—Staff

## 32  Staff

(1)  The Chief Executive may appoint such persons to be officers of the Organisation as the Chief Executive determines are necessary for the purposes of this Act.

(2)  The terms and conditions of service (other than in respect of matters provided for by this Act) of officers appointed under this section are such as are determined by the Chief Executive.

Section 33

# Part VII—Strategic plans and annual operational plans

## 33  Planning periods

(1) In this Part, ***planning period*** means a period not exceeding 5 years that the Board declares to be a planning period for the purposes of this Part.

(2) The Board shall cause a copy of each declaration made under subsection (1) to be given to the Minister.

(3) Where:

    (a) the Board declares a period (in this subsection referred to as the ***first period***) to be a planning period for the purposes of this Part; and

    (b) the Board subsequently declares a period (in this subsection referred to as the ***second period***) commencing during the first period and ending after the end of the first period to be a planning period for the purposes of this Part;

the following plans cease to have effect on the commencement of the second period:

    (c) the strategic plan relating to the first period;

    (d) an annual operational plan relating to the strategic plan referred to in paragraph (c).

## 34  Strategic plans

(1) The Board shall:

    (a) before the commencement of each planning period, formulate a strategic plan, for the planning period concerned, setting out:

        (i) the broad objectives of the Organisation in performing its functions during the planning period; and

        (ii) a broad outline of the policies and strategies to be pursued by the Organisation to achieve those objectives; and

    (b)  from time to time, review and revise the strategic plan.

(2)  A strategic plan, or a revision of a strategic plan, shall be submitted to the Minister as soon as practicable after it is formulated and before it comes into effect.

## 35  Annual operational plans

(1)  The Chief Executive shall:

    (a)  before the commencement of each financial year that is included in a planning period, formulate an annual operational plan, for the financial year concerned, setting out the details of:

        (i)  the strategies the Organisation proposes to pursue;

       (ii)  the activities the Organisation proposes to carry out; and

      (iii)  the resources the Organisation proposes to allocate to each such activity;

    during the financial year in giving effect to the strategic plan that relates, or the intended strategic plan that will relate, to the financial year; and

    (b)  from time to time, review and revise the annual operational plan.

(2)  An annual operational plan, or a revision of an annual operational plan:

    (a)  shall be submitted to the Board as soon as practicable after it is formulated; and

    (b)  has no effect until approved by the Board.

(3)  Where a part only of a financial year is included in a particular planning period, subsection (1) applies to that part of the year as if a reference in that subsection to a financial year were a reference to that part of the year.

## 36  Compliance with plans

(1)  Subject to subsection 49(2), when a strategic plan or an annual operational plan is in effect, the Organisation shall not perform its functions otherwise than in accordance with that plan.

Section 36

    (2)  Nothing done by the Organisation is invalid on the ground that the Organisation has failed to comply with subsection (1).

# Part VIII—Finance

### 46  Moneys payable to Organisation

(1) There are payable to the Organisation such moneys as are appropriated by the Parliament for the purposes of this Act.

(2) The Minister for Finance may give directions as to the amounts in which, and the times at which, moneys referred to in subsection (1) are to be paid to the Organisation.

### 48  Application of moneys

(1) The moneys of the Organisation shall be applied only:

    (a) in payment or discharge of the costs, expenses and other obligations of the Organisation; and

    (b) in payment of remuneration and allowances payable to any person under this Act.

(2) Subsection (1) does not prevent investment of surplus money of the Organisation under section 18 of the *Commonwealth Authorities and Companies Act 1997*.

### 51  Extra matters to be included in annual report

(2) In each report on the Organisation under section 9 of the *Commonwealth Authorities and Companies Act 1997*, the members must set out:

    (a) a statement of the policies of the Organisation in relation to the carrying out of the scientific research of the Organisation that were current at the beginning of the year;

    (b) a description of any developments in those policies that occurred during the year;

    (c) any determinations made by the Minister under subparagraph 9(1)(a)(iv) during the year;

    (d) any directions or guidelines given by the Minister under subsection 13(1) during the year; and

Section 53

(e) any policies notified by the Minister under section 28 of the *Commonwealth Authorities and Companies Act 1997* during the year.

## 53  Liability to taxation

The Organisation is not subject to taxation under any law of the Commonwealth or of a State or Territory.

Case 8:09-cv-00178-DOC-MLG    Document 29    Filed 07/15/2009    Page 41 of 92

# Part IX—Miscellaneous

### 54  Inventions etc. by officers

(1)  A discovery, invention or improvement of or in any process, apparatus or machine made by an officer of the Organisation in the course of the officer's official duties is the property of the Organisation.

(2)  An officer of the Organisation shall not, except with the consent in writing of the Chief Executive, make application for a patent for an invention that is made by the officer in the course of the officer's official duties or that relates to any matter or work connected with the officer's official duties.

### 56  Consultative Council

(1)  There is established a Consultative Council comprising:

    (a)  persons nominated by the Board to represent the management of the Organisation; and

    (b)  representatives of organisations of officers.

(2)  The functions of the Council are to consider, and to report to the Board on, any matter affecting, or of general interest to, the officers of the Organisation, including any such matter that is referred to the Council by the Board.

(3)  The regulations shall prescribe the manner in which the Council is to be constituted, the manner in which the Council is to carry out its functions and any other matter relevant to the operations of the Council.

### 58  Regulations

The Governor-General may make regulations, not inconsistent with this Act, prescribing all matters required or permitted by this Act to be prescribed, or necessary or convenient to be prescribed, for carrying out or giving effect to this Act.

# Notes to the *Science and Industry Research Act 1949*

## Note 1

The *Science and Industry Research Act 1949* as shown in this compilation comprises Act No. 13, 1949 amended as indicated in the Tables below.

All relevant information pertaining to application, saving or transitional provisions prior to 1 October 2001 is not included in this compilation. For subsequent information *see* Table A.

## Table of Acts

| Act | Number and year | Date of Assent | Date of commencement | Application, saving or transitional provisions |
|---|---|---|---|---|
| *Science and Industry Research Act 1949* | 13, 1949 | 25 Mar 1949 | 19 May 1949 (*see* Gazette 1949, p. 1306A) | |
| *Science and Industry Research Act 1959* | 78, 1959 | 1 Dec 1959 | 1 Jan 1960 (*see* Gazette 1959, p. 4435) | — |
| *Statute Law Revision (Decimal Currency) Act 1966* | 93, 1966 | 29 Oct 1966 | 1 Dec 1966 | — |
| *Science and Industry Research Act 1968* | 7, 1968 | 8 May 1968 | 8 May 1968 | — |
| *Science and Industry Research Act (No. 2) 1968* | 52, 1968 | 24 June 1968 | 1 July 1968 | S. 12 |
| *Statute Law Revision Act 1973* | 216, 1973 | 19 Dec 1973 | 31 Dec 1973 | Ss. 9(1) and 10 |
| *Administrative Changes (Consequential Provisions) Act 1976* | 91, 1976 | 20 Sept 1976 | 20 Sept 1976 *(a)* | S. 4 |
| *Administrative Changes (Consequential Provisions) Act 1978* | 36, 1978 | 12 June 1978 | 12 June 1978 | S. 8 |
| *Science and Industry Research Amendment Act 1978* | 143, 1978 | 24 Nov 1978 | 14 Dec 1978 (*see* Gazette 1978, No. S276) | S. 10 |
| *Statute Law (Miscellaneous Amendments) Act (No. 2) 1982* | 80, 1982 | 22 Sept 1982 | Part LXVI (ss. 248–252): 20 Oct 1982 *(b)* | — |
| *Statute Law (Miscellaneous Provisions) Act (No. 1) 1985* | 65, 1985 | 5 June 1985 | S. 3: 3 July 1985 *(c)* | — |

Notes to the *Science and Industry Research Act 1949*

## Table of Acts

| Act | Number and year | Date of Assent | Date of commencement | Application, saving or transitional provisions |
|---|---|---|---|---|
| *Science and Industry Research Legislation Amendment Act 1986* | 121, 1986 | 2 Dec 1986 | 5 Dec 1986 (*see Gazette* 1986, No. S622) | Ss. 4(2), (3), 8(2) and 30 |
| *Industry, Technology and Commerce Legislation Amendment Act 1991* | 66, 1991 | 15 June 1991 | 15 June 1991 | S. 2(2)–(4) |
| *Industrial Relations Legislation Amendment Act 1991* | 122, 1991 | 27 June 1991 | Ss. 4(1), 10(b) and 15–20: 1 Dec 1988 Ss. 28(b)–(e), 30 and 31: 10 Dec 1991 (*see Gazette* 1991, No. S332) Remainder: Royal Assent | S. 31(2) |
| *Prime Minister and Cabinet Legislation Amendment Act 1991* | 199, 1991 | 18 Dec 1991 | 18 Dec 1991 | — |
| *Industry, Technology and Commerce Legislation Amendment Act 1992* | 168, 1992 | 11 Dec 1992 | Part 5 (ss. 14, 15): 30 July 1975 Remainder: Royal Assent | — |
| *Statute Law Revision Act 1996* | 43, 1996 | 25 Oct 1996 | Schedule 4 (items 131–134): Royal Assent *(d)* | — |
| *Industry, Science and Tourism Legislation Amendment Act 1997* | 91, 1997 | 30 June 1997 | Schedule 1 (item 24): 1 July 1997 *(e)* | — |
| *Audit (Transitional and Miscellaneous) Amendment Act 1997* | 152, 1997 | 24 Oct 1997 | Schedule 2 (items 1178–1192): 1 Jan 1998 (*see Gazette* 1997, No. GN49) *(f)* | — |
| *Public Employment (Consequential and Transitional) Amendment Act 1999* | 146, 1999 | 11 Nov 1999 | Schedule 1 (item 807): 5 Dec 1999 (*see Gazette* 1999, No. S584) *(g)* | — |
| *Corporate Law Economic Reform Program Act 1999* | 156, 1999 | 24 Nov 1999 | Schedule 10 (items 116, 117): 13 Mar 2000 (*see Gazette* 2000, No. S114) *(h)* | — |
| *Abolition of Compulsory Age Retirement (Statutory Officeholders) Act 2001* | 159, 2001 | 1 Oct 2001 | 29 Oct 2001 | Sch. 1 (item 97) [*see* Table A] |
| *National Measurement Amendment Act 2004* | 27, 2004 | 25 Mar 2004 | Schedule 1 (item 66): 1 July 2004 (*see Gazette* 2004, No. GN22) | — |

Notes to the *Science and Industry Research Act 1949*

**Table of Acts**

| Act | Number and year | Date of Assent | Date of commencement | Application, saving or transitional provisions |
|---|---|---|---|---|
| *Governance Review Implementation (Science Research Agencies) Act 2007* | 84, 2007 | 21 June 2007 | Schedules 1–3: 10 Sept 2007 (*see* F2007L03555) Remainder: Royal Assent | Sch. 3 (item 38) [*see* Table A] |

Notes to the *Science and Industry Research Act 1949*

## Act Notes

(a) By virtue of subsection 2(7) of the *Administrative Changes (Consequential Provisions) Act 1976* the amendment made by that Act to the *Science and Industry Research Act 1949* is deemed to have come into operation on 22 December 1975.

(b) The *Science and Industry Research Act 1949* was amended by Part LXVI (sections 248–252) only of the *Statute Law (Miscellaneous Amendments) Act (No. 2) 1982*, subsection 2(16) of which provides as follows:

> (16) The remaining provisions of this Act shall come into operation on the twenty-eighth day after the day on which this Act receives the Royal Assent.

(c) The *Science and Industry Research Act 1949* was amended by section 3 only of the *Statute Law (Miscellaneous Provisions) Act (No. 1) 1985*, subsection 2(1) of which provides as follows:

> (1) Subject to this section, this Act shall come into operation on the twenty-eighth day after the day on which it receives the Royal Assent.

(d) The *Science and Industry Research Act 1949* was amended by Schedule 4 (items 131–134) only of the *Statute Law Revision Act 1996*, subsection 2(1) of which provides as follows:

> (1) Subject to subsections (2) and (3), this Act commences on the day on which it receives the Royal Assent.

(e) The *Science and Industry Research Act 1949* was amended by Schedule 1 (item 24) only of the *Industry, Science and Tourism Legislation Amendment Act 1997*, subsection 2(3) of which provides as follows:

> (3) The amendment of the *Science and Industry Research Act 1949* made by Schedule 1 commences on 1 July 1997.

(f) The *Science and Industry Research Act 1949* was amended by Schedule 2 (items 1178–1192) only of the *Audit (Transitional and Miscellaneous) Amendment Act 1997*, subsection 2(2) of which provides as follows:

> (2) Schedules 1, 2 and 4 commence on the same day as the *Financial Management and Accountability Act 1997*.

(g) The *Science and Industry Research Act 1949* was amended by Schedule 1 (item 807) only of the *Public Employment (Consequential and Transitional) Amendment Act 1999*, subsections 2(1) and (2) of which provide as follows:

> (1) In this Act, **commencing time** means the time when the *Public Service Act 1999* commences.

> (2) Subject to this section, this Act commences at the commencing time.

(h) The *Science and Industry Research Act 1949* was amended by Schedule 10 (items 116 and 117) only of the *Corporate Law Economic Reform Program Act 1999*, subsection 2(2)(c) of which provides as follows:

> (2) The following provisions commence on a day or days to be fixed by Proclamation:

> > (c) the items in Schedules 10, 11 and 12.

Notes to the *Science and Industry Research Act 1949*

**Table of Amendments**

## Table of Amendments

ad. = added or inserted    am. = amended    rep. = repealed    rs. = repealed and substituted

| Provision affected | How affected |
|---|---|
| Title ........................................... | am. No. 121, 1986 |
| **Part I** | |
| S. 3 ............................................. | rs. No. 52, 1968 |
| | rep. No. 216, 1973 |
| Ss. 4–6 ...................................... | am. No. 143, 1978 |
| | rep. No. 121, 1986 |
| S. 7 ............................................. | am. No. 52, 1968 |
| | rs. No. 143, 1978 |
| | am. No. 80, 1982 |
| | rs. No. 121, 1986 |
| | am. No. 84, 2007 |
| **Part II** | |
| Heading to Part II ..................... | am. No. 121, 1986 |
| S. 8 ............................................. | am. No. 52, 1968; No. 121, 1986; No. 84, 2007 |
| Note to s. 8(2) ........................... | ad. No. 152, 1997 |
| S. 9 ............................................. | am. No. 216, 1973 |
| | rs. No. 143, 1978 |
| | am. No. 121, 1986; No. 27, 2004 |
| S. 9AA ....................................... | ad. No. 143, 1978 |
| | am. No. 121, 1986; No. 152, 1997; No. 84, 2007 |
| S. 9AB ....................................... | ad. No. 143, 1978 |
| | am. No. 121, 1986 |
| | rep. No. 91, 1997 |
| S. 9A .......................................... | ad. No. 52, 1968 |
| | am. No. 121, 1986; No. 66, 1991; No. 84, 2007 |
| S. 10 ........................................... | am. No. 121, 1986 |
| **Part IIA** | |
| Part IIA ...................................... | ad. No. 121, 1986 |
| S. 10A ......................................... | ad. No. 121, 1986 |
| S. 10B ......................................... | ad. No. 121, 1986 |
| | am. No. 168, 1992; No. 159, 2001; No. 84, 2007 |
| S. 10C ......................................... | ad. No. 121, 1986 |
| | rs. No. 122, 1991 |
| | am. No. 146, 1999; No. 84, 2007 |
| S. 10D ......................................... | ad. No. 121, 1986 |
| | am. No. 84, 2007 |
| S. 10E ......................................... | ad. No. 121, 1986 |
| | am. No. 122, 1991; No. 152, 1997; No. 156, 1999; No. 84, 2007 |
| Ss. 10F, 10G ............................. | ad. No. 121, 1986 |
| | am. No. 84, 2007 |
| S. 10H ......................................... | ad. No. 121, 1986 |
| | am. No. 43, 1996 |
| S. 10J .......................................... | ad. No. 121, 1986 |

Notes to the *Science and Industry Research Act 1949*

## Table of Amendments

ad. = added or inserted    am. = amended    rep. = repealed    rs. = repealed and substituted

| Provision affected | How affected |
| --- | --- |
| **Part III** | |
| Heading to Part III ................... | am. No. 121, 1986 |
| Part III ........................................ | rs. No. 143, 1978 |
| S. 11 ........................................... | am. No. 78, 1959<br>rs. No. 143, 1978; No. 121, 1986 |
| S. 12 ........................................... | rs. No. 143, 1978; No. 121, 1986<br>am. No. 84, 2007 |
| S. 13 ........................................... | am. No. 78, 1959<br>rs. No. 143, 1978; No. 121, 1986 |
| S. 14 ........................................... | am. No. 52, 1968<br>rs. No. 143, 1978; No. 121, 1986<br>rep. No. 152, 1997 |
| S. 14A ........................................ | ad. No. 121, 1986<br>am. No. 152, 1997; No. 84, 2007 |
| Note to s. 14A(7)...................... | ad. No. 152, 1997<br>am. No. 84, 2007 |
| S. 15 ........................................... | rs. No. 143, 1978<br>am. No. 121, 1986; No. 84, 2007 |
| S. 15A ........................................ | ad. No. 84, 2007 |
| S. 16 ........................................... | am. No. 52, 1968<br>rs. No. 143, 1978; No. 121, 1986 |
| Heading to s. 17 ....................... | am. No. 84, 2007 |
| S. 17 ........................................... | rs. No. 143, 1978; No. 121, 1986<br>am. No. 43, 1996; No. 84, 2007 |
| S. 18 ........................................... | rs. No. 143, 1978<br>rep. No. 121, 1986 |
| S. 19 ........................................... | rs. No. 143, 1978<br>am. No. 121, 1986; No. 43, 1996; No. 84, 2007 |
| S. 20 ........................................... | rs. No. 143, 1978; No. 121, 1986 |
| S. 21 ........................................... | am. No. 93, 1966; No. 52, 1968<br>rs. No. 143, 1978<br>rep. No. 121, 1986 |
| S. 22 ........................................... | am. No. 216, 1973<br>rs. No. 143, 1978<br>am. No. 121, 1986; No. 152, 1997; No. 156, 1999 |
| S. 23 ........................................... | rs. No. 143, 1978; No. 121, 1986<br>rep. No. 152, 1997 |
| S. 22A ........................................ | ad. No. 84, 2007 |
| **Part IV** | |
| Heading to Part IV ................... | rep. No. 121, 1986 |
| Part IV ........................................ | rs. No. 143, 1978; No. 121, 1986 |
| S. 24 ........................................... | rs. No. 143, 1978; No. 121, 1986<br>am. No. 43, 1996 |
| Part V ......................................... | rs. No. 143, 1978<br>rep. No. 121, 1986 |
| S. 25 ........................................... | rs. No. 52, 1968<br>am. No. 36, 1978 |

Notes to the *Science and Industry Research Act 1949*

## Table of Amendments

ad. = added or inserted    am. = amended    rep. = repealed    rs. = repealed and substituted

| Provision affected | How affected |
| --- | --- |
|  | rs. No. 143, 1978 |
|  | rep. No. 121, 1986 |
| S. 26 | rs. No. 52, 1968; No. 143, 1978 |
|  | rep. No. 121, 1986 |
| Ss. 26A, 26B | ad. No. 52, 1968 |
|  | rep. No. 143, 1978 |
| S. 26C | ad. No. 52, 1968 |
|  | am. No. 36, 1978 |
|  | rep. No. 143, 1978 |
| Ss. 26D–26F | ad. No. 52, 1968 |
|  | rep. No. 143, 1978 |
| S. 26G | ad. No. 52, 1968 |
|  | am. No. 216, 1973 |
|  | rep. No. 143, 1978 |
| Ss. 27–29 | rs. No. 143, 1978 |
|  | rep. No. 121, 1986 |
| S. 30 | rs. No. 52, 1968 |
|  | am. No. 36, 1978 |
|  | rs. No. 143, 1978 |
|  | rep. No. 121, 1986 |
| S. 31 | rs. No. 143, 1978 |
|  | rep No. 121, 1986 |
| **Part VI** |  |
| Part VI | rs. No. 52, 1968; No. 143, 1978 |
| S. 32 | am. No. 78, 1959; No. 7, 1968 |
|  | rep. No. 91, 1976 |
|  | ad. No. 143, 1978 |
|  | am. No. 121, 1986; No. 199, 1991 |
| **Part VII** |  |
| Part VII | rs. No. 143, 1978; No. 121, 1986 |
| S. 33 | rs. No. 143, 1978; No. 121, 1986 |
| Ss. 34–36 | ad. No. 143, 1978 |
|  | rs. No. 121, 1986 |
| Ss. 37, 38 | ad. No. 143, 1978 |
|  | rep. No. 121, 1986 |
| S. 38A | ad. No. 80, 1982 |
|  | rep. No. 121, 1986 |
| Ss. 39, 40 | ad. No. 143, 1978 |
|  | am. No. 80, 1982 |
|  | rep. No. 121, 1986 |
| Ss. 41–44 | ad. No. 143, 1978 |
|  | rep. No. 121, 1986 |
| **Part VIII** |  |
| Part VIII | ad. No. 143, 1978 |
| S. 45 | ad. No. 143, 1978 |
|  | rep. No. 152, 1997 |
| S. 46 | ad. No. 143, 1978 |
|  | am. No. 121, 1986 |

Notes to the *Science and Industry Research Act 1949*

## Table of Amendments

ad. = added or inserted    am. = amended    rep. = repealed    rs. = repealed and substituted

| Provision affected | How affected |
| --- | --- |
| S. 47 | ad. No. 143, 1978 |
| | rep. No. 121, 1986 |
| S. 48 | ad. No. 143, 1978 |
| | am. No. 121, 1986; No. 152, 1997 |
| S. 49 | ad. No. 143, 1978 |
| | am. No. 121, 1986 |
| | rep. No. 152, 1997 |
| S. 50 | ad. No. 143, 1978 |
| | am. No. 121, 1986 |
| | rep. No. 84, 2007 |
| Heading to s. 51 | rs. No. 152, 1997 |
| S. 51 | ad. No. 143, 1978 |
| | rs. No. 121, 1986 |
| | am. No. 152, 1997 |
| S. 52 | ad. No. 143, 1978 |
| | rep. No. 121, 1986 |
| S. 53 | ad. No. 143, 1978 |
| | am. No. 121, 1986 |
| **Part IX** | |
| Part IX | ad. No. 143, 1978 |
| S. 54 | ad. No. 143, 1978 |
| | am. No. 121, 1986 |
| S. 55 | ad. No. 143, 1978 |
| | rep. No. 65, 1985 |
| S. 56 | ad. No. 143, 1978 |
| | am. No. 121, 1986 |
| S. 57 | ad. No. 143, 1978 |
| | rep. No. 121, 1986 |
| S. 58 | ad. No. 143, 1978 |
| **Schedules** | |
| First Schedule | |
| Renumbered Schedule 1 | No. 143, 1978 |
| Schedule 1 | rep. No. 121, 1986 |
| Second Schedule | rep. No. 143, 1978 |

Notes to the *Science and Industry Research Act 1949*

**Table A**

**Application, saving or transitional provisions**

*Abolition of Compulsory Age Retirement (Statutory Officeholders) Act 2001*
(No. 159, 2001)

## Schedule 1

### 97  Application of amendments

The amendments made by this Schedule do not apply to an appointment if the term of the appointment began before the commencement of this item.

_____

*Governance Review Implementation (Science Research Agencies) Act 2007*
(No. 84, 2007)

## Schedule 3

### 38  Application of amendments—Chief Executive

(1)    The amendments and repeals made by this Schedule apply to a person appointed after commencement as Chief Executive.

(2)    The instrument of appointment of the current Chief Executive continues in effect after commencement, despite the amendments and repeals made by this Schedule.

(3)    Subject to subitem (4), the old Act continues to apply, in relation to the current Chief Executive, as if the amendments and repeals made by this Schedule had not happened.

(4)    Subsection 10C(2) of the *Science and Industry Research Act 1949*, as amended by this Schedule, has effect after commencement in relation to the current Chief Executive.

(5)    In this item:

*commencement* means the commencement of this item.

Notes to the *Science and Industry Research Act 1949*

**Table A**

*current Chief Executive* means the person who, immediately before commencement, held the office of Chief Executive of the Organisation under section 10A of the old Act.

*old Act* means the *Science and Industry Research Act 1949*, as in force immediately before commencement.

# EXHIBIT B

A978

# TECHNOLOGY LICENCE AGREEMENT


BETWEEN


## COMMONWEALTH SCIENTIFIC AND
## INDUSTRIAL RESEARCH ORGANISATION


AND


## RADIATA COMMUNICATIONS PTY LIMITED


F:\docs.ch\radiata/techlic

1

## TECHNOLOGY LICENCE

Dated:                23rd day of February 1998.

**BETWEEN these** parties:

CSIRO        **COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH** ORGANISATION, a body corporate established under the Science *and Industry Research Act 1949* (Cth) and having its principal office at Limestone Avenue, Campbell, ACT, acting through CSIRO Telecommunications and Industrial Physics of Pembroke & Vimiera Roads, Marsfield NSW 2 12 1.

**LICENSEE    RADIATA COMMUNICATIONS PTY** LIMITED ACN 080 704 696 of

6 Nanette Place, Castle Hill NSW 2154.

1.    **Background**

1.1        CSIRO has developed the Technology.

1.2    The Licensee wishes to obtain a licence of the Technology on the terms of this Agreement.

2.    **Meaning** of Words

'**Application**' is described in the Schedule.

'**Confidential Information**' of a party ('**Discloser**'):
(a)        means all information which a party claims is confidential to itself and identifies at the time of disclosure as confidential;
(b)    includes:
    (i)        in the case of CSIRO all confidential information specified in the Schedule; and
    (ii)    all copies and notes of the Discloser's confidential information generated by the '**Recipient**';
(c)    does not include information to the extent that information is:
    (iii)    independently developed or known by the Recipient (including because it is in the public domain); or
    (iv)    required to be disclosed or retained by law.

'**Improvement**' has the meaning given to it in clause 10 (Improvements).

'**Intellectual Property Rights**' or '**IPR**' means all intellectual property rights, including:
(a)        patents, copyright, rights in circuit layouts, registered designs, trade marks, know how and any right to have confidential information kept confidential; and

(b)     any application or right to apply for registration of any of the rights referred to in (a).

'Minimum **Performance** Obligations' are described in the Schedule.

'**Price** of a Product means the price payable by a purchaser for a Product Sold, being the price:

(a)     agreed between the Licensee (or any sub licensee) and the purchaser of that Product in good faith and at arms' length; or

(b)     if not agreed between the Licensee (or any sub licensee) and the purchaser of that Product at arms' length, the price that would have applied had the Sale been at arms' length.

'Product' means a component in the form of a computer chip for incorporation in communications products manufactured or assembled by or with the authority of the Licensee or a sublicensee or any other product that incorporates, or otherwise exploits the Technology.

'**Revenue**' means revenue from the Sale or licensing of the Technology including:

(a      the Price of each Product Sold; and

(b)     revenue or other fees payable by any sub licensee; and

(c)     excluding reasonable freight, insurance and delivery costs and any applicable taxes or duties.

'**Royalty**' means those percentages set out in the Schedule of the Price of each Product Sold (but excluding the Price of faulty Products which are returned to the place of manufacture).

'Sell' a Product means to transfer ownership or possession of that Product to a third person, including by sale, lease or license. '**Sold**' and '**Sale**' have corresponding meanings.

'**Technology**' is described in the Schedule.

'**Territory**' is described in the Schedule.

3.     **Grant of Licence:**

CSIRO:

(a      grants the Licensee for the Application in the Territory a perpetual non-exclusive licence to use, develop and exploit the Technology; and

(b)     unless CSIRO has already done so, must provide the Technology to the Licensee promptly on signing this Agreement in the form of both software and hard-copy documentation.

4.    **Commercialising the Tethnology**

4.1    **The Licensee** must:
    (a)    provide relevant excerpts from is business plan which indicate how the Licensee intends to exploit the Technology;
    (b)    use its best efforts to exploit the Technology;
    (c)    meet the Minimum Performance Obligations; and
    (d)    obtain and maintain all government approvals and licences necessary to allow it to exploit the Technology and to manufacture, assemble and Sell Products.

4.2    The Licensee must ensure that each Product Sold:
    (a)    is of merchantable quality;
    (b)    is fit for the purpose for which it is acquired;
    (c)    satisfies any conditions and warranties implied by the law of the country in which it is Sold; and
    (d)    complies with all laws and standards regulating manufacture, assembly, labelling, packaging, storage and Sale in the country in which it is Sold.

5.    **Sublicences**

5.1    The Licensee may grantsublicences consistent with the terms of this Agreement but only if the Licensee first obtains CSIRO's written consent to thesublicence (which will not be unreasonably withheld).

5.2    Any sublicence granted by the Licensee in accordance **withclause 5.1** must:
    (a)    unless otherwise agree.d by CSIRO, be in the form attached to this Agreement as Annexure A; and
    (b)    contain such other terms which are reasonably required by CSIRO.

5.3    The Licensee may only provide the Technology and any Improvements to asublicensee in the form that will allow thesublicensee to manufacture integrated circuits but not redesign or make improvements to the Technology.

5.4    The Licensee may consent to the granting ofsublicenses, by the Licensee, but only if the Licensee obtains CSIRO's written consent.

6.1    **Payments**

6.1    **The Licensee** must pay CSIRO the Royalty.

6.2    Within 60 days after 30 June and 31 December of each year the Licensee must:
    (a)    give to CSIRO a statement:
        (i)    specifying the Revenue received during the six month period just ended; and

          (ii)    showing the calculation of the Royalty payable to CSIRO for that six month period; and

    (b)    pay CSIRO the Royalty payable for that six month period as directed by CSIRO from time to time.

6.3    The Licensee must pay CSIRO:

    (a)    any other amounts agreed between the parties from time to time in accordance with this Agreement; and

    (b)    interest on all amounts due under this Agreement but unpaid, calculated at the rate 1% above the Commonwealth Trading Bank Reference Rate from the due date until the date of payment.

    (c)    if the Agreement is terminated under clause 1'7, continue to pay Royalties for Products manufactured prior to termination and sold after termination.

7.    Royalty Buy-Out

7.1    If at any time before termination of this Agreement the Licensee notifies CSIRO in writing that it wishes to pay a lump sum in lieu of the expected Royalty for the duration of the Licence ('Royalty Price') then:

    (a)    when the Licensee pays CSIRO the Royalty Price, clauses 6.1, 6.2 and 16.3(b) of this Agreement will be deleted; and

    (b)    in all other respects, this Agreement will continue.

7.2    The parties will negotiate in good faith in an attempt to agree on the Royalty Price.

7.3    If the parties cannot agree on a Royalty Price within two months of the Licensee notifying CSIRO in accordance with clause 7.1 (or such longer time as agreed between the parties):

    (a)    the parties will jointly appoint an independent valuer qualified and experienced in valuing future royalties to determine the Royalty Price;

    (b)    that valuer's decision of the Royalty Price will be final and binding; and

    (c)    the parties will bear equally the costs of the valuer.

7.4    If the parties cannot agree on the valuer to be appointed in accordance with clause 7.3:

    (a)    each party must appoint an independent valuer qualified and experienced in valuing future royalties to determine the Royalty Price;

    (b)    the Royalty Price will be the average of the values determined by the valuers appointed under paragraph (a); and

    (c)    each party must bear the costs of the valuer appointed by it.

8.    Records and Inspection

    The Licensee must:

    (a)    keep records in sufficient detail to enable the Royalty to be easily and accurately determined;

(3)   make those records available annually at CSIRO's request to CSIRO or an auditor appointed by CSIRO; and

(c)   pay CSIRO's costs of any audit that indicates the Licensee has underpaid CSIRO by more than 5%.

## 9.   Intellectual Property Rights

9.1   The Licensee acknowledges that this Agreement does not transfer to the Licensee any IPR in the Technology.

9.2   The Licensee must:

(a)   not take any action to challenge the validity of any IPR in Technology licensed under this Agreement;

(b)   advise CSIRO immediately on becoming aware of :

(i)   any suspected or actual infringement by any person of IPR in the Technology; and

(ii)   any person claiming that the Technology infringes the rights of any person.

9.3   A party may not institute or defend proceedings unless it first confers as to what steps, if any, are to be taken about any infringement.

9.4   If one party decides to take proceedings:

(a)   it will be solely:

(i)   liable for all costs and damages; and

(ii)   entitled to all compensation; and

(b)   the other party will provide reasonable assistance at the expense of the party taking proceedings.

## 10.   Improvements

10.1   The Licensee:

(a)   must keep CSIRO informed of any improvements the Licensee makes to the Technology ('**Improvements**') and provide details reasonably requested by CSIRO;

(b)   will own IPR in Improvements; and

(c)   grants CSIRO a non-revocable, non-exclusive, royalty free perpetual licence to use the IPR in the Improvements to conduct research.

(d)   on termination of this Agreement assign all IPR in improvements to CSIRO

(e)   if requested by CSIRO, grant a licence to use the IPR in the Improvements on reasonable commercial terms.

10.2   Sublicensee are not entitled to make any improvements.

Ff/docs.cW radiatakchlic

6

11.   Confidential Information

11.1  Each party ('Recipient') must in relation to the Confidential Information of the other party
      i'Discloser'):
      (a)     keep it confidential;
      (b)     use it only as permitted under this Agreement;
      (c)     not disclose it to any person other than:
              (i)     to those of the Recipient's employees:
                      (A)     who have a need to know (and only to the extent that each such
                              employee has a need to know); and
                      (B)     who have first been directed and have undertaken orally or in
                              writing to keep it confidential and to use it only as permitted under
                              this ,Agreement ('Undertaking');
              (ii)    to other people such as contractors, agents and visitors:
                      (A)     who have a need to know (and only to the extent that each such
                              person has a need to know); and
                      (B)     who have agreed in writing to keep it confidential in accordance
                              with this Agreement (also an 'Undertaking');
      (d)     not to copy it or any part of it that is in material form other than as strictly
              necessary and must mark any such copy Confidential  Discloser';
      (e)     promptly comply with any request by the Discloser to return or destroy any or all
              copies of Confidential Information.

11.2  The Recipient must:
      (a)     implement security practices against unauthorised copying, use and disclosure
              (whether that disclosure is oral, in writing or in any other form);
      (b)     enforce each Undertaking; and
      (c)     immediately notify the Discloser if the Recipient becomes aware of any:
              (i)     unauthorised copying, use or disclosure in any form; or
              (ii)    disclosure required by law.

11.3  The burden of showing that any Confidential Information is not subject to the terms of this
      Agreement will rest on the Recipient.

12.   Use of Names and Publication

12.1  Except to the extent required by law, a party may only use the other party's name, trade
      mark or logo, or make a public statement about this Agreement, if it has first obtained
      written consent from the other party.

12.2  Unless otherwise agreed by the parties in writing, the Licensee must include the relevant
      CSIRO patent numbers on any products manufactured which were developed using the
      Technology.

Ff/docs.cb/radiata/t.echlic

13.  **Warranties and** Limitation of Liabilities

CSIRO:

(3)  does not warrant that the Technology does not infringe any third party's IPR but will advise the Licensee if it becomes aware of any infringement;

(b  excludes all terms, conditions and warranties implied by custom, the general law or statute except any implied condition or warranty the exclusion of which would contravene any statute or cause any part of this Agreement to be void;

(c)  limits its liability to the Licensee for any claim (whether arising in contract, tort or by statute) for loss or damage suffered by the Licensee in relation to the Technology to the total Royalties paid by the Licensee during the 12 months immediately preceding that claim; and

(d)  excludes all liability to the Licensee for consequential damage (including but not limited to, lost revenue or lost profit or loss of data) suffered by the Licensee in any way relating to the Licensee' exploitation of the Technology.

14.  **Indemnity and Insurance**

14.1  The Licensee agrees that it exploits the Technology at its own risk. Accordingly, the Licensee indemnifies CSIRO against all loss and damage (including costs on a full indemnity basis and whether incurred by or awarded against CSIRO) that CSIRO may sustain or incur arising in any way out of the Licensee' exploitation of the Technology

14.2  The Licensee must ensure, and on request from CSIRO from time to time give CSRO written confirmation, that:

(a)  the Licensee has valid, enforceable, adequate and appropriate professional indemnity, product liability and public liability insurance policies against any liability referred to in this clause and **clause 13;**

(b)  each of those policies notes CSIRO's interest under the policy; and

14.3  The Licensee or its Directors must:

(a)  comply with the terms of its insurance policies; and

(b)  within 30 days after request by CSIRO provide evidence of the currency of the insurance policies referred to in this clause

(c  notify CSIRO if it becomes aware of anything which will cause a policy to be void or a policy is terminated.

15.  **Dispute Resolution**

15.1  A party must not start arbitration or court proceedings (except proceedings seeking interlocutory relief) about a dispute arising out of this Agreement **(Dispute')** unless it has complied with this clause.

15.2  A party claiming that a Dispute has arisen must notify the other party to the Dispute giving details of the Dispute **('Notification').**

Ff/docs.cW/radlata/techllc

8

15.3    On receipt of a Notification each party must negotiate in good faith to resolve the Dispute and, if necessary to resolve the Dispute, involve the Chief Executive Officers or other senior officers of the parties directly in those negotiations.

15.3    If the Dispute involves technical matters and has not been resolved by negotiations under the previous clause within a reasonable time, the parties will refer the Dispute for determination by an independent expert agreed by the parties in the technical field the subject of the Dispute.

15.5    If the Dispute is not resolved under clause 15.3 **or** 154 within 30 days (or longer period agreed between the parties), the parties must refer the Dispute for mediation by the Australian Commercial Dispute Centre Limited (ACDC ') for resolution in accordance with the Conciliation Rules of ACDC.

15.6    If the Dispute is not resolved under clause 15.5 within 60 days after referral (or longer period agreed between the parties) either party may initiate proceedings in a court,

16.    Termination

16.1    The Agreement will continue unless terminated under clause 16.2.

16.2    CSIRO may terminate this Agreement with immediate effect by giving notice to the Licensee if:

  (a)    the Licensee breaches any provision of this Agreement and fails to remedy the breach within 60 days after receiving notice requiring it to do so;

  (b)    the Licensee breaches a material provision of this Agreement (including but not limited to clause 4 (Commercialising the Technology) clause 5 (Sublicences) or clause 6 (Payments) where that breach is not capable of remedy;

  (c)    the Licensee does not meet the Minimum Performance Obligations; or

  (d)    any event referred to in clause 16.3 happens to the Licensee.

16.3    The Licensee must notify CSIRO immediately if:

  (a)    there is any change in the direct or indirect beneficial ownership or control of the Licensee which would adversely affect its ability to comply with its obligations under this Agreement;

  (b)    it disposes of the whole or any part of its assets, operations or business other than in the ordinary course of business;

  (c)    it ceases to carry on business;

  (d)    it ceases to be able to pay its debts as they become due;

  (e)    any step is taken by a mortgagee to take possession or dispose of the whole or any part of its assets, operations or business;

  (f)    any step is taken to enter into any arrangement between the Licensee and its creditors; or

  (g)    any step is taken to appoint a receiver, a receiver and manager, a trustee in

FI/docs.cb/radiataAechlic

bankruptcy, a liquidator, a provisional liquidator, an administrator or other like person of the whole or any part of its assets or business.

17.    **Consequences of Termination**

On termination of this Agreement:

(a)    the licence ceases and the Licensee must immediately:

(i)    stop using the Technology;

(ii)    assign to CSIRO all sub-licences of the Technology;

(iii)    at CSIRO's option return to CSIRO all copies of all or any part of CSIRO's Confidential Information in the Licensee's possession or control;

(iv)    pay all amounts payable to CSIRO under this Agreement; and

(iii)    if requested by CSIRO, confirm by letter signed by a Director of the Licensee that it has complied with all of its obligations under this clause 17;

(b)    the obligations of confidentiality in clause 11 (Confidential Information)(but not the rights to use, disclose and copy) continue;

(c)    **Clause 6.3(c)** (Payments), Clause 8 (Records and Inspection) clause 12 (Use of names and Publication)Clause 13 (Warranties and Limitation of Liability) Clause 14 (Indemnity and Insurance),and clause 15 (Dispute Resolution) and clause 10.3 (licence to use Improvements) continue; and

(d)    accrued rights and remedies of either party are not affected

(e)    CSIRO will negotiate in good faith a licence agreement on substantially the same terms as Annexure A with M/A-COM, a Division of AMP Incorporated with offices at 100 Pawtucket Boulevard, Lowell, MA 01854, USA (**'M/A-COM'**) enable M/A-COM to satisfy its future requirements for Products

18.    Notices

18.1    A party notifying or giving notice under this Agreement must give notice:

(a)    in writing;

(b)    addressed to the address of the recipient specified in this Agreement or as altered by notice given in accordance with this clause; and

(c)    left at or sent by prepaid post or by fax to that address.

18.2    A notice given in accordance with this clauseis received:

(a)    if left at the recipient's address, on the date of delivery;

(b)    if sent by prepaid post, 5 days after the date of posting; and

(c)    if sent by fax, when the sender's facsimile system generates a message confirming successful transmission of the total number of pages of the notice.

19.    **General**

19.1    Relationships:

(a)    This Agreement does not create a relationship of employment, agency or

Ff/docs.cb/radista/techlic

10

partnership between the parties; and

(@) The rights and obligations of each party under this Agreement are several, not joint or joint and several.

19.2 **Further Action:** Each party must do or cause to be done all things necessary or desirable to give effect to, and refrain from doing things that would hinder performance of, this Agreement.

19.3 Assignment: A party must not assign or attempt to assign or otherwise transfer any right arising out of this Agreement without the written consent of the other parties (which must not be unreasonably withheld).

19.4 **Severability:** If all or part of any clause of this Agreement is illegal or unenforceable, it will be severed from this Agreement and will not affect the continued operation of the remaining provisions of this Agreement.

19.5 Waiver: The failure of a party at any time to insist on performance of any obligation of another party under this Agreement is not a waiver of its right:

(a to insist on performance of, or claim damages for breach of, that obligation unless that party acknowledges in writing that the failure is a waiver; and

(b) at any other time to insist on performance of that or any other obligation of another party under this Agreement.

19.6 Costs: The Licensee must pay all stamp duty and its own legal costs associated with finalising this Agreement.

19.7 **Entire Agreement:** This Agreement:

(a records the entire agreement between the parties and supersedes all earlier agreements and representations by the parties about its subject matter; and

(b) may only be altered in writing signed by both parties.

19.8 **Governing Law:** This Agreement is governed by the laws of New South Wales.

FB/daes.eWradiata/tcchlic

11

## SCHEDULE

**Technology**

Circuit descriptions, HDL code and test suites for the modem chip design
CSIRO patent 'A wireless LAN' contained in:
- Australian Patent Number 666411
- Japanese Patent Number 6-296176
- USA Patent Number 5,487,069
- Europe Patent Application Number 9330937 1.8 (patent pending)
- PARROT MAC - Australian Provisional Patent Application no: PO9322 "Medium Access Control Protocol for Data Communications" dated 19 September 1997.

**Application**

To develop, manufacture and sell Discrete Multitone (DMT) Chip for communications products.

**Minimum Performance Obligations**

The Licensee must sell 10,000 Products by 31 December 2001.

**Royalty percentages**

| Products Sold | Percentage of Price for Standard Chip | Percentage of Price for Derivative Chip |
|---|---|---|
| 1 - 100,000 | 5.0% | 5.0% |
| 100,001 - 400,000 | 4.0% | 4.0% |
| 400,001 - 1,000,000 | 3.0% | 3.0% |
| 1,000,001 - 3,000,000 | 2.0% | 1.0% |
| 3,000,001 and over | 1.0% | 0.5% |

Where:

'**Standard Chip**' means a chip developed by the Licensee based on the current design of a 16 point FFT with 9-bit internal arithmetic, differential QPSK modulator and demodulator and a rate 1/2 convolution code with constraint length of 5 and either with or without a PARROT MAC Processor.

and

'**Derivative Chip**' means a chip developed by the Licensee with parameters other than those contained in the Standard Chip.

FBdocs.cMadiata/techlic

12

CSIRO Confidential Information

,411 software and hard-copy documentation which is provided to the Licensee under this Agreement.

**Territory**

Anywhere in the world.

Signed on the 23 RD day of FEBRUARY        1998

EXECUTED BY THE PARTIES

Signed for and on behalf of                          )
COMMONWEALTH SCIENTIFIC AND                          )
INDUSTRIAL RESEARCH ORGANISATION                     )
                                                     )
                                                     )
                                                     )
By........................................           )
Dennis N Cooper   WARREN D KING                      )
ACTING Chief, CSIRO Telecommunications & Industrial Physics )
a duly authorised officer of CSIRO                   )
                                                     )
and in the presence of:                              )
                                                     )
Witness:...........................................  )
                                                     )
                                                     )
THE COMMON SEAL of RADIATA                           )
COMMUNICATIONS PTY LIMITED                           )
is affixed in accordance with its articles of        )
association in the presence of                       )

Secretary.................................     Director:...........................................

Name of Secretary (print) NEIL WESTE     Name of Director (print) DAVID SKEL LERN

Ff/docs .cb/radiata/techlic

ANNEXURE A

## TECHNOLOGY SUBLICENCE

**Dated:**          23rd day of February 1998.

BETWEEN these parties:

RADIATA      RADIATA COMMUNICATIONS PTY LIMITED ACN **080 704 696** of
             6 Nanette Place, Castle Hill NSW **2164**

SUBLICENSEE:
             of

1.     Background

1.1    Radiata has licenced the Technology from the Commonwealth Scientific and
       Industrial Research Organisation ('CSIRO') under an agreement dated
       .,......l...................... ('Licence Agreement').

1.2    Under the Licence Agreement, Radiata is required to obtain approval from
       CSIRO to grant subficences. CSIRO has approved the grant of this sublicence.

1.3    The Sublicensee wishes to obtain a sublicence of the Technology onthe terms
       of this Agreement.

2.     Meaning of Words

       'Application' is described in the Schedule.

       'Confidential Information' of a party ('Discloser'):
       (a)     means all information which a party claims is confidential to itself and
               identifies at the time of disclosure as confidential;
       (b)     includes:
               (i)     in the case of Radiata all confidential information specified in
                       the Schedule; and
               (ii)    all copies and notes of the Discloser's confidential information
                       generated by the 'Recipient';
       (c)     does not include information to the extent that information is:
               (i)     independently developed or known by the Recipient (including
                       because it is in the public domain); or
               (ii)    required to be disclosed or retained by law.

       'Intellectual **Property** Rights' or 'IPR' means all intellectual property rights,
       including:

(a)    patents, copyright, rights in circuit layouts, registered designs, trade marks, know how and any right to have confidential information kept confidential; and

(b)    any application or right to apply for registration of any of the rights referred to in (a).

'Minimum Performance Obligations' are described in the Schedule.

**'Price'** of a Product means the price payable by a purchaser for a Product Sold, being the price:

(a)    agreed between the Sublicensee (or any sub licensee) and the purchaser of that Product in good faith and at arms' length; or

(b)    if not agreed between the Sublicensee (or any sub licensee) and the purchaser of that Product at arms' length, the price that would have applied had the Sale been at arms' length.

**'Product'** means a component for incorporation in communications products manufactured or assembled by or with the authority of or any other product that incorporates, or otherwise exploits the Technology.

**'Revenue** means revenue from the Sale or licensing of the Technology including:

(a)    the Price of each Product Sold; and

(b)    revenue or other fees payable by any sub licensee; and

(c)    excluding reasonable freight, insurance and delivery costs and any applicable taxes or duties.

**'Royalty'** means those percentages set out in the Schedule of the Price of each Product (but excluding the Price of faulty Products which are returned to the place of manufacture)

'Sell' a Product means to transfer ownership or possession of that Product to a third person, including by sale, lease or license. **'Sold'** and **'Sale'** have corresponding meanings.

**'Technology'** is described in the Schedule and any Improvements.

**'Territory'** is described in the Schedule.

3.    **Grant of Licence:**

Radiata:

(a)    grants the Sublicensee for the Application in the Territory a perpetual non-exclusive licence to manufacture, market and sell Products

(b)    Provide the Technology to the Sublicensee promptly on signing this Agreement in the form of the Manufacturing Kit described in the Schedule.

4.      Commercialising **the** Technology

4.1     The Sublicensee must:

(a)     use its best efforts to exploit the Technology;

(b)     meet the Minimum Performance Obligations; and

(c)     obtain and maintain all government approvals and licences necessary to allow it to exploit the Technology and to manufacture, assemble and Sell Products

(d)     not reverse engineer the Product.

4.2     The Sublicensee must ensure that eaeh Product Sold:

(a)     is of merchantable quality;

(b)     is fit for the purpose for which it is acquired;

(c)     satisfies any conditions and warranties implied by the law of the country in which it is Sold; and

(d)     complies with all laws and standards regulating manufacture, assembly, labelling, packaging, storage and Sale in the country in which it is Sold.

5.      Sublicences

5.1     The Licensee may only grant sublicences if the SubLicensee first obtains Radiata's written consent to the sublicence.

5.2     The Sublicensee acknowledges that Radiata may grant its consent on such terms and conditions as it sees fit, including the condition that the relevant parties enter into an escrow agreement in a form reasonably required by Radiata.

6.      Payments

6.1     The Sublicensee must pay Radiata the Royalty.

6.2     Within 60 days after 30 June and 31 December of each year the Sublicensee must:

(a)     give to Radiata a statement:

(i)     specifying the Revenue received during the six month period just ended; and

(ii)    showing the calculation of the Royalty payable to Radiata for that six month period; and

(b)     pay Radiata the Royalty payable for that six month period as directed by Radiata from time to time.

6.3     The Sublicensee must pay Radiata:

(a)     any other amounts agreed between the parties from time to time in accordance with this Agreement; and

(b)     interest on all amounts due under this Agreement but unpaid, calculated at the rate 2 above the Australian Commonwealth Trading Bank Reference Rate from the due date until the date of payment

(c)     Royalties for products manufactured prior to termination and sold after termination.

7. Records **and** inspection

The Sublicensee must:

(a)   keep records in sufficient detail to enable the Royalty to be easily and accurately determined;

(b)   make those records available annually at Radiata's request to Radiata or an auditor appointed by Radiata; and

(c)   pay Radiata's costs of any audit that indicates the Sublicensee has underpaid Radiata by more than 5%.

8.   Intellectual **Property** Rights

8.1   **The** Sublicensee acknowledges that this Agreement dues not transfer to the Sublicensee any IPR in the Technology.

8.2   The Sublicensee must:

(a)   not take any action to challenge the validity of any IPR in Technology licensed under this Agreement;

(b)   advise Radiata immediately on becoming aware of:

(i)   any suspected or actual infringement by any person of IPR in the Technology; and

(ii)   any person claiming that the Technology infringes the rights of any person.

8.3   A party may not institute or defend proceedings unless it first confers as to what steps, if any, are to be taken about any infringement.

8.4   If one party decides to take proceedings:

(a)   it will be solely:

(i)   liable for all costs and damages; and

(ii)   entitled to all compensation; and

(b)   the other party will provide reasonable assistance at the expense of the party taking proceedings.

9.   **Improvements**

The Sublicensee:

(a)   must not make any improvements to the Technology; and if it breaches paragraph (a) must do all things necessary to assign IPR in those improvements. to Radiata.

10.    Confidential Information

10.1    Each party ('Recipient') must in relation to the Confidential information of the other party ('Discloser'):

(a)    keep it confidential;

(b)    use it only as permitted under this Agreement;

(c)    not disclose it to any person other than:

(i)    to those of the Recipient's employees:

(A)    who have a need to know (and only to the extent that each such employee has a need to know); and

(B)    who have first been directed and have undertaken orally or in writing to keep it confidential and to use it only as permitted under this Agreement ('Undertaking');

(ii)    to other people such as contractors, agents and visitors:

(A)    who have a need to know (and only to the extent that each such person has a need to know); and

(B)    who have agreed in writing to keep it confidential in accordance with this Agreement (also an 'Undertaking');

(d)    not to copy it or any part of it that is in material form other than as strictly necessary and must mark any such copy 'Confidential-(Discloser)';

(e)    promptly comply with any request by the Discloser to return or destroy any or all copies of Confidential Information.

10.2    The Recipient must:

(a)    implement security practices against unauthorised copying, use and disclosure (whether that disclosure is oral, in writing or in any other form);

(b)    enforce each Undertaking; and

(c)    immediately notify the Discloser if the Recipient becomes aware of any:

(i)    unauthorised copying, use or disclosure in any form; or

(ii)    disclosure required by law.

10.3    The burden of showing that any Confidential Information is not subject to the terms of this Agreement will rest on the Recipient.

11.    Use of Names and Publication

11.1    The Sublicensee must mark all Products "Manufactured under licence from Radiata under one or more of the following patents" and list all patents used.

11.2    Except as provided in clause 11.1 and to the extent required by law, a party may only use the other party's name, trade mark or logo, or make a public statement about this Agreement, if it has first obtained written consent from the other party. Unless otherwise agreed by the parties in writing, the Sublicensee must include the relevant patent numbers on any products manufactured which were developed using the Technology.

12. **Warranties and** Limitation of Liability

Radiata:

(a) does not warrant that the Technology does not infringe any third party's IPR but will advise the Sublicensee if it becomes aware of any infringement;

(b) excludes all terms, conditions and warranties implied by custom, the general law or statute except any implied condition or warranty the exclusion of which would contravene any statute or cause any part of this Agreement to be void;

(c) limits its liability to the Sublicensee for any claim (whether arising in contract, tort or by statute) for loss or damage suffered by the Sublicensee in relation to the Technology to the total Royalties paid by the Sublicensee during the **12** months immediately preceding that claim; and

(d) excludes all liability to the Sublicensee for consequential damage (including but not limited to, lost revenue or lost profit or loss of data) suffered by the Sublicensee in any way relating to the Sublicensee' exploitation of the Technology.

13. **Indemnity and Insurance**

13.1 The Sublicensee agrees that it exploits the Technology at its own risk. Accordingly, the Sublicensee indemnifies Radiata against all loss and damage (including costs on a full indemnity basis and whether incurred by or awarded against Radiata) that Radiata may sustain or incur arising in anyway out of the Sublicensee' exploitation of the Technology

13.2 The Sublicensee must ensure, and on request from Radiata from time to time give Radiata and CSIRO written confirmation, that:

(a) the Sublicensee has valid, enforceable, adequate and appropriate professional indemnity, product liability and public liability insurance policies against any liability referred to in this clause and **clause** 12;

(b) each of those policies notes Radiata's interests under the policy; and

(c) each of those policies requires the insurer to notify Radiata if the insurer becomes aware of anything which will cause a policy to be void or a policy is terminated.

13.3 The Sublicensee must:

(a) comply with the terms of its insurance policies; and

(b) within 30 days after request by Radiata provide evidence of the currency of the insurance policies referred to in this clause.

14. **Dispute Resolution**

14.1 A party must not start arbitration or court proceedings (except proceedings seeking interlocutory relief) about a dispute arising out of this Agreement (**'Dispute'**) unless it has complied with this clause.

14.2 A party claiming that a Dispute has arisen must notify the other party to the Dispute giving details of the Dispute (**'Notification'**).

14.3   On receipt of a Notification each party must negotiate in good faith to resolve the Dispute and, if necessary to resolve the Dispute, involve the Chief Executive Officers or other senior officers of the parties directly in those negotiations.

14.4   If the Dispute involves technical matters and has not been resolved by negotiations under the previous clause within a reasonable time, the parties will refer the Dispute for determination by an independent expert agreed by the parties in the technical field the subject of the Dispute.

14.5   If the Dispute is not resolved under **clause 14.3 or 14.4** within 30 days (or longer period agreed between the parties), the parties must refer the Dispute for mediation by the Australian Commercial Dispute Centre Limited (' **ACDC'**) for resolution in accordance with the Conciliation Rules of ACDC.

14.6   If the Dispute is not resolved under **clause 14.5** within 60 days after referral (or longer period agreed between the parties) either party may initiate proceedings in a court.

15.    **Termination**

15.1   **The** Agreement will continue until the first to occur of:
    (a)     termination of the Radiata's licence from CSIRO; and
    (b)     termination under **clause 15.2.**

15.2   Radiata may terminate this Agreement with immediate effect by giving notice to the Sublicensee if:
    (a)     the Sublicensee breaches any provision of this Agreement and fails to remedy the breach within 60 days after receiving notice requiring it to do so;
    (b)     the Sublicensee breaches a material provision of this Agreement (including but not limited to **clause 4** (Commercialising the Technology), **clause 5** (Sublicences) or **clause** 6 (Payments)) where that breach is not capable of remedy;
    (c)     the Sublicensee does not meet the Minimum Performance Obligations; or
    (d)     any event referred to in **clause 15.3** happens to the Licensee.

15.3   The Sublicensee must notify Radiata immediately if:
    (a)     there is any change in the direct or indirect beneficial ownership or control of the Sublicensee which would adversely affect its ability to comply with its obligations under this Agreement;
    (b)     it disposes of the whole or any part of its assets, operations or business other than in the ordinary course of business;
    (c)     it ceases to carry on business;
    (d)     it ceases to be able to pay its debts as they become due;
    (e)     any step is taken by a mortgagee to take possession or dispose of the whole or any part of its assets, operations or business;
    (f)     any step is taken to enter into any arrangement between the Sublicensee and its creditors; or
    (g)     any step is taken to appoint a receiver, a receiver and manager, a trustee in bankruptcy, a liquidator, a provisional liquidator, an

administrator or other like person of the whole or any part of its assets or business.

16.    **Consequences** of Termination

On termination of this Agreement:

(a)    the licence ceases and the Sublicensee must immediately:

I.  stop using the Technology
II. terminate all sublicences of the Technology;
III. return to Radiata all copies of all or any part of Radiata's Confidential Information in the Sublicensee's possession or control;
IV. pay all amounts payable to Radiata under this Agreement, and
V.  if requested by Radiata, confirm by letter signed by a Director of the Sublicensee that it has complied with all of its obligations under this clause 16;

(b)    the obligations of confidentiality in clause 10 (Confidential Information) (but not the rights to use, disclose and copy) continue;

(c)    **Clause** 7 (Records and Inspection) clause 11 (Use of names and Publication) **Clause** 12 (Warranties and Limitation of Liability) **Clause** 13 (Indemnity and Insurance),and **clause** 14 (Dispute Resolution) and clause 9(b) (Improvements) continue; and

(d)    accrued rights and remedies of either party are not affected.

17.    **Notices**

17.1    A party notifying or giving notice under this Agreement must give notice:

(a)    in writing;
(b)    addressed to the address of the recipient specified in this Agreement or as altered by notice given in accordance with this clause; and
(c)    left at or sent by prepaid post or by fax to that address.

17.2    A notice given in accordance with this clause is received:

(a)    if left at the recipient's address, on the date of delivery;
(b)    if sent by prepaid post, 5 days after the date of posting; and
(c)    if sent by fax, when the sender's facsimile system generates a message confirming successful transmission of the total number of pages of the notice.

18.    **General**

18.1    **Relationships:**

(a)    This Agreement does not create a relationship of employment, agency or partnership between the parties; and
(b)    The rights and obligations of each party under this Agreement are several, not joint or joint and several.

18.2    **Further Action:**  Each party must do or cause to be done all things necessary or desirable to give effect to, and refrain from doing things that would hinder performance of, this Agreement.

**18.3**    **Assignment:** A party must not assign or attempt to assign or otherwise transfer any right arising out of this Agreement without the written consent of the other parties (which must not be unreasonably withheld).

18.4    Severability: If all or part of any clause of this Agreement is illegal or unenforceable, it will be severed from this Agreement and will not affect the continued operation of the remaining provisions of this Agreement.

18.5    **Waiver:** The failure of a party at any time to insist on performance of any obligation of another party under this Agreement is not a waiver of its Fight:

(a)    to insist on performance of, or claim damages for breach of, that obligation unless that party acknowledges in writing that the failure is a waiver; and

(b)    at any other time to insist on performance of that or any other obligation of another party under this Agreement.

18.6    Costs: The Sublicensee must pay all stamp duty and its own legal costs associated with finalising this Agreement.

18.7    Entire Agreement: This Agreement:

(a)    records the entire agreement between the parties and supersedes all earlier agreements and representations by the parties about its subject matter; and

(b)    may only be altered in writing signed by both parties.

18.8    **Governing Law:** This Agreement is governed by the laws of New South Wales.

## SCHEDULE

**Technology**
Manufacturing Kit

DMT Chip

      Chip Layout Database in GDS2 or equivalent format (magnetic media)
      Suggested manufacturer and contact details
      Suggested package and manufacturer and contact details
      Pin-out diagram
      Chip data sheet
      Chip application notes (if applicable)
      Test Vectors (magnetic media)
      Test Specifications
      Load Board Details

**Application**

[to *be completed]*

**Minimum Performance Obligations**

[to *be completed]*

**Royalty percentages**

[to *be completed]*

**Radiata Confidential Information**

*[to be completed]*

**Territory**

[to *be completed]*

**Signed on the**                      **day of**                      1998.

EXECUTED BY **THE PARTIES**

THE COMMON SEAL of RADIATA
**COMMUNICATIONS PTY LIMITED is**
affixed in accordance with its articles of
association in the presence of

Secretary                                    Director

Name of secretary (print)              Name of director (print)

THE COMMON SEAL of
SUBLICENSEE PTY LIMITED is
affixed in accordance with its articles of
association in the presence of

Secretary                                    **Director**

**Name** of secretary (print)          Name of director (print)

Ff/docs/cm/radiata/techsublic

# EXHIBIT C



**C S I R O**

**Telecommunications & Industrial Physics**
ABN 41 687 119 230

1 February 2001

**Marsfield Site**
Cnr Vimiera & Pembroke Roads
Marsfield NSW 2122
PO Box 76
Epping NSW 1710 Australia
Telephone +61-2-9372 4222
Facsimile   +61-2-9372 4400

The Directors
Radiata Communications Pty Limited
Level 2, 3 Innovation Road
Macquarie University Research Park
North Ryde NSW 2113

**Lindfield Site**
Bradfield Road, West Lindfield
PO Box 218
Lindfield NSW 2070 Australia
Telephone +61-2-9413 7000
Facsimile   +61-2-9413 7631

The Directors
Cisco Systems, Inc.
170 West Tasman Drive
San Jose, California CA 95134 1706
United States of America

Dear Sirs,

We refer to:

A.      the Technology Licence Agreement between Commonwealth Scientific And Industrial
        Research Organisation (**CSIRO**) and Radiata Communications Pty Limited (**Radiata**) dated
        23 February 1998 (**Licence Agreement**); and

B.      the proposed merger and reorganisation of Radiata, Inc. (being Radiata's parent company)
        and a subsidiary of Cisco Systems Inc (**Cisco**), as a result of which Radiata will become a
        wholly-owned subsidiary of Cisco (**Ownership Change**).

We acknowledge and agree:

1.      **Ownership Change**

With respect to clause 16.3(a) of the Licence Agreement, on the basis of the representations that
have been made to CSIRO, the Ownership Change will not adversely affect the ability of Radiata
to comply with Radiata's obligations under the Licence Agreement.

2.    **Amendments to Licence Agreement**

CSIRO and Radiata agree to amend the Licence Agreement as set out in Attachment A, with effect on and from signature by Radiata of a copy of this letter duly executed for and on behalf of CSIRO.

3.    **Sublicence**

CSIRO consents to Radiata granting, in accordance with the amended terms of the Licence Agreement, a sublicence of the Technology and Improvements (as defined in the Licence Agreement) to any company within the Cisco Group of Companies (it being understood that this means any company in which Cisco has a controlling shareholding or other controlling interest), substantially in the form attached to this letter as Attachment B, and to the further sublicense by that Cisco Group Company to any other Cisco Group Company.

4.    **Novation of Licence Agreement**

CSIRO will, if requested by Radiata or Cisco during the term of the Licence Agreement, novate the Licence Agreement to Cisco Systems (Bermuda) Limited or a company within the Cisco Group of Companies (on one or more occasions) on terms substantially in the form attached to this letter as Attachment C. We acknowledge that the novation will not constitute an event under clause 16.3(b) entitling CSIRO to terminate the Licence Agreement under clause 16.2(d).

5.    Assignment of Agreement for Design Services

CSIRO consents to an assignment by Radiata to any Cisco Group Company of the Agreement for Design Services for a concept antenna between CSIRO and Radiata dated 5 June 2000 (Contract No.A1459).

6.    **No other amendments**

Except as set out in this letter and attachment A, the other terms and conditions of the Licence Agreement remain unchanged.

Please confirm your agreement with the above terms by signing and dating below. On execution please return an executed copy to CSIRO by return mail.

Yours sincerely,

for and on behalf of
Commonwealth Scientific And Industrial Research Organisation

Agreed and accepted by:

for and on behalf of
Radiata Communications Pty Ltd

**ATTACHMENT A**

**Amendments to Licence Agreement**

The Licence Agreement is amended as follows:

(a)     clause 2 is amended by:

(i)     adding the following definitions:

A.     "Cisco Group Company" means a company in the Cisco Group of Companies;

B.     "Cisco Group of Companies" means Cisco Systems (Bermuda) and any of its affiliates (such term being understood to mean any company in which Cisco Systems Inc has a controlling shareholding or other controlling interest);

C.     "Cisco Systems (Bermuda)" means Cisco Systems (Bermuda) Limited;

D.     "Use" means the sale (other than to a Cisco Group Company) of a communications product which incorporates the Product and is manufactured or assembled by or with the authority of a Cisco Group Company. "Used" shall have a corresponding meaning;

(ii)    by amending the definition of "Application" in the Schedule to read as follows:

To develop, manufacture, Use and/or Sell Products;

(iii)   by amending the definition of "Price" to read as follows:

"**Price**" of a Product means the price payable for a Product Sold or Used, being the price:

(a)     in the case of a Product Used by a Cisco Group Company, the fair market value for the Product as reasonably determined by the Licensee and the Cisco Group Company as if the Cisco Group Company had purchased the Product at arms length for incorporation into the communications product manufactured or assembled by or with the authority of the Cisco Group Company;

(b)  in the case of a Product Sold:

    (i)  the price agreed between the Licensee (or any sublicensee) and the purchaser of that Product in good faith and at arms length; or

    (ii)  if not agreed between the Licensee (or any sublicensee) and the purchaser of that Product at arms' length, the price that would have applied had the Sale been at arms' length;

(iv)  by amending the definition of "Product" to read as follows:

**"Product"** means a computer chip that exploits the Technology (including any derivative chips based on the Technology whether or not such chips incorporate any Improvements) intended for incorporation in communications products manufactured or assembled by or with the authority of the Licensee or a sublicensee;

(v)  by amending the definition of "Revenue" by adding the words "or Use" after the word "Sale" in line 1, and adding the words "or Used" after the word Sold in subparagraph (a);

(vi)  by amending the definition of "Sell" by adding the words "(whether separately or as a component part of another product)" before the words "to a third person" in line 1 and the words "(other than a Cisco Group Company)" after the words "third person" in line 2 .

(b)  clause 4.1(d) is amended by adding the word "Use" after the word "assemble" in line 2;

(c)  clause 4.2(c) is amended by adding the word "or Used" after the word "Sold in line 2;

(d)  clause 4.2(d) is amended by adding the word "or Used" at the end of the clause;

(e)  clause 5 is amended by adding:

(i)  a new clause 5.5 as follows:

Notwithstanding clauses 5.1-5.2, the Licensee may grant a sublicence consistent with the terms of this Agreement to a Cisco Group Company in the form attached to this Agreement as Annexure B. The Licensee must notify CSIRO of the identity of each such sublicensee and, on a periodic basis (but in any event at the same time it provides CSIRO with the statements referred to in clause 6.2(a)), the

total number of Products and communication products incorporating Products, which have been Sold by those Sublicensee to any person (other than a Cisco Group Company) and the unit price of applicable Product. ;

(ii)     a new clause 5.6 as follows:

Notwithstanding clause 5.3, if the Licensee grants a sublicence to a Cisco Group Company pursuant to clause 5.5 the Licensee may provide the Technology and any Improvements to that Cisco Group Company in a form that will allow the Cisco Group Company to redesign or make improvements to the Technology and those Improvements;

(iii)    a new clause 5.7 as follows:

Notwithstanding clause 5.4, a Cisco Group Company who has been granted a sublicence pursuant to clause 5.5 may grant a sublicence to another Cisco Group Company in the form attached to this Agreement as Annexure B. The Licensee must notify CSIRO of the identity of each such sublicensee of a Cisco Group Company and, on a periodic basis (but in any event at the same time it provides CSIRO with the statements referred to in clause 6.2(a)), the total number of Products and communication products incorporating Products, which have been sold by that sublicensee to any person (other than a Cisco Group Company) and the unit price of the applicable Product ;

(f)     clause 6.2 (b) will be amended to read:

pay CSIRO the Royalty applicable for that six month period and such payment is to be made in accordance with CSIRO's directions from time to time;

(g)     a new clause 6.4 is to be added as follows:

'6.4.1   Any consideration or payment obligation in this Agreement is exclusive of GST unless stated otherwise.

6.4.2   If a Supply made under or in connection with this deed is a Taxable Supply the consideration for the Supply is increased by an additional amount equal to the amount of that consideration multiplied by the relevant GST rate.

6.4.3    The additional amount under clause 6.4.2 is payable at the same time and in the same manner as the consideration for the Supply to which the additional amount relates.

6.4.4    A party who receives consideration for a Taxable Supply under or in connection with this deed must give the other party a Tax Invoice in a form which complies with the GST Law within 10 Business Days after the end of the month in which any consideration is paid, or an invoice issued, in relation to the Supply, whichever occurs first.

6.4.5    If a party is entitled under this deed to be reimbursed or indemnified by another party for an expense, claim, loss, liability or cost incurred in connection with this deed, the reimbursement or indemnity payment must not include any GST component of the expense, claim, loss, liability or cost for which an Input Tax Credit may be claimed.

6.4.6    If a party sets off an amount under this Agreement, the same principles apply to calculate the amount to be set-off, as if the amount had been paid in accordance with clause 6.4.5.

6.4.7    Fur the purposes of this clause:

(a)    "GST Law" has the same meaning as in A New Tax System (Goods and Services Tax) Act 1999; and

(b)    a term of expression starting with a capital letter which is defined in the GST Law but is not defined in this Agreement, has the same meaning as in the GST Law;

(h)    Clause 10.1(a) is amended by adding the words "or its Sublicensees or any sub-sublicensees of those Sublicensees" after the word "Licensee";

(i)    clause 10 is amended by adding a new clause 10.3 as follows:

Notwithstanding clause 10.2, if the Licensee grants a sublicence to a Cisco Group Company pursuant to clause 5.5, that Cisco Group Company will, subject to the terms of the sublicence, own the IPR in any improvements it makes to the Technology or any Improvements. The Licensee must ensure that those Cisco Group Companies which are granted a sub-licence pursuant to this clause 10.3 keep the Licensee informed of any improvements made to the Technology so that the Licensee is able to comply with its obligations under clause 10.1;

(j)     a new Annexure B will be added in the form attached to this letter as Attachment B.

**ATTACHMENT B**

**Technology Sublicence**

**ATTACHMENT C**

**Deed of Novation**

EXHIBIT D

FILE COPY

COPY

*ORIGINAL MAILED TO SUSAN FREEMAN 12/9/03*
*CC R. COLWELL 12/9/03*

*ORIGINAL TO T. SWEENAM 15/9/03*

## AMENDMENT TO TECHNOLOGY LICENSE AGREEMENT

THIS AMENDMENT TO THE TECHNOLOGY LICENSE AGREEMENT ("Amendment"), with an effective date of August 1, 2002 (the "Amendment Effective Date"), is entered into by and between CISCO SYSTEMS, INC., a California corporation with a principal place of business at 170 West Tasman Drive, San Jose, California 95134 ("Cisco"), and the COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION, a body corporate established under the "Science and Industry Research Act 1949" of Australia and having its principal office at Limestone Avenue, Campbell, ACT, Australia ("CSIRO").

### RECITALS

WHEREAS, CSIRO and Radiata Communications Pty. Ltd. ("Radiata") entered into a Technology License Agreement ("TLA") dated February 23, 1998, in which CSIRO granted to Radiata a nonexclusive license to commercialize and exploit certain technology belonging to CSIRO;

WHEREAS, Cisco acquired Radiata and became a party to the TLA, and CSIRO, Cisco and Radiata amended such Technology License Agreement pursuant to a letter agreement dated February 1, 2001;

WHEREAS, Cisco now wishes to extend certain sublicensees under the TLA to permit Marvell Technology Group, Ltd., and Marvell International Ltd., (collectively referred to as "Marvell") to make, to have manufactured, to use, and to sell to a limited number of companies, including Cisco, commercial products containing the technology licensed by Radiata and further enhanced by Cisco;

WHEREAS, CSIRO believes that such activities will also benefit CSIRO's joint venture partner Macquarie University of New South Wales, Australia;

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree to the following:

### AGREEMENT

1.    **DEFINITIONS.** The following terms, when used in this Amendment with initial capital letters, will have the meanings ascribed to them below. Other capitalized terms that are not defined elsewhere in this Amendment will have the same meanings as those ascribed to them in the TLA.

   1.1    **"Licensed Sales"** means sales by Marvell to Cisco, to Cisco Systems International B.V., Cirrus Logic, Inc., Sharp Corporation, and SkyPilot Networks, Inc.

   1.2    **"Licensed Product"** means the M11a integrated circuit, a Cisco developed enhancement of the DMT chip licensed to Radiata by CSIRO under the TLA.

2.    **SUBLICENSE.** Cisco and Marvell have entered into an agreement between themselves relating to Marvell's supervision of foundry manufacturing of the Licensed Product. CSIRO hereby grants to Cisco the right to sublicense Marvell under the TLA the right to manufacture and have manufactured the Licensed Product, but only for the Licensed Sales.

1

3.     AMENDMENT TO ANNEXURE A.  By the terms of the TLA, CSIRO and Radiata agreed upon a form of sublicense (Annexure A Technology Sublicense) to be used for sublicense grants by Radiata (or Cisco as Radiata's successor-in-interest).  CSIRO hereby agrees that Cisco may use its own form of agreement for the sublicense under the TLA by Cisco to Marvell subject to the following modifications of Annexure A which are hereby agreed upon between CSIRO and Cisco.  Cisco warrants that its agreement with Marvell contains no terms materially inconsistent with Annexure A to the TLA, as Annexure A is modified by this Amendment below.

    3.1     CSIRO and Cisco hereby agree to delete Section 4.2 of Annexure A to the TLA and replace it with the following:

        "4.2     No Liability for CSIRO.  Notwithstanding the foregoing, Cisco hereby agrees that CSIRO will have no liability under the Technology License Agreement solely because a Product (a) is not of merchantable quality; (b) is not fit for the purpose for which it is acquired; (c) does not satisfy any conditions or warranties implied by the law of the country in which the Product is Sold; or (d) does not comply with all laws and standards regulating the manufacture, assembly, labeling, packaging, storage, and Sale in the country in which the Product is Sold."

    3.2     CSIRO and Cisco hereby agree to modify the introductory sentence of Section 6.2 of the TLA and replace it with the following:

        "6.2     Within 60 days after 31 July and 31 January of each year the Licensee must:"

4.     GENERAL

    4.1     Other Terms and Conditions.  Except as expressly set forth in this Amendment, all terms and conditions of the TLA remain in full force and effect.

    4.2     No Other Sublicenses or Sales.  The rights granted herein are limited to the Licensed Products and the Licensed Sales.  Except for sublicenses related to the Licensed Products and the Licensed Sales, which shall be governed by this Amendment, all other grants of sublicenses by Cisco of the CSIRO technology shall be governed by the TLA.

    4.3     Entire Agreement.  The TLA and Annexure A thereto as amended by this Amendment, including the exhibits attached to both, represents the entire agreement between the parties and supersedes all prior agreements, representations, or communications by any party, whether oral or written, with respect to the matters contained herein.

    4.4     Governing Law.  This Amendment shall be governed by the laws of New South Wales.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Amendment as of the Amendment Effective Date.

"Cisco"                                "CSIRO"

CISCO SYSTEMS, INC.                    COMMONWEALTH SCIENTIFIC AND INDUSTRIAL
                                       RESEARCH ORGANISATION

_____                _____
By                                     By

_____                _____
Name        William Rossi              Name        DENIS REDFERN

_____                _____
Title       VP/GM                      Title       GM. BUSINESS DEV.

_____                _____
Date        8/29/03                    Date        9/12/03